1  DANIEL ROBERT BARTLEY, CA Bar No. 79586
   4040 Civic Center Drive, Suite 200
2  San Rafael, CA  94903-4184
   Telephone 415 898 4741  Fax 415 898 4841
3  Email DanielBartleyLaw@aol.com

4  SHARON GREEN, CA Bar No. 43392
   3004 Beach View Court
5  Las Vegas, NV  89117
   Telephone 702 596 1931  Fax 702 385 4593
6  Email vertlaw@aol.com

7  Attorneys for Derek Hoggett and Tavis Good, Relators

8

9                    UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA and          *   Case No. 2:10-CV-2478 MCE KJN
    STATE OF CALIFORNIA, *ex rel.* DEREK  *
13  HOGGETT and TAVIS GOOD,               *   **SECOND AMENDED COM-**
                                          *   **PLAINT FOR DAMAGES, WITH**
14                                        *   **DEMAND FOR JURY TRIAL**
                    Plaintiffs,           *
15                                        *   Causes of Action:
                                          *
16  vs.                                   *   1.  Knowingly Causes A False or Fraudulent
                                          *   Claim to Be Presented in Violation of the
17                                        *   False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
                                          *
18  UNIVERSITY OF PHOENIX, APOLLO         *   2.  Knowingly Makes, Uses, or Causes to Be
    GROUP, INC., and DOES 1 through 100,  *   Made or Used, a False Record or Statement
19  Inclusive,                            *   Material to a False or Fraudulent Claim, in
                                          *   Violation of 31 U.S.C. § 3729(a)(1)(B)
20                                        *
                    Defendants.           *   3.  Knowingly Causing A False Claim to Be
21                                        *   Presented in Violation of the California
                                          *   False Claims Act, Cal. Gov. C. §
22                                        *   12651(a)(1)
                                          *
23                                        *   4.  Submission of False Record to Obtain
                                          *   Payment of a False or Fraudulent Claim in
24                                        *   Violation of the California False Claims
                                          *   Act, Cal. Gov. C. § 12651 (a)(2)
25                                        *
                                          *
26                                        *
                                          *
27                                        *
                                          *
28  _____      *

1    Plaintiffs and Relators Derek Hoggett and Tavis Good allege as follows:

2    **Introduction.**

3    1.  (a) This is an action to recover damages and civil penalties on behalf of the United

4    States of America arising out of false claims approved and presented by Defendants to obtain

5    hundreds of millions of dollars annually from the United States Department of Education pursuant

6    to the Higher Education Act, Title IV ("HEA"), from at least December 12, 2009, continually

7    through the present.  (b) Defendant University of Phoenix ("UOP") is one of the largest recipients

8    of  HEA federal student financial aid funds from the United States Department of Education.  (c) In

9    requesting and receiving hundreds of millions of dollars annually, Defendants falsely represent

10   every year that they are in compliance with HEA's prohibition against using incentive payments for

11   recruiters for recruiting activities, which is a core prerequisite to eligibility for the Title IV funds.

12   (d) Defendants had, and continue to have, actual knowledge that they are not adhering to the HEA

13   incentive compensation ban, that their representations of adherence were and are false, and that

14   they therefore were and are submitting false or fraudulent representations of compliance with each

15   request for HEA or California student financial aid funds.  (e) Alternatively, Defendants act and

16   acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.

17   (f) Relators assert causes of action under the False Claims Act for submission of a knowingly false

18   or fraudulent claims for payment or approval, and knowingly false records or statements to get a

19   false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

20   (g) Relators further assert that UOP's noncompliance flows from corporate policies promulgated by

21   corporate headquarters; the illegal practices alleged herein are followed throughout all of the UOP

22   entities in the United States, including California.

23   **The False Claims.**

24   2.   This action seeks to recover damages and civil penalties, and obtain injunctive relief,

25   on behalf of the United States of America and the State of California,, arising out of false claims

26   approved and presented by Defendants, via express and implied certifications, regarding

27   compliance with the incentive compensation ban, from at least December 12, 2009, continually

28   through the present.

*United States of America ex rel. Hoggett et al. v. University of Phoenix et al.*                    -2-

3.   Over the ten-year period immediately preceding the filing of this Complaint, Defendants, incident to requesting and receiving hundreds of millions of dollars in federal and state funding annually, falsely certified to the United States of America and the State of California, every year, that they are in compliance with federal provisions requiring compliance with the incentive compensation ban.

4. (a) Defendants had, and continue to have, actual knowledge that they are not adhering to these certifications, that their certifications of adherence were, and continue to be, false and fraudulent certifications of compliance.  (b) Such knowledge is evidenced by UOP's settlement agreement entered effective December 11, 2009, in the case entitled Hendow v. UOP, Civil Action no. CIV.S-03-0457 filed in the Eastern District of California and the Department of Education ("ED")  Program Review Report dated January 5, 2004 relating to the UOP site visit by ED in August 2003.

**Jurisdiction and Venue.**

5.   This is a federal action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq., and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331.  This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the United States of Department of Education.

6.   This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.  31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred.

7.   Venue is proper in the Eastern District of California because Defendants maintain and operate at lease 35 locations within the State of California, more than any other state, and they operate a campus in Sacramento, within this District.

**Plaintiffs/Relators.**

8. (a) *Qui Tam* Plaintiff and Relator Derek Hoggett is a resident alien of the United States of America and is a resident of the state of Texas.  (b) Mr. Hoggett brings this action on behalf of

1   the United States of America.  (c) Mr. Hoggett  is a former employee of UOP where he was

2   employed as an Enrolment counselor serving from March 16, 2007,  through May 5, 2010.

3       9. (a) *Qui Tam* Plaintiff and Relator Tavis Good is a citizen of the United States of

4   America and is a resident of the State of Texas.  (b) Mr. Good brings this action on behalf of the

5   United States of America and the State of California.  (c) Mr. Good is a former employee of UOP

6   serving from November 2008,  through August 18, 2010.

7       10.   Relators, as required by law, contemporaneous to the filing of this Complaint,

8   provided to the United States Attorney for the Eastern District of California, to the United States

9   Attorney General, and to the Attorney General ("AG") of the State of California, a copy of this

10  Complaint and Disclosure Statement presenting material evidence and information related to this

11  Complaint.

12      11.   The United States of America and the State of California are herein named plaintiffs

13  because funds of the United States of America ("Federal funds") and funds of the State of

14  California ("State funds") were, and are, awarded to Defendants as a result of false claims alleged

15  in this complaint.

16  **Defendants UOP and The Apollo Group.**

17      12.  (a) Defendant UOP is the largest provider of private for-profit post-secondary

18  education in North America, based on student enrollment and revenue, with nearly 200 locations in

19  the U.S. and advertises that it has locations within 10 miles of 87 million Americans.  (b) Head-

20  quartered in Phoenix, Arizona, UOP is a wholly owned subsidiary of Defendant The Apollo

21  Group.  (c) UOP has enrolled over 465,000 students.  (d) UOP anticipated revenue of $4.92 billion

22  for 2010.

23      13.  (a) UOP offers programs in Business, Technology, Education, Counseling and

24  Nursing.  (b) UOP offers associate, undergraduate, graduate, and postgraduate degrees, and it has a

25  large online school.

26  **Financial and Operational Statistics.**

27      14.  (a) Financial aid at UOP includes the Federal and State of California loan and grant

28  programs to students, plus tuition assistance from all branches of the military for active duty

military personnel, plus tuition assistance from the Veterans Administration.  (b) More than 90%
of students at UOP are attending UOP pursuant to some form of government tuition payment.

**Doe Defendants.**

15.   Relative to all counts, Relators sue fictitious Defendants Does 1 through 100,
inclusive, because their names, and/or capacities, and/or facts showing them liable are not known
presently.  Relators are unaware of the true names and capacities of the Defendants sued as Does 1
through 100.  They will amend their complaint when the true names and capacities have been
ascertained.  Each Doe Defendant is responsible in some actionable manner for the events,
occurrences, injuries and damages alleged herein.

**General Allegations Regarding Defendants.**

16.   (a) The terms "Defendants" will refer collectively to UOP and Apollo Group acting
by and through their managerial employees, and each of them.  (b) The term "UOP" will
collectively refer to the entirety of UOP, embracing all of its groups, including the online
programs.

17.   Managerial employees of the Defendants, in doing the acts and things described in
this complaint, were acting within the course and scope of their respective agencies and/or
employment with the Defendants, and each of them, with the knowledge and consent of the
Defendants, and each of them, unless otherwise indicated.

18.   At all relevant times each Defendant was the authorized agent of each other
Defendant.

**The Particular False Claims.**

19.   (a) A higher education institution that wants to receive monies or payment made to it
under the Title IV of the Higher Education Act ("HEA") makes certain certifications to the United
States Department of Education ("ED") in a document titled the Program Participation Agreement
(PPA), executed every few years.  (b) The PPA bans the institution from paying recruiters any
commission, bonus, or other incentive payment  based directly or indirectly on the success of
securing enrollments or financial aid to any  persons or entities engaged in any student recruiting
or admissions activities or in making decisions regarding the award of student financial assistance.

20 U.S.C. § 1094(a)(20).

20.  For participation in the Cal Grant program and the Chaffee grant program, the State of  California utilizes an Institutional Participation Agreement ("IPA") as a counterpart to, and functional equivalent of, the federal PPA.

21.  (a) UOP is in knowing violation of the HEA incentive compensation prohibition, and continually has been so for at least since December 12, 2009.  (b) Relators allege that UOP falsely certifies it is in compliance with the PPAs' and IPAs' requirements by promising that UOP will comply with key components of the PPAs' requirements in addition to the incentive compensation ban.

22.  (a) In addition, UOP every year falsely asserts compliance with the incentive compensation ban in "management assertion letters" written by UOP management for an annual compliance audit.  (b) UOP must submit to the United States Government this annual compliance audit performed by an independent certified public accountant.  (c) Participation in the Title IV program is conditioned upon UOP submitting these audits certifying compliance with the HEA incentive compensation ban.  (d) UOP is ineligible to submit any claims for HEA funds unless it submits this annual audit.  (e) As a required part of the audit, UOP certifies in a management assertion letter that it had "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . for each year at issue."  (f) UOP knows this certification is false, because UOP intentionally violates the incentive compensation ban.  (g) Regardless of the terminology used in the matrix and the other publications, the *practices* of UOP violate the safe harbor provision.  (h) UOP made false statements in their certification of compliance with the incentive compensation ban because they knew, at the time UOP entered into the program participation agreement, and when UOP executives signed annual management assertion letters affirming UOP's compliance with the PPA, that its enrollment counselors (recruiters) were paid solely on the basis of the number of students enrolled; or those signing the statements of compliance  acted with deliberate indifference and reckless disregard of the truth or falsity of their statements of compliance.  (i) UOP's compensation scheme for enrollment counselors did not come within the safe harbor provisions promulgated by

Department of Education because the recruiters were solely paid commissions, bonuses and other incentive payments based on the number of students enrolled.  (j) Any UOP agent who believed that its written compensation policies were within the safe harbor provisions acted with deliberate indifference and reckless disregard of the truth or falsity of any statements of compliance because in practice the compensation scheme was based on recruitment numbers alone.

23.  Additionally, to increase enrolment, UOP falsifies information such as career information, services offered by the college, financial aid practices, placement and graduation statistics, and therefore makes substantial misrepresentations to potential students, all in violation of 16 C.F.R. § 254.

24.  (a) UOP knowingly violates the PPA and the IPA (the State of California  counter-part), because UOP managers hide their methods of rewarding recruiters with financial compensa-tion through a web of lies in their policies and procedures.  (b) As a direct  result, high-pressure sales methods are employed to recruit students into programs regardless of their fitness, aptitude or motivation, and students are misled with falsified information and promises about programs.  (c) These students who are deceived into enrolling find little or no benefit upon graduating from the programs.  (d) As a result, such students are unable to re-pay student loans.

25.  (a) Deception and lies are commonplace in the business of UOP.  (b) UOP is an institution which promotes individuals who carry out unethical business practices, and provides a safe haven career-wise to those who keep quiet and feign ignorance of the facts about ongoing violations.  (b) The organization's motivation is purely greed, and the intention of obtaining profit.  (c) The paramount objectives are to increase revenue and do the bare minimum to maintain accreditation credentials.  (d) Students are being misled into shouldering the risk of large amounts of student loans to participate in programs that will have little to no career benefit to them upon their completion.  (e) Because of the numbers and results-driven mentality in the UOP corporate organization, employees are forced to exaggerate or contrive the numbers and deceive  everyone – from potential students about its own graduation rates and job placement statistics, and to report false data to use as effective tools to solidify the decision of the potential students who believe they will obtain desirable good paying jobs to pay back the tuition loans.

26.  (a) UOP has created an elaborate recruiting scheme that uses incredible pressure on its recruiters who are not successfully meeting enrollment budgets (quotas) or targets.  (b) UOP pressures such recruiters to enroll unqualified students and to make their numbers in order to earn bonuses and raises in salary.  (c) UOP creates fake or imaginary qualitative criteria in the Apollo Performance Matrix, while the sole criterion for recruiters that truly counts is the number of students enrolled.   (d) To avoid detection by ED, the UOP organization, from corporate headquarters on down the line, uses a series of deceptive methods to hide the fact they are paying recruiters based solely on the number of students enrolled.  (e) High-enrolling recruiters who are rewarded and promoted would rather take the money and keep quiet or ignorant to the fact of the illegal activities, while those who are not making their enrollment quotas are compelled to improve their enrollment performance by any means possible.

26.1 (a) UOP could not reasonably believe, and did not believe that the compensation program was within the Department of Education Safe Harbor provisions, as evidenced by the following:  (b) UOP knew that its conduct was outside any safe harbor because the sole factor UOP used in setting enrollment counselors' compensation was the number of students enrolled.  c)  The salary of every counselor Relator Hoggett knew was based solely on the number of students enrolled.  (d) On January 21, 2010, Tom Noble requested that Relator Hoggett meet with him immediately to go over his six-month performance review.  (e) At that review Noble promised Hoggett a salary increase provided two of his students "stuck", meaning they made it past their first class and therefore counted.  (f) No enrollment counselor who did not meet his student enrollment targets received a raise during the entire p eriod of Relator's employment.  (g) Raises were given on the matrix categories, which depended solely on how many students were enrolled in the six-month period.  (h) In a team meeting in Austin on April 23, 2010, Enrollment Manager Tom Noble told enrollment counselors three times that he knew of no plans to change the UOP compensation matrix.  (i) UOP never ever verbally or in writing told enrollment counselors they could get a salary increase in any way without meeting student enrollments.  (j) University of Phoenix typically heightens the pressure on enrollment counselors to enroll students before their performance review period ends.  (k) They do this in mock reviews in which they tell counselors how many students

they must enroll in order to earn salary increases.  (l) Counselors often resort to pressuring and bullying students into starting in order to try to make their numbers to earn a salary raise.  (m) In 2010, Enrollment Counselor Lisa Pratt told Hoggett and other counselors that she was applying increased pressure on her students in order to meet the enrollment target set by Enrollment Manager Tom Noble to earn a salary increase at her upcoming review and keep her tuition reimbursement, a perk that was given only to enrollment counselors who met their target enrollment numbers.  (n) Enrollment Counselor Jose Medrano told Hoggett, in July 2010, that enrollment counselors were compensated by the number of students they enrolled and that performance is based solely on enrollments.  (o) Enrollment Director Courtney Fellenz told Mr. Medrano on numerous occasions that if he enrolled a certain number of students he could expect salary increases.  (p) Enrollment Counselor Evan Williams told Relators Hoggett and Good that enrollment counselors were compensated by the number of students they enrolled and that performance is based solely on enrollments and that he got a pay increase based on his number of enrollments.  (q) Corporate Liaison Counselor Wendy Farrar told Relator Hoggett that salary increases were only about student enrollment numbers and that UOP fired or forced out enrollment counselors who did not meet student enrollment targets.  (r) Student Support Specialist Adriana Cavitt told Relator Hoggett that salary increases were only about student enrollment numbers.  (s) Enrollment Counselor Cynthia Rios told Hoggett that salary increases were only about student enrollment numbers and that she was promised salary increases for enrolling students.

27.  (a) UOP, since the time the institution has been eligible to receive funds from ED, has falsely certified each year that it is in compliance with regulations such as the incentive compensation ban, while intentionally and knowingly violating such regulations in order to receive the Title IV and Higher Education Act funds.  (b) The subject fraud is blatant and systemic, and is a direct result of the institution's business plan.  (c) This conduct was not deterred or altered by the *Hendow* settlement.  (d) UOP has continued to violate the incentive compensation ban from December 12, 2009, to the present.  (e) To hide UOP's conduct, in early August 2010, UOP Compliance Manager Ryan Stanley and others in UOP management publicly ordered all enrollment counselors at the South Austin

UOP campus to print, and then destroy, any files or documents on their desktop computers that related to training, and sales scripts.  (f) Management then confiscated all of the printed documents.  (g) Recruiters were not told to stop using these scripts, they were just not to keep any evidence of them.  (h) The failed tactics used by UOP recruiters trying to make their numbers were not changed.

27.1 (i) UOP attempts to disguise its violation of the incentive compensation ban by utilizing the "matrix".  (j) However its attempts to circumvent the intent of the compensation ban by these methods did not fool the enrollment counselors who were well aware that their compensation was at all times, based exclusively on the number of students enrolled.  (k) The following conduct of UOP agents informed the recruiters that their compensation was directly based on the number of students they enrolled, and that no other criteria was relevant:  (l) Relator Hoggett's salary was increased once, decreased twice solely on the number of students he enrolled.  (m) At every six-month performance review, Relator Hoggett was shown a document showing the percentage salary increase enrolment counselors would earn based on the number of students they enrolled.  (n) Never did Enrollment Manager Tom Noble or any other manager in Austin ever tell enrollment counselors they could get a salary increase for any performance metric other than the number of student enrollments.  (o) Noble and Director of Enrollment Ryan Hampton told Hoggett and others that the compensation policy was determined by corporate headquarters in Phoenix, AZ, and there was nothing Austin could do about it. (p) Phoenix Ombudsman Mike Grill in 2010 corrected an earlier statement to Hoggett, and reiterated that salary increases were determined only by the student enrollment bracket (determined by the number of students enrolled) that  the counselor achieved.

**A.  After the *Hendow* settlement, nothing changed – Enrollment Counselors at UOP were still retained, paid, and promoted based solely on the number of student enrollments.**

28.   (a) The *Hendow* settlement did not deter UOP, in continuing  flagrant violation of the Title IV ban, UOP continued to compensate, promote or terminate enrollment counselors, including Relators, based solely and directly upon the number of students enrolled; (b) UOP continued using a chart it called a  matrix, setting forth the enrollment activity numbers necessary for each performance rating (such as "exceeds expectations" or "meets expectations").  (c) Along with the matrix charts, UOP continued to publish corresponding  salary schedules in separate documents, showing a salary range aligned with each performance rating.  (d) An enrollment counselor thus knows his or her salary range, based on their enrollment activities level.  (e) UOP also continued to "stack rank" counselors based upon their number of enrollments.  (f) The top ranking counselors are among the highest paid counselors, receiving the highest salary as well as chances for promotion,; those at the bottom of the list risk termination. (g) Austin Associate Campus Director Michael Cullup told Relator Hoggett at year end 2009 that "our goal has always been just to get them in the door" and "we are not going to change what has worked for us" despite the lawsuit.  (h) In a team meeting on April 23, 2010, Enrollment Manager Tom Noble told those present, including Relator Hoggett, that he did not know of any plans to change the performance matrix.

29.   (a) To boost UOP's enrollment numbers, UOP Corporate Enrollment management urges enrollment counselors to enroll students regardless of whether they have the academic qualifications to attend university.  (b) This process leads to student disqualification from UOP (or additional financial costs for the students to take additional classes, such as those incurred by MW[1] who took and paid for two classes because the Academic Counselor missed 6 credits MW should have been credited in his transfer) and financial disaster for the students forced to repay the federal loans from which UOP collects the federal funds for these fraudulently "enrolled" students.

30.   (a) As a result of the *Hendow* settlement and the preceding Department of Education audit report on UOP, and the underlying litigation, UOP is fully aware of the illegality of its

---

[1]Relators will provide the full names of students and employees identified by their initials after an appropriate protective order has been entered so as not to compromise student privacy and to prevent retaliation against current employees.

compensation scheme.  (b) UOP senior management has openly acknowledged to Relators that nothing has or will change, during a staff meeting on April 28, 2010, Corporate Liaison Manager, Matt Kappel, reminded counselors to "get those REGS in." (REGs refers to registrations, REG is code for enrollments.)  (c) In July, 2010, Relator Good attended a mandatory all staff meeting – all staff meetings are devoted to discussing meeting budget targets - "budget" is UOP code for the student enrollment quota each enrollment counselor is assigned.  (d) Charts are shown at all staff meetings which display the names of those who recruited the most students, and quarterly awards were given out to the top producers. (e) The July 2010, meeting was used to announce proposed changes to improve morale following much negative press about for-profit colleges.  (f) The Director of Enrollment, Julie Burt, spoke about plans for a "new enrollment culture" which would focus on student experience rather than student enrollment.  (g) Relator Good, and everyone sitting near him, was very excited to hear this. (h) Then Regional Vice President Chris Helmueller stunned everyone into silence when he got up and said that while the proposed new culture was all well and good, "we are here to enroll students."  (i) Evan Williams, another enrollment counselor, and Relator Good left the meeting and agreed that the "new culture" was another bogus public relations ploy.  (j)  The only fact that mattered, and it will always "only be about the student enrollment numbers."

31.  (a)  UOP continues to disguise its illegal compensation scheme in many ways.  (b) UOP titles its documents to mask its illegal compensation scheme.  (c) For example, UOP calls its weekly reports to enrollment counselors verifying the number of each counselor's  student enrollments "Start Reports" - a "start" is an enrolled student -- a student who has agreed to a payment plan and is attending classes (two nights attended for an undergraduate; or completion of the first three-week course for a graduate student) – each start is one student enrolled.  (d) UOP still creates "stack rankings" from these reports, the counselor with the most starts is at the top of the list.  (e) After the *Hendow* settlement, UOP continued its compensation scheme and simply renamed the reports to disguise that salary increases were based solely on enrollments.  (f) UOP informs its enrollment counselors how many students they must enroll each month if they want to keep their jobs by providing each counselor with a "start budget" which is really an enrollment

quota.  (g) An excerpt from Relator Hoggett's last start budget, given to him the week before he was terminated in 2010, is attached as Exhibit 1[2]; he is number 15 on the list, the bottom entry on the portion printed.  It is clear from this exhibit that no change occurred after the *Hendow* settlement December 12, 2009.  (h) Relator Hoggett still received a "budget" telling him how many students he had to enroll.

32.  (a) Further indication that enrollment numbers are the sole criteria for the decision on pay and promotions are the last two performance reviews given to Relator Hoggett before he was terminated.  (b) The reviews are attached as Exhibit 2.  c)  He was not criticized for anything during the reviews except his enrollment activities and his enrollment numbers. (d) The performance reviews clearly state that he was expected to enroll 7 students each month and he only enrolled four and two.  (e) In the written review , Enrollment Manager, Tom Noble, notes that he is disturbed that Relator Hoggett thinks enrollment targets are immoral.  (f) the reviewer goes on to say "These targets have been part of our performance expectations as enrollment representatives for the duration of our tenure as agents of the University and are necessary in order to maintain our staff headcount in enrollment, etc." (g) In other words, if you want to keep your job you better enroll more students.

33.  (a) After the *Hendow* settlement UOP continued to utilize its glossary of "code words" such as "starts" and "budget" used in documents to further disguise that compensation at UOP is based solely on student enrollments.  (b) During Relators' tenure at UOP no counselor at the bottom of the stack rankings was ever given a raise or promoted - many were terminated..

### B.  Counselors' Enrollment Numbers Determine Their
### Salary, Advancement, and Retention.

34.  (a) It is still the case that UOP enrollment counselor compensation, including salary, is based upon the number of students enrolled.  (b) The UOP Corporate Enrollment Department in Phoenix AZ, still determines enrollment counselors' salary using the "matrix" published by that Department.

---

[2]All exhibits are hereby incorporated by reference into this Complaint as though fully set forth in the text.

35. (a) In the matrix, UOP rates a counselor's performance based upon enrollments and enrollment recruitment activities (telephone calls soliciting students, appointments soliciting students to UOP, leads, enrollments) under the following performance ratings: "always exceeds expectations," "often exceeds expectations," "meets expectations," "requires improvement," and "unsatisfactory", but, in practice, if the enrollments do not meet one's budget or quota all of the enrollment activities referred to are ignored. (b) The matrix sets forth the minimum enrollment numbers necessary for each performance rating and salary level. See Exhibit 3, Hoggett's matrix.

36. (a) Until recently, the matrix listed the salary level corresponding to the quantitative enrollment activity level and performance rating. (b) UOP removed the salary levels from the matrix, setting forth the salary for the matrix enrollment numbers in a separate documentation to make the incentive compensation violations appear less obvious.

37. (a) The compensation scheme for enrollment counselors is developed, implemented and directed by UOP Corporate Enrollment in Phoenix. (b) UOP Corporate Enrollment tracks and verifies the number of students enrolled (called "starts") for all enrollment counselors. (c) Based on these numbers, Corporate Enrollment publishes monthly reports and "stack rankings" listing admissions counselors based upon their "starts."

38. (a) UOP meticulously tracks each counselor's enrollment activities on a daily, weekly, monthly, quarterly and annual basis. (b) On a daily basis, UOP posts and submits to each counselor all of his or her enrollment numbers. (c) Counselors are divided into Enrollment Teams, which meet daily to review each counselor's enrollment activities for the previous day and their goals for that day. (d) UOP posts each team's student enrollment numbers on whiteboards daily, which serves to embarrass low performers and encourages their team members to harass them. (e) The team performance whiteboards were prominently displayed showing the number of student enrollments and applications made by each counselor, updated during the workday. (f) This practice continued at least through the end of July 2010.

39. (a) Relator Good was terminated solely because his enrollment numbers were low. (b) Relator good met all the criteria in the performance matrix with one exception, the number of student enrollments. (c) In September 2010, a month after Relator Good was terminated, his

former co worker and Enrollment Counselor Shawna Cunningham told him that Enrollment Manager Autumn Radtke stated UOP had no other option but to fire Good when they did because they might not have another chance to fire him solely on lack of enrollments if new performance criteria were adopted.

40.  (a) On August 10, 2010, the day Relator Good was terminated,  Associate Director of Enrollment, Courtney Fellenz told Relator Good that she had to let him go because of his enrollment performance.  (b) Mr. Good was shocked because only two days before he had been assured by Enrollment Counselor Michelle Westbook that he would be OK under the proposed culture change because he "did everything right."  (c) He was well liked and had excellent rapport with the students he enrolled.

41.  (a) The previous April, 2010,  Relator Good was scheduled for a "mock review" but when he went to the meeting Enrollment Manager Autumn Radtke said they were going to "hold off on the mock review" and handed Good a Written Warning.(Exhibit 4).   (b) The only area where Good needed improvement set forth in the Written Warning was student enrollments.  (c) There was no discussion about anything other than enrollments.  (d) In all other categories of the phoney performance criteria his performance was average or above (items such as 100 calls a day). (e) There was never any discussion with Relator Good about any area of his performance except the number of student enrollments.

42.  (a) One of Relator Good's co-workers was Elvira Johns, who in early 2010 had transferred from UOP San Diego, California.  (b) In a discussion with Mr. Good and Evan Williams, Ms. Johns said the pressure to enroll students was worse in San Diego, where she had an enrollment budget to enroll a minimum of 10 students a month as a Senior Enrollment Counselor. (c) She took a demotion to Enrollment Counselor because she realized she could make more money by exceeding the lower monthly student minimum in that position than she could make by enrolling the same number of students to meet the minimum required of a Senior Counselor.

43.  (a) In May or June, 2010, Shawna Cunningham spoke to Relator Good and Michelle Westwood when she came out of a one-on-one review with Enrollment Manager Autumn Radtke. (b) Cunningham was visibly anxious and said that she was told she needed to enroll 10 to 12 more

students before the end of her six month review period in order to get a salary raise.  (c) Enrollment Counselors all knew that pay raises were made only on the basis of enrolling a sufficient number of students. (d) Senior Enrollment Counselor AH was demoted in 2010, and suffered a decrease in salary because AH did not make AH's enrollment budget of 10 students per month.

44.  (a) After *Hendow* UOP continued to place Enrollment Counselors failing to reach acceptable enrollment activity levels on a "performance plan or action plan" setting forth minimum enrollment activity goals.   (b) Enrollment Counselors who do not meet their budget quotas, including Relator Hoggett,  are told they must come up with a written "action plan" to "improve" their performance before they are allowed to return to work.  (c) Unsuccessful completion of a "performance plan" leads to termination of the counselor's employment.

45.  (a) At the weekly enrollment department meetings and monthly campus meetings Managers announce and praise the counselors who have the top enrollment numbers.  (b) UOP raises the pressure on enrollment counselors before their performance review period ends so Counselors often resort to pressuring and bullying students into starting in order to try to meet the numbers required to keep their job.

46.  (a) UOP uses, and recently reintroduced, psychological sales coaching to train counselors to help manipulate vulnerable people into enrolling whether they are qualified or motivated to attend college or not.  (b) Examples of their manipulative sales techniques are set forth in the AMMIAPIN script attached as Exhibit 5.  (c) When Relator Hoggett complained about the impropriety of using psychological manipulation to shame potential students into enrolling at UOP, Campus Director Michael Cullup responded that "changing the entire system is not going to happen until it comes from higher than me or your or Ryan or pretty much anyone at this campus."

47.  (a) Only those counselors classified as "meets expectations" meaning those who meet enrollment targets, are eligible to apply for promotions, the posted job qualifications state that a candidate "must be at meets expectations or better."  (b) They are also the only ones who are chosen for the leadership development programs.  (c) UOP favors those counselors willing to pressure students into starting, while retaliating and discriminating against those who refuse.  (d) Such favoritism takes the form of directing hot leads only to compliant Enrollment Counselors, and

providing them with enrollments from other sources, including departing counselors.  (e) Relator Hoggett made numerous complaints to UOP human resources departments at the Austin Campus and at Corporate Headquarters in Phoenix about management's refusal to interview him for promotions, which included salary increases, their failure to let him attend leadership courses and their refusal to fairly distribute leads, all because his enrollment numbers were low.  (f)  No other criteria were used.  (g) Relator Hoggett was better educated,  more widely experienced and far better qualified as a management candidate than those with high enrollments who were chosen – all without even interviewing Hoggett.  (h) At his performance review on February 24, 2010, Hoggett was told he needed to "identify successful students" euphemism for get more student enrollments, as such would **greatly** contribute to your success . . . to meets expectations." (I) On March 10, 2010, Hoggett's performance review said he was "capable of identifying and preparing 2 students for success each week" which meant he was expected to enroll 2 students per week.  (j) On March 26, 2010, Hoggett's performance review said that his enrollment targets, set by management, had "been set forth as our minimum expectations."

### C. Misrepresentations to Students to Get Enrollments.

48.  (a)  In mid-March, 2010, Sara Wingfield, Corporate Liaison Lead, at the Austin Campus instructed Relator Hoggett to tell potential RN students (who were her referrals) that their RN designation automatically transferred in 30 extra credits to the University of Phoenix nursing degree programs.  (b) Enrollment Manager Tom Noble admitted to Hoggett  in a one-on-one meeting on March 16, 2010, that this representation was false.  (c) Hoggett emailed Mr. Noble on March 17, 2010, confirming that Hoggett knew it was not true.

49.  (a) UOP advertised that well-paid jobs could be had as a result of getting a degree from University of Phoenix. (b) Enrollment Counselors received and worked leads which came directly from this advertising.  (c) The University held regular meetings for alumni and held career fairs. (d) Counselors regularly attended job fairs at employers.  (e) In a two-day education counselor training course in 2010 in Austin conducted by trainers from corporate headquarters in Phoenix, Arizona, Hoggett and other counselors were told that teachers who had UOP education degrees were rarely laid off when many other teachers were. (f) Relators are informed and believe

that the representations set forth in (a) and (e) above are false.

50.  (a) Throughout their tenure, Relators and other counselors were told by management that students could get financial aid by using the University's Professional Judgment, and that UOP was licensed by the government to approve Pell Grants subject to audit only.  (b) Relator Hoggett's  students 'CN' 'SG' were promised by UOP  that they would get Pell grants but **after they enrolled** they were refused such grants.

51.  (a)  UOP trained Relators  and other enrollment counselors to tell students that they would be able to use the new job opportunities website section to find jobs posted by UOP alumni. (b)  UOP represented that UOP had such a large body of alumnus that UOP offered a major advantage over other universities for graduates seeking  jobs. c) The foregoing representations are false.

52.  (a) Enrollment counselors were never told UOP's true graduation rates.  (b) Due to this lack of information, Counselors were not able to provide true information to prospective students; in response to inquiries Enrollment Counselors were forced to fabricate answers in order to sell a student an enrollment.

53.  (a) Relator Hoggett overheard Counselor JB tell a student that getting a UOP degree guarantees a job paying over $100,000 a year.  (b) Hoggett complained about this misrepre-sentation to Enrollment Manager Erick Estrada, who ignored his complaint.  (c) Administrative employee AW complained to Relator Hoggett in mid 2010,  that she overheard enrollment counselors tell serious lies to students, telling them that Austin Community College (ACC) cost more than UOP, and that ACC credits won't transfer – neither statement is true.  (c) One counselor misled a student who wanted to work with airplanes and was induced to signing up for an IT class.

54.  (a) Relator Hoggett saw one marketing email sent out by UOP corporate headquarters in Phoenix that said "Standardized tests have shown that our undergraduate students improve their reading, writing, and mathematical skills at a greater rate than students at other colleges surveyed." (b) Such misleading claims are used to induce students who are unqualified for college work to enroll and take out student loans, which are paid directly to UOP.  (c) When the student drops out \\\

*United States of America ex rel. Hoggett et al. v. University of Phoenix et al.*                    -18-

1   the student still must repay the student loan, UOP keeps all the money.  (d) Such students do not

2   benefit from their experience at UOP and they default on their loans.

3        55.  (a) Relator Hoggett's students who were enrolled in bachelors degree programs

4   complained throughout 2009 and 2010 that many other students in their classes did not contribute

5   to team projects.  (b) Non participants benefitted from the work of other students because all

6   members on a team project got the same  grade.  (c) This team project  practice allows students

7   who might otherwise get a failing grade to pass their classes and to continue in their degree

8   program – and to continue  paying UOP's tuition fees.  (d) Hoggett's student 'JC' constantly

9   complained that half of the students in his classes were unfit academically or were too lazy to

10   study.  (e) Hoggett's student 'MW' complained to him throughout 2010 that he often had to

11   complete team assignments almost single-handedly in order to earn the team project grades. (f)

12   MW's classes in 2009 and 2010 were final year bachelor's degree level classes.  (g) Many times

13   'MW' would read Hoggett  correspondence from illiterate students – sentences so grammatically

14   poor and nonsensical that the authors appeared incompetent to graduate high school.  (h) MW said

15   he had complained about the abysmal education level of students in his classes to class instructors

16   but was ignored.  (i) MW said his degree has not helped him at all in finding employment.

17

18        **D.  The entire enrollment system at UOP is systemwide –**

19        **created, administered, and tightly controlled by**

20        **corporate headquarters in Phoenix, AZ.**

21        56.  (a) The separation agreement presented to Relator Travis Good when he was

22   terminated was issued from corporate headquarters and it was to be signed, approved and accepted

23   by headquarters.  (b) Emails announcing changes in Counselors' terms and conditions of

24   employment are all issued from corporate headquarters, the local campuses have no control and are

25   not permitted to make any changes.  (c) Relator Hoggett was terminated by Dayna Thompson by

26   teleconferencing call from Human Relations, Apollo Group in Phoenix.  (d) Relator Hoggett had

27   observed that all hiring and firing of UOP employees was cleared and approved by Phoenix

28   headquarters.  (e) Hoggett heard Kelly Blackstone, former Director of Enrollment, complain about

1    having to follow Phoenix headquarters' lengthy termination process.  (f) AW complained to

2    Hoggett on August 10, 2010 that Corporate in Phoenix controlled everything, centralizing jobs,

3    student labs,  pay for faculty, all marketing, everything.  (g) Student appreciation days were

4    abolished on the grounds they were "non-compliant" with corporate policy.

5         57.  (a) All of Relator Hoggett's performance reviews were submitted by Enrollment

6    manager Tom Noble to corporate headquarters.  (b) The review of April 1, 2010, clearly indicated

7    that the enrollment quotas were set in Phoenix, not at the local campus: "much of what we

8    discussed . . . are things outside of your and m[y] control."

9         58.  (a) Management personnel at the local campuses submit all performance reviews of

10   employees to Phoenix headquarters.  (b) The performance and Quality Feedback section in

11   Phoenix notifies the employee by email and then asks the employee to visit the website to review

12   and acknowledge the performance review form online.  (c) The conduct of Enrollment Counselors

13   throughout the UOP system is tightly controlled and monitored from Phoenix headquarters.  (d) All

14   employee Written Warnings must be submitted and approved by headquarters before being given

15   to the employee.  (e) Dayna Thompson of Apollo Group in Phoenix wrote the formal termination

16   letter to Relator Tavis Good on Phoenix letterhead.  (f) Austin student finance and academic

17   counselors, Terry Flint, Nadia Huff and Amanda Walsh were based in Phoenix, there were no

18   academic or financial counselors based in Austin.

19        59.  (a) Sales training was based in Phoenix, AZ, and those who completed one or more of

20   the courses received email acknowledgment from Apollo Corporate  University.  (b) In 2010,

21   Relator Hoggett was accepted into eight National WAVE Training programs, with titles like,

22   "Probing for Motivation " and "Commitment to the First Class."  (c) Sales training was exclusively

23   regarded by UOP as the proper continuing education for Enrollment Counselors. See attached

24   Exhibit 6, the UOP "2010 Strategic Plan" for enrollment counselors, as additional evidence of

25   UOP's single-minded devotion to sales.

26        60.  (a) All enrollment job openings were handled by corporate headquarters.  Teresa

27   McCarthy of Apollo Group Corporate Enrollment routinely sent emails containing "enrollment

28   opportunities" to all campuses across te U.S. - Relator Hoggett last received one on March 8, 2010.

*United States of America ex rel. Hoggett et al. v. University of Phoenix et al.*                    -20-

(b) All UOP employees who wanted to enroll in a UOP degree program (reimbursed tuition was a perk offered UOP Enrollment Counselors who met budget) were assigned an Employee Education Service Advisor based in Phoenix.  (c) An employee attending UOP in a degree program lost his or her tuition reimbursement if they did not meet enrollment budgets, and continuing into 2011, UOP managers use the loss of tuition reimbursement to pressure Enrollment Counselors into enrolling more students.

**First Cause of Action:**

**Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.SC. § 3729(a)(1)(A)**

61.   The allegations of paragraphs 1 through 60, inclusive, are fully incorporated herein by this reference, the same as if completely set forth herein

62.   In performing the acts set out herein, Defendants, via express and implied certifications, from December 12, 2009, forward, submitted false claims to the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

63.   Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America, during the applicable period from December 12, 2009, forward, is in the several hundreds of millions of dollars.

\\\

\\\

\\\

\\\

1

2

3

**Second Cause of Action:**

**Knowingly False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B)**

4

5

64.  The allegations of paragraphs 1 through 60, inclusive, are fully incorporated herein by this reference, the same as if completely set forth herein

6

7

8

9

10

11

12

65.  By virtue of the acts described above, Defendants, from December 12, 2009, forward, via express and implied certifications, knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

13

14

15

66.  Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America, during the applicable period from December 12, 2009, forward, is in the hundreds of millions of dollars.

16

17

**Third Cause of Action:**

18

19

**Knowingly Causing A False Claim to Be Presented in Violation of the California False Claims Act, Cal. Gov. C. § 12651(a)(1)**

20

21

22

67. The allegations of paragraphs 1 through 60, inclusive, are fully incorporated herein by this reference, the same as if completely set forth herein.

23

24

25

26

27

28

68.  By virtue of the acts described above, Defendants, via express and implied certifications, during the ten years immediately preceding the filing of this action, knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of California in contravention of the California False Claims Act, Cal. Gov. C. § 12651(a)(1), to the damage of the treasury of the State of California, by causing it to pay out money it was not obligated to pay.

69.   Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the State of California, during the applicable ten-year period set forth in Cal. Gov. C. § 12654(a) immediately preceding the filing of this action, is in the tens of millions of dollars.

**Fourth Cause of Action:**

**Submission of False Record to Obtain Payment of a False or Fraudulent Claim in Violation of the California False Claims Act, Cal. Gov. C. § 12651 (a)(2)**

70. The allegations of paragraphs 1 through 60, inclusive, are fully incorporated herein by this reference, the same as if completely set forth herein.

71.   By virtue of the acts described above, Defendants, via express and implied certifications, during the ten years immediately preceding the filing of this action, knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of California, in contravention of the California False Claims Act, Cal. Gov. C. § 12651 (a)(2), to the damage of the treasury of the State of California, by causing it to pay out money it was not obligated to pay.

72.   Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the State of California, during the applicable ten-year period immediately preceding the filing of this action, is in the tens of millions of dollars.

**Prayer for Relief**

WHEREFORE,  Plaintiffs request the following relief:

1.   Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the civil penalty for each violation, as prescribed by the Federal False Claims Act,

and as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410);

2.  Judgment in favor of the State of California against Defendants, jointly and severally, by reason of the violations of the California False Claims Act as set forth above, in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus the civil penalty for each violation, as prescribed by the California False Claims Act, pursuant to Cal. Govt. Code § 12651(a).

3.  Award to Relators of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

4.  Award to Relators of the maximum amount allowed pursuant to Cal. Govt. Code § 12652(g), the California False Claims Act, on the State of California's recovery;

5. Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

6.  Punitive damages on all causes of action, to the extent allowable by law; and

7.  Injunctive relief; and

8.  Such other and further relief as the Court deems proper.

DATED:  August 28, 2011                SHARON GREEN and DANIEL BARTLEY
                                        ATTORNEYS FOR RELATORS


                                        By:  s /_____
                                                Daniel Robert Bartley

\\\

\\\

\\\

\\\

**Demand for Jury Trial**

Plaintiffs demand a trial by jury, pursuant to FRCP 38.

DATED:  August 28, 2011                     SHARON GREEN and DANIEL BARTLEY
                                            ATTORNEYS FOR RELATORS


                                            By:  s/ _____
                                                 Daniel Robert Bartley

**PROOF OF SERVICE**

I declare I am employed in the County of Marin, State of California, by Daniel Robert Bartley Law Offices, 4040 Civic Center Drive, Suite 200, San Rafael, CA, 94903-4184.  I certify that I am over the age of 18.  I hereby certify that on today's date, I electronically filed the foregoing **"SECOND AMENDED COMPLAINT FOR DAMAGES, WITH DEMAND FOR JURY TRIAL"** with the Clerk of the United States District Court for the Eastern District of California by using the District Court's CM/ECF system.  I certify that all the counsel listed below are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

| | |
|---|---|
| Casey M. Nokes, Esq.<br>KIRKLAND & ELLIS LLP<br>555 California Street<br>San Francisco, CA 94104<br>Tel 415 439-1400 • Fax  415 439-1500 | Jonathan C. Bunge, Esq., Leonid Feller, Esq., and Alec Solotorovsky<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Tel 312 862-2000 • Fax 312 862-2200<br>Email Jbunge@kirkland.com,<br>leonid.feller@kirkland.com |
| Jay D. Majors, Esq.<br>Civil Division - Fraud Section<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>601 D Street, N.W.<br>Post Office Box 261, Ben Franklin Station<br>Washington, D.C. 20004<br>Tel 202 307 0264 • Fax 202 514 0280<br>Email Jay.Majors@usDOJ.gov | Catherine Swann, Assistant U.S. Attorney<br>Office of the U.S. Attorney<br>Sacramento Federal Courthouse<br>501 " I " Street Suite 10-100<br>Sacramento, CA 95814<br>Tel 916 554-2700 • Fax 916 554-2900<br>Email Catherine Swann@usdoj.gov |
| Rick Acker, Esq.<br>Deputy Attorney General<br>Office of State of California Attorney General<br>State of California Department of Justice<br>Office of the Attorney General<br>1300 "I" Street<br>P.O. Box 944255<br>Sacramento, CA 94244-2550<br>Tel 916 445-9555<br>Email Rick.Acker@doj.ca.gov | |

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed on this 28th day of August, 2011, at San Rafael, Marin County, California.

By: _s/_____
            Daniel Robert Bartley

*United States of America ex rel. Hoggett et al. v. University of Phoenix et al.*

# EXHIBIT 1

2009

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |

# EXHIBIT 2



Department of
# **Performance and Quality**



Evaluated: **Derek Hoggett - 114764**
Date: **3/26/2010**
Status: **Manager**
Acknowledgements: **Unacknowledged**

**v.1 One on One**

Section 1. **One on One**

1. Previous Action Item Outcomes

2. Current Action Items
   **Make sure you are careful about not guarateeing credit transfers or even suggesting strongly that credits will transfer without first qualifying your statement with the appropriate expectations about qualifying grades, accreditation etc.**

3. Job Performance

| Current Month | Expectations | Actual |
|---|---|---|
| Dials (Daily Average) | 80 | 40.8 |
| CST (Daily Average) | 4 Hours | 3.8 |
| Referrals | 8 | 7 |
| Referral Conversion | 1 | 0 |
| Enrollments | 7 | 4 |

4. Quality

| Lead to Activity | L-C | Act to APIN | Act to REG |
|---|---|---|---|
| 22.31% | 85.38% | 20.69% | 17.24% |

I am glad to see that you are taking the presentation on conversions from the PROPEL training last month to heart. Continue to focus on increasing your activitity to APIN and REG as these measurements reflect the success of the relationships you have put the most time and effort into.

5. Attendance
   **OT submitted**

6. Graduation Team Relationships

**Thank you for sending specific examples of grad team interactions to me. These are essential to improving our relationship with our CSI and Houston/Dallas teams**

7. Miscellaneous

**I am glad that you are seeing the results of your hard work in the form of consistent referrals and more consistant applications leading to sccessful student starts. Two things we discussed in our meeting gave me pause, specifically that you believe enrollment targets to be immoral, and that you rely on management feedback to tell you whether you are performing to expectations. I do not want you to feel that you have to chase an arbitrary target and enroll people who are not qualified just to mee that goal, I hope you do not feel this way. These targets have been a part of our performance expectations as enrollment representatives for the duration of our tenure as agents of the University and are necesary to maintain in order to maintain our staff headcount in enrollment, academics, finance, and faculty which in turn provides a positive experience for our current and future students. I believe that these goals are attainable and that if we persist in having the right conversation with the right student at the right time that we will reach beyond what has been set forth as our minimum expectations**

Please note: You are viewing a printed version of a document submitted in
the CWEB system. To view the actual submission please visit CWEB.

---

4/14/2010

Report any issues to DQPQFeedback@phoenix.edu



Department of
Performance and Quality



Evaluated:        **Derek Hoggett - 114764**
Date:             **4/1/2010**
Status:           **Manager**
Acknowledgements: **Unacknowledged**


### v.1 One on One

Section 1. **One on One**

1. Previous Action Item Outcomes

   **Monitoring your lead conversion - I think its a great idea to keep your eye on these as they are a good indicator of how your service to students is affecting their decision to enroll.**

2. Current Action Items

   **Ashley Swinney - needs COS since she was not REGed in time to start in March**

   **Christina Telegraphis - needs COS since she failed UNIV for second time**

   **Compliance tutorial - deadline for completion is today**

3. Job Performance

   **Please bring with you your completed 1 on 1 form. This is an expectation I have of all counselors. It does you no good to have me fill this form out for you.**

   | Current Month | Expectations | Actual |
   |---|---|---|
   | **Dials (Daily Average)** | 80 | 40.8 |
   | **CST (Daily Average)** | 4 Hours | 3.8 |
   | **Referrals** | 8 | 7 |
   | **Referral Conversion** | 1 | 0 |
   | **Enrollments** | 7 | 2 |

   **Your activity levels are adequate, but I belive you could use this time to be more productive since the results of your efforts in referral conversions, referrals, and enrollments are all below expectations**

4. Quality

   | Lead to | L-C | Act to | Act to |



22.31%85.38%20.69%17.24%

Good job maintaining a high lead-to-contact percentage. Your use of the iS3
contact strategy that Courtney presented is clearly paying off!

Activity to APIN and Activity to REG remain very low. I understand that you feel it
is important not to force students into a start date, I agree. I also believe that
there is tremendous opportunity to identify students in the potential students
currently statused apph and appt. I beliwve that if you are consistent in following
up with these students thatyou will identify more qualified students ready to start.

5. Attendance

Thank you for submitting your OT

6. Graduation Team Relationships

Please continue to submit to me any specific examples of opportunities to improve
our interaction with the grad team along with specific examples of when an AC or
FC exceeds your expectations in either help to you or in service to your students

7. Miscellaneous

Thank you for sharing with me your frustrations. I am saddened to hear that you
believe the enrollment targets we have are not attainable without resorting to
unethical behavior. I do not believe this is the case. There are counselors who
meet these expectations at our campus and i believe that you can be among them.
Much of what we discussed (i.e. ideas for changing the EC role, lead flow,
changing the rules for UNIV) are things that are outside of your and m control and
believe that these meetings along with your mental energy would be better spent
focusing on what you and i can control. Do not confuse "hitting the matrix" with
hitting your enrollment target either and enrollments represent only 32% of the
total points on your performance review. You are a seasoned counselor and are
capable of a higher level of performance than you are acheiving. Key in part to
reaching this success is maintaining a positive attitude and not succumbing to the
frustration you experience when things do not turn out the way you or I hope.
Continue to follow up with all the students youhave significant conversations with
because there is room for improvement here. Many student records have
incomplete notes from initial conversations and may go weeks without followup.
Also identify proactively those students who have not turned in all of their
assignments each week in UNIV by checking their posts in iS3 and comparing
those to the assignments listed in the guide for the course. Also develop a system
for tracking those student who have committed to a start date (i.e. started an
application, clear for apin, clear for reg) so that we do not delay starts
unnecesarily.

Please note: You are viewing a printed version of a document submitted in
the CWEB system. To view the actual submission please visit CWEB.

4/14/2010

# EXHIBIT 3

ENROLLMENT AGENCY HIRE PERFORMANCE MATRIX

In order to move from agency hire to permanent position, employees must meet expectations in majority of the soft skills listed below AND generate the expected number of enrollments listed on the right.

| JOB PERFORMANCE | Meets Expectations | Customer Service | Meets Expectations | New Enrollment Expectations | | | | Merit Increase Matrix | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Enrollment Month 1 | Enrollment Month 2 | Enrollment Month 3 * | Enrollment Month 3 * | Total | Base Salary Increase |
| Uses creativity in generating new ideas (Relevant) | Works with difficult workloads to the (humanity, generate a rich team of technical personnel) | Increases cooperativity and teamwork by with informal and external customers | Most experiences involving self with management, directional team, and other employees, as well as essential professional students. | 4 | 4 | ░░░ | ░░░ | 8-9 | $3,600 |
| In consideration in use of company resources | A message of new students that completed a later set week of attendance to the first case workload and period 2 weeks of attendance in the second source (Mark 40%-73.5%) | Demonstrates tact and diplomacy when involved in problem solving customer relations | Works to resolve internal and external problems in a timely manner | 4 | 4 | ░░░ | ░░░ | 8-9 | $4,000-$6,000 |
| | | Demonstrates a willingness to build rapport with all difficult customers | Meets expectations in delivering customer service by utilizing good knowledge and documenting 10- and 19-week mutual concern strategy and is reflected in retention outcomes. | 4 | 6 | ░░░ | ░░░ | 10+ | $6,000-$8,000 |
| Communication: | Meets Expectations | Creates a positive attitude toward fellow employees and, whenever possible, assists them in their work | Is generally positive | 2 | 4 | | 4 | 10 | $2,000 |
| Communicates Effectively: Oral | Met expectations in enhanced/ inbound phone calls daily (70-79%) | Maintains a professional, competent demeanor with individuals outside the company (1%) | Is professional in dress, speech, and attitude | 2 | 4 | | 8 | 14+ | $3,000-$4,000 |
| Communicates Effective: Written | Meets expectations in documenting notes in folders according to method laid out, policy and all appropriate areas student folder are usually populated; email and quotes and Academic communication is good | | | 2 | 2 | | 4 | 8-9 | no pay change |
| Contributes worthwhile information during meetings | On-time participation in meetings, and supports solution to issues | Working Relationships | Meets Expectations | 2 | 2 | | 2 | However 4-5 | no pay change ** |
| | | Informs Supervisor and affected personnel of areas of current assignments | Works to a strategic start, has become prospectious and has role groups and class and systemwork | | | | | | |
| Judgment: | Meets Expectations | Shows flexibility by accepting new ideas | Practices and implements coaching tips | | | | | | |
| Uses sound judgment in making decisions | 70-79% of Applicants start class | Shows flexibility by grabbing from constructive feedback | Accepts feedback from leadership tips | | | | | | |
| Is timely in making decisions | Meets daily customer service time levels needed to accomplish goals (4.0 - 4.1 hours). Works with manager to improve skill sets as needed | Establishes and promotes constructive working relationships | Subtle class and complies own enrollment documentation own; Usually works well with finance and Academic team to achieve graduation to set goals | | | | | | |
| Analyzes consequences/effects of decisions | Use to meet time (two times) for a admitted shift, generally adheres to lunch and break schedules, limited time (stop) stating to own policy & all mixed calls (REND) during the review period | Professional Development | Meets Expectations | | | | | | |
| Demonstrates effective problem solving skills | Meets expectations in pursuing students for enrollment and financial expectation using campus processes or enrollment week | Communicates professional development plan and prepares to manage and maintain proper approval to participate in learning opportunities | Meets PD guidelines. Willing to participation in PD activities. Implements PD training, when deemed to help to be supportive. | | | | | | |
| | | Satisfies professional development guidelines as tied to job classification and company goals | Makes suggestions as to their own personal development. | | | | | | |
| | | Applies and utilizes new knowledge, skills or abilities gained from learning opportunities into daily work assignments to improve individual productivity | Completes all skills testing (ex: Pre-Course Orientation, Program Knowledge, Quality Assurance, Service Observance) with scores of 80%-91%. | | | | | | |

* If the last month of the agency period generates 3 or less enrollments, there may be a no pay increase and no merit request as additional month of performance

** If an agency hire produces between 4-6 during their agency period AND they have been meeting expectations in the majority of the soft skills, management may request up to two additional months of performance. A total of eight enrollments will need to be generated during the additional two month period prior to being given permanently.

# EXHIBIT 4

| TO: | Tavis Good, (121912) Enrollment Counselor |
|---|---|
| FROM: | Autumn Radtke, Enrollment Supervisor |
| DATE: | March 23, 2010 |
| RE: | Written Warning |

This document outlines your continuing deficient performance in comparison to your job expectations as an Enrollment Counselor. The deficient performance has been outlined and discussed with you through Discussion Memos dated 12/17/2009. Additionally, we have continued to meet to discuss your work performance and job expectations. Per our discussions, you are to utilize the Enrollment Counselor Performance Guideline Matrix to assist you in managing your activity levels. You have been given the following trainings and meetings to assist you in performing your role: 12/17 One on One, 12/21 Call Coaching, 1/4 One on One, 1/4 Call Coaching, 1/11 Recommendations Training, 1/15 One on One and Call Coaching, 1/28 Call Coaching. 2/2 One on One and Call Coaching, 2/11 Motivation training, 2/17 Call Coaching, 2/17 Gaining Commitment Wave, 3/1 One on One, 3/2 Call Coaching, 3/4 Coaching Session, 3/6 One on One, 3/15 Call Coaching and One on One, 3/15 Y-Connect.

Your work performance has not improved and you are not performing at an acceptable performance level for your position. Your January and February activities and actual performance were as follows:

**January 2010**

| Job Performance | Goal | Actual |
|---|---|---|
| Plans & organizes work to complete objectives | 5.33 | 2 |
| Uses creativity in pursing new ideas (Referrals) | 8 | 10 |
| Uses creativity in pursing new ideas (Referral conversion) | 1 | 0 |
| Is conscientious of company resources | 69 % | Not Available |
| Is motivated to achieve results independently | 1 | 0 |

**February 2010**

| Job Performance | Goal | Actual |
|---|---|---|
| Plans & organizes work to complete objectives | 5.33 | 1 |
| Uses creativity in pursing new ideas (Referrals) | 8 | 5 |
| Uses creativity in pursing new ideas (Referral conversion) | 1 | 0 |
| Is conscientious of company resources | 69 % | Not available |
| Is motivated to achieve results independently | 1 | 0 |

| Judgment | | |
|---|---|---|
| Uses sound judgment in making decisions<br>Is timely in making decisions | 70-79% app start<br>daily activities | Unsatisfactory- 38.1%<br>Requires – Lack of<br>balance between talk time<br>and dials, results of<br>managing day |
| Analyzes consequences/offects of decisions | 6-10 RONA's | Meets |
| Demonstrates effective problem-solving skills | Prepares students | Meets |

| Communication | | |
|---|---|---|
| Communicates effectively – oral | Works to students'<br>best interest | Meets |
| Communicates effectively – written | Notes in Galaxy | Meets |
| Contributes worthwhile information during meetings | On time, participates | Meets |

| Working Relationships | | |
|---|---|---|
| Informs supervisor of status of current assignments | Strategic Plan | Requires—Does not work<br>to a strategic plan, goals<br>not met each month. We<br>worked to create an action<br>plan. You have not |

| | | adhered to the delivered plan. Lacks consistency in daily performance, goals and activities |
|---|---|---|
| Shows flexibility accepting new ideas | Implements coaching tips | Meets |
| Shows flexibility by profiting from constructive feedback | Y-connects | Meets |
| Establishes and promotes constructive working relationships | Fin/Acad Team | Meets |
| Professional Development Communicates professional development plans | Meets PD guidelines | Requires- Lack of updating PD hours in MyHR upon completion of training, while trainings are attended, implementation of material is lacking. |
| Satisfies professional development guidelines Applies and utilizes new knowledge | Makes suggestions Completes testing | Meets Unsatisfactory---67.8% average |
| Customer Service Interacts cooperatively and constructively with internal & external customers Demonstrates tact and diplomacy Demonstrates a willingness to build rapport Conveys positive attitude toward fellow employees Maintains professional, competent demeanor | Works w/employees Resolves problems 10-19 contact strategy Positive Dress, speech | Meets Meets Meets Meets Meets |

You have continued to not meet all or some of the above expectations. It is our expectation going forward you will utilize the Enrollment Counselor Performance Guideline Matrix to ensure adequate activity levels are maintained and overall performance is improved to an acceptable level.

As a result of this Written Warning you are required to complete an Action Plan which will provide you with the opportunity to outline the steps you are committed to take with improving the above referenced poor performance.

In accordance with the Apollo Group, Inc. Education Tuition Policy, your tuition waiver and your dependents' waivers will be revoked. I look forward to your improved performance; however, understand that failure to improve your performance may result in further disciplinary action up to and including termination.

Tavis Good, Enrollment Counselor                               Date

Autumn Radtke, Enrollment Supervisor                           Date

# EXHIBIT 5

## Script for a NEW/UNCONTACTED LEAD – AMMIAPIN?

Student Name: _____

Date/Time of Call: _____

**Intro to call:**
1) Hi, ___, this is EC NAME from University of Phoenix. I am calling because I got a response from you indicating that you are interested in getting your ____ Degree. I think it is great that you are pursing this goal. (Let them respond). It is my job to make sure that you get all of the information you need to make an educated decision about returning to school. But first, I need some information from you so that I know how to better help you.

**Transition:** Can you first tell me a little about yourself?

# Admissibility:
1) **Educational background:** where have they been, when did they go, what have they taken, why did they stop? Tell them that we can evaluate what they have in the appointment if they have their transcripts available.
   a. **Tell me about your educational background.**
2) **Work:** Likes, dislikes, career plans, tuition reimbursement
   a. **Where do you work?** What do? How long have you been there?
   b. **Ask for the ECRF and Corporate Referral (see script details for this)**
3) **Military background:** active, not active, GI Bill?
   a. **Do you have any military background?**

# Modality/Program of study: What type of learning environment are you looking for? Why is ____ the perfect option for you?
THEN, YOU CHOOSE THE PROGRAM FOR THEM…make sure you ask the right questions then deliver a program. What subjects are you interested in learning? What types of classes are you interested in taking? Then give them a benefit statement based on Modality and program.

# Motivation/Drive Theory:
1) **Negative Motivation (Pain):** How has not having the degree affected you? Will happen if you do not do this? USE THE 2 SECOND RULE – MAKE THEM SIT IN THEIR PAIN, THANK THEM FOR SHARING WITH YOU
2) **Positive Motivation:** What will the degree do for you? How will it help you ____? Dig the layers…
   **\*\*Make the connection:** Make sure their motivation is directly tied to the degree…if not, you need to ask questions such as how will the degree help you get to ____ motivation? Or help you avoid ____ pain?
3) **Present situation:** Why is now the perfect time to complete your degree? What has changed for you that makes you want to do this now?
4) **Future With / Future without:** Flash forward 3 years, how will your life be different if you have the degree? If you do nothing about your educational goals, how will your life be different?

# Importance: On a scale of 1-10 how important is getting the degree to you right now? How do we get it to a 10? Why do you think you will be a successful student?

# Apprehensions:
1) How long have you been thinking about obtaining/finishing your degree?
2) What has prevented you from completing your degree?
3) What will prevent you from being able to get started again?
4) What are you looking for in an ideal university?
5) How will University of Phoenix help to meet your needs?
6) Use benefit statements…Then get them to sell it all back to you (Why do you think University of Phoenix will work for you?)

**P**ayment:

1) **Do they have TR?**
   a. Yes- You mentioned earlier that ____(fill in with company name) offers you TR. That is so wonderful. I am glad that your company is willing to invest that in you. You are smart to take advantage of it.
   b. No- You mentioned earlier that ____ (fill in with company name) is not in a position to offer you TR. That is too bad, but it should not be a reason why you still can not complete your degree. Our tuition prices are competitive and we can look at financing your degree another way. Do you think you would prefer a pay as you go plan or to apply for financial aid?

2) **Solidify a finance option.** It sounds like our adult financial aid program is going to be your best option. I am sure, like most of our prospective students you have lots of questions regarding your financial aid, so we can go over everything in more detail shortly. I will also send you a link for financial aid in a moment, if you want to get a jump start on the application.

**I**nventory Close: Summarize the following with the student. Do mini temp checks throughout...is that correct?
   1) What is their ultimate goal? And also what happens if they do not achieve their ultimate goal?
   2) How will the degree get them there?
   3) Why they like UOP
   4) Why now – How soon would you like to stop feeling like ____? OR How soon would you like to start feeling like ____ ? OR How soon would you like to be _____ (fill in with motivation). – You are looking for an ASAP answer.

**N**ext Step: Okay, it sounds like you are ready to do this. The next step for you would be to complete your application. Throughout this process, I will answer specific questions you have about going to school and what to expect as a student including when you can start and how you can finance your education. I just sent you over the link to complete the application and financial documents. Can you check your email? We can continue this call and complete the application right now over the phone or you can schedule a brief meeting with me at the campus to complete the application. Which option works best for you?

**Give them alternate choices based on their response.** It may be that an additional phone appt works best...that is okay too!

**Set the expectation for the future phone or face to face appt:**
   1) Let them know you will be sending them an email to confirm the appointment and to give directions (if face to face)
   2) I will include the application links for FAW and Applyweb if you wish to get a jump start on that process. They are both non-obligation and will help us to save time and gain the necessary demographic information on you to confirm your eligibility for enrollment.
   3) I like to make sure that you and I are both prepared for the appt, what do you hope to get out of our appt?
      a. Make sure they know they are coming to enroll
      b. Bring questions
      c. Bring transcripts
      d. Bring method of payment
      e. Talk about the Nervousness after booking the appt
   4) REFERRAL - Who will you bring with you to your appointment that is also interested in learning more about Univ. of Phoenix? (if face to face) OR Who else do you know that would also benefit from an enrollment appointment like we will be conducting ____ (fill in day of appt)? (If phone appt)

   5) Remind them of the email you will be sending. Have your written down the date and time of our appt?
   6) I know this decision is very important to you and time is limited for you to be able to come in. I am blocking this time out especially for you. It is important that you are able to make the time we agreed on because I have a lot of students to enroll, and I can only fit in meetings with a maximum of 4 students a day.
   7) Is there any reason why you will not be able to make your appointment?

   8) Please promise me that you will call or email me in advance if you are not able to make your appointment so that I can give that spot to another student.
   9) Are you excited?

**Close the call:** Congratulations on taking the next step toward your educational goals. I sincerely hope that we are the fit you are looking for, and I feel confident we will be. I look forward to meeting with you on _____ (appt date and time). If you need me to prepare any additional information for you before our meeting, please just respond to my email or call me at _____ (fill in your number).

**Overcoming "I am too busy to talk right now":**
- I Understand that is why you contacted the University of Phoenix in the first place. You are a busy working professional, like our students.
- When is a better time to talk today?
- When I call you back what information would you like me to prepare for you?

**Overcoming the initial stall (no longer interested, too expensive, not enough time...):**
- Welcome the concern -- Thanks for sharing that concern with me.
- Clarify-listening to student -- **If I am hearing you right, there was a time when you were interested in completing your degree and exploring how it might fit it into your life however right now I hear you saying you are not sure how you can** _____ **(fill in with objection). Did I hear you correctly?**
- Confirm accuracy -- **So it's not that you do not want your degree, but you want to be able to find a way to** _____ **(fill in with objection), is that right?**
- Probe – Tell me more about why _____ **(fill in with objection) is holding you back.**
- Ask for Solution -- **It is my job to do everything I can to show you how you can overcome this barrier. I am not worried at this point that we can find a solution to your problem. I'm glad you have given some thought to how you were going to** _____ **(fill in with objection). That's exactly why we need to talk. If I could show you a way to attend school and** _____ **(fill in with solution), would you like me to share that with you?**
- 2 sentence benefit statement
- What that means for you...
- Temp Check

## Asking for the ECRF and CREF during the Admissability section:

1) Does your company offer tuition reimbursement? Yes or No (probe for amount)

2) Does your company support its employees returning to school? Yes

3) Cookie: "That is great that your company supports its employees returning to school and that they are willing to invest in you. You are smart to take advantage of their reimbursement."

4) Ask for the ECRF: Who else do you know from your company that may also be interested in taking advantage of their tuition benefit and returning to school?

5) CREF 2 Sentence Feature Statement:

You know, University of Phoenix works with many companies in the local area to spread the news to their employees about what we can offer for the busy working professional. Many times we will send a representative out to a company to talk to their employees during a staff meeting or even set up a table during the lunch hours.

6) WIIFM:

What that means for you and your company is that we could help many of your co-workers discover University of Phoenix too and how easy it is to attend classes while working a full time job.

7) Ask for the CREF:

If we wanted to set up a visit at your company, who would be the best person to speak with about scheduling a meeting?

8) Thank them and next step:

Thank you very much. I will make sure someone follows up with _____ in the next day or so to try and schedule that meeting.

9) Proceed with the Admissability or Modality section

# EXHIBIT 6



## **rstrategy** _Our game pianl_
Translating the Mission into Desired Outcomes

*Strategy*

 *Our game plan*

# El

Exceed student retention targets
Exceed total enrollment budget
Exceed new enrollment budget
Exceed campus financial objectives.
Enhance employee retention
Enhance UPX brand in Austin.

Kaplan, Norton, p 73

**CONFIDENTIAL—INTERNAL USE ONLY 4**

## Internal Perspective

CORPORATE EDUCATION
Contribute 25% of STARTs to New Enrollment Budget
Increase REG to START conversion to 80%
Increase Lead to REG conversion to *10%*
Increase CREF to RGA conversion to 10%

ENROLLMENT
Lead to Start: 10%
%toPlan: 110+%
Start per EC average per month: 40
Weekly progression in current month:
30% of plan by end of wk I
75% of plan by end of wk 2

105% of plan by end of wk 3
125% of plan by end of wk 4
30% of total monthly starts from unpaid lead sources: ECRF or CEL Retention of new students (2 month lag): 78%
Average 3 hours of customer service time per day
Maintain new student retention % between 80% .85%
Maintain 66+ AiR wlo CCC between $103 .$277 per student
Maintain average Disb. In 40 days % between 60% .65%
Maintain group size average of 13 or greater
Increase daytime rental revenue by I new contract per quarter

ACADEMIC AFFAIRS
Terminally Degreed faculty in the Graduate classroom: > 50%
Terminally Degreed faculty in the Undergrad classroom: >30%
Drop Rates: <6%
Continuation Rates: Targets under development

STUDENT AND FINANCIAL SERVICES

CONFIDENTIAL---INTERNAL USE ONLY 6