1  Jonathan C. Bunge (*pro hac vice*)
   Leonid Feller (*pro hac vice*)
2  KIRKLAND & ELLIS LLP
   300 North LaSalle Street
3  Chicago, Illinois  60654
   Telephone: (312) 862-2000
4  Facsimile: (312) 862-2200

5  Matthew G. Jacobs (State Bar No. 122066)
   W. Scott Cameron (State Bar No. 229828)
6  DLA PIPER LLP (US)
   400 Capitol Mall, Suite 2400
7  Sacramento, CA 95814-4428
   Telephone: (916) 930-3200
8  Facsimile: (916) 930-3201

9  *Attorneys for Defendants,*
   *UNIVERSITY OF PHOENIX*
10 *and APOLLO GROUP, INC.*

11

12                    **UNITED STATES DISTRICT COURT**

13                   **EASTERN DISTRICT OF CALIFORNIA**

14                        **SACRAMENTO DIVISION**

15

16 **United States of America and State of**      Case No. 2:10-cv-02478-MCE-EFB
   **California, *ex rel.* Derek Hoggett and**
17 **Tavis Good,**                                 **MEMORANDUM IN SUPPORT OF**
                                                   **DEFENDANTS' MOTION TO DISMISS**
18          Plaintiff,                             **FOR LACK OF FEDERAL SUBJECT**
                                                   **MATTER JURISDICTION PURSUANT TO**
19 v.                                              **FED. R. CIV. P. 12(b)(1)**

20 **University of Phoenix, Apollo Group, Inc.,**
   **and Does 1 through 100, Inclusive,**

21          Defendants.

22

23

24

25

26

27

28

---

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 5

I.  Allegations Of Continuing Recruitment And Compensation Violations Were
Widely Reported Between The ***Hendow*** Settlement And The Filing Of This
Lawsuit.......................................................................................................................... 6

    A.  Disclosures In The Media ..................................................................................... 6

    B.  Disclosures In Government Reports And Investigations....................................... 8

    C.  Disclosures In Other Litigation........................................................................... 10

II.  Relators Had No Knowledge Of UOPX's Compensation Practices, Even At The
Austin Campus Where They Worked, Other Than Their Own Salaries And The
Hearsay Accounts Of A Handful Of Others. ............................................................ 11

STANDARD OF REVIEW ............................................................................................... 15

ARGUMENT ..................................................................................................................... 18

I.  The Post-*Hendow* Misconduct Alleged In Relators' Complaint Was The Subject
Of Widespread Public Disclosures Between December 12, 2009 And
September 15, 2010. .................................................................................................. 18

II.  Relators Are Not Original Sources. ........................................................................... 22

    A.  Relators Did Not Have A Hand In the Public Disclosures. ................................ 22

    B.  Relators Do Not Have Knowledge Independent Of The Publicly
Disclosed Allegations That Materially Adds To Them. ..................................... 24

        1.  Relators Lack Knowledge Of HEA Certification Requirements.................... 26

        2.  Relators Lack Knowledge Of UOPX's Compensation Practices. .................. 28

    C.  Relators Did Not Disclose To The Government The Information On
Which Their Claims Are Based Prior To A Public Disclosure. .......................... 29

        1.  Other Matrix Elements................................................................................... 32

        2.  Numbers On Whiteboards............................................................................... 34

        3.  Praise For Enrollments At Meetings............................................................... 34

        4.  Action Plans To Improve Performance........................................................... 35

        5.  Manipulative Sales Methods........................................................................... 35

        6.  "Get Them In The Door." ............................................................................... 36

CONCLUSION................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) ................................................................ 2, 16

*Bates v. Mortg. Elec. Registration Sys., Inc.*,
694 F.3d 1076 (9th Cir. 2012) ................................................ 16

*Boyal v. Napolitano*,
No. 2:09-cv-03263, 2011 WL 864618 (E.D. Cal. Mar. 10, 2011) ................ 15

*Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund*,
No. 2:09-cv-0090, 2009 WL 2230776 (E.D. Cal. July 24, 2009) ........... 15, 16

*Gaer v. Apollo Group, Inc. et al.*,
No. 2:10-cv-01735-JAT (D. Ariz. Aug. 13, 2010) .......................... 10

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010) ................................................................ 16

*Hagood v. Sonoma Cty. Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ................................................ 18

*In re Natural Gas Royalties*,
562 F.3d 1032 (10th Cir. 2009) ............................................ 31

*Malhotra v. Steinberg*,
C09-1618JLR, 2013 WL 441740 (W.D. Wash. Feb. 5, 2013) ............. 18

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
131 S. Ct. 1885 (2011) ...................................................... 23

*Schultz v. Devry Inc.*,
No. 07 C 5425, 2009 WL 562286 (N.D. Ill. Mar. 4, 2009) ............... 4, 27

*Seal 1 v. Seal A*,
255 F.3d 1154 (9th Cir. 2001) ................................................ 16

*U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*,
709 F. Supp. 2d 1084 (D.N.M. 2010) .................................... 17

*U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*,
933 F. Supp. 2d 825 (E.D. Va. Mar. 21, 2013) ...................... 10, 20, 25

*U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.*,
161 F.3d 533 (9th Cir. 1998) ................................................ 19

*U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cty.*,
494 F. App'x 285 (4th Cir. 2012) .......................................... 20

*U.S. ex rel. Casady v. Am. Int'l Grp., Inc.,*
 No. 10CV0431-GPC-MDD, 2013 WL 1702777 (S.D. Cal. Apr. 19, 2013) .............................. 3, 22

*U.S. ex rel. Cervantes v. Deere & Co.,*
 CV-10-3034-RMP, 2011 WL 5325466 (E.D. Wash. Nov. 3, 2011) ....................................... 16, 19

*U.S. ex rel. Devlin v. State of California,*
 84 F.3d 358 (9th Cir. 1996) ...................................................................................................... 19, 24

*U.S. ex rel. Feldstein v. Organon, Inc.,*
 No. 07–CV–2690 (DMC), 2009 WL 961267 (D.N.J. Apr. 7, 2009) ............................................ 25

*U.S. ex rel. Fine v. Sandia Corp.,*
 70 F.3d 568 (10th Cir. 1995) .......................................................................................................... 20

*U.S. ex rel. Fried v. West Indep. Sch. Dist.*
 527 F.3d 439 (5th Cir. 2008) .......................................................................................................... 25

*U.S. ex rel. Gohil v. Aventis Pharm., Inc.,*
 387 F. App'x 143, 145 (3d Cir. 2010) ............................................................................................ 16

*U.S. ex rel. Hafter D.O v. Spectrum Emergency Care, Inc.,*
 190 F.3d 1156 (10th Cir. 1999) ...................................................................................................... 32

*U.S. ex rel. Hays v. Hoffman,*
 325 F.3d 982 (8th Cir. 2003) .......................................................................................................... 25

*U.S. ex rel. Hendow v. Univ. of Phoenix,* |
 No. 2:03-cv-0457-GEB-DAD, 2009 WL 2705851 (E.D. Cal. Aug. 25, 2009) ............................... 5

*U.S. ex rel. Jamison v. McKesson Corp.,*
 649 F.3d 322, 326 (5th Cir. 2011) .................................................................................................. 16

*U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.,*
 No. 3:07CV290-HEH, 2011 WL 129842 (E.D. Va. Jan. 12, 2011),
 *aff'd,* 469 F. App'x 244 (4th Cir. 2012) ................................................................................. 25, 32

*U.S. ex rel. Lee v. Corinthian Colls.,*
 No. 07-1984 PSG (MANx) (C.D. Cal. Mar. 15, 2013) ........................................................... passim

*U.S. ex rel. Lockey v. City of Dallas, Tex.,*
 No. 3:11-CV-354-O, 2013 WL 268371 (N.D. Tex. Jan. 23, 2013) .................................... 25, 31, 32

*U.S. ex rel. Lopez v. Strayer Educ., Inc.,*
 698 F. Supp. 2d 633 (E.D. Va. 2010) ..................................................................................... passim

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
 162 F.3d 1027 (9th Cir. 1998) ........................................................................................................ 17

*U.S. ex rel. Meyer v. Horizon Health Corp.,*
 565 F.3d 1195 (9th Cir. 2009) ............................................................................................ 17, 18, 22, 24

*U.S. ex rel. Paulos v. Stryker Corp.,*
 No. 11-0041-cv-W-ODS, 2013 WL 2666346 (W.D. Mo. June 12, 2013) ...................................... 10

*U.S. ex rel. Smith v. Yale Univ.,*
    415 F. Supp. 2d 58 (D. Conn. 2006) ..................................................... 25

*U.S. ex rel. Swan v. Covenant Care, Inc.,*
    279 F. Supp. 2d 1212 (E.D. Cal. 2002) .............................................. 3, 22

*U.S. ex rel. Zaretsky v. Johnson Controls, Inc.,*
    457 F.3d 1009 (9th Cir. 2006) ....................................................... 3, 18, 22

*U.S. v. Alcan Elec. & Eng'g, Inc.,*
    197 F.3d 1014 (9th Cir. 1999) ........................................................ 18, 24

*U.S. v. Northrop Corp.,*
    59 F.3d 953, 964 (9th Cir. 1995) ........................................................... 22

*Valdez v. United States,*
    56 F.3d 1177 (9th Cir. 1995) ................................................................. 16

*Wang v. FMC Corp.,*
    975 F.2d 1412 (9th Cir. 1992) ........................................................ passim

*Whipple v. Chattanooga-Hamilton Hosp. Auth.,*
    No. 3-11-0206, 2013 WL 4510801 (M.D. Tenn. Aug. 26, 2013) .......................... 17, 25

**Statutes**

20 U.S.C. § 1094(A)(20)............................................................................. 1

31 U.S.C. § 3730(e)(4)(A) ........................................................................ 18

31 U.S.C. § 3730(e)(4)(a)(i) ..................................................................... 10

31 U.S.C. § 3730(e)(4)(A)(ii) .................................................................... 20

31 U.S.C. § 3730(e)(4)(B) ........................................................................ 31

31 U.S.C. § 3730(e)(4)(B) (2010)................................................... 17, 20, 24

31 U.S.C. § 3730(e)(4)(B) (2013)............................................................ passim

31 U.S.C. §3730(e)(4) ............................................................................. 16

34 C.F.R. § 668.14(b)(22)(ii)(a) ................................................................. 1

**Rules**

Fed. R. Civ. P. 12(b)(1).............................................................................. 15

Fed. R. Civ. P. 12(h)(3)........................................................................... 2, 16

1

### INTRODUCTION

2          In their Complaint under the False Claims Act, Relators Derek Hoggett and Tavis Good

3   allege that enrollment counselors at Defendant University of Phoenix were paid "solely" based on

4   the number of students enrolled, in violation of the Higher Education Act's incentive compensation

5   ban (20 U.S.C. § 1094(A)(20)).  (Pls. Third Am. Compl. at ¶¶ 1-4, 22, hereinafter "TAC").  Relators

6   claim that, even after the settlement of the prior *Hendow* incentive compensation litigation in

7   December 2009, UOPX continued to compensate enrollment counselors *solely* on the basis of

8   enrollments.  They styled their claims this way because compensation decisions based *in part* on

9   enrollments were legal during the relevant period, as long as enrollment numbers were not the sole

10  factor considered in those decisions.  (34 C.F.R. § 668.14(b)(22)(ii)(a)).

11         Relators' own recent depositions have confirmed that this premise of Relators' suit—*i.e.*, that

12  compensation decisions were based solely on enrollments after the *Hendow* settlement—is false.

13  Relator Hoggett testified that his own compensation was determined by a performance matrix

14  including "a number of … different things," such as "retention" of students, "referrals" of

15  prospective students, "judgment," "working relationships," and "professional development."[1]

16  Likewise, Relator Good conceded that "retention," "judgment," "ability to communicate," "working

17  relationship[s] with other persons at the campus," "efforts you took to develop yourself as a

18  professional," and "customer service that you provided to students" were all considered in his

19  performance evaluations and salary determinations.[2]  Moreover, as described below, neither Relator

20  had knowledge that any other enrollment counselors were compensated in a manner that violated the

21  incentive compensation ban.

22         At the conclusion of discovery, Relators will be unable to generate a genuine issue of

23  material fact regarding their substantive claims of unlawful compensation.  The Court need not and

24  should not allow this case to proceed to the conclusion of discovery, however, because the discovery

25  already taken demonstrates that Relators' claims of post-*Hendow* misconduct are jurisdictionally

26  [1]     Ex. 1, 8/26/13 Hoggett Dep. at 84:14-85:18, 86:21-87:1.

27  [2]     Ex. 2, 8/27/13 Good Dep. at 20:10-15, 102:5-103:5.

28

barred by similar, earlier, and more fulsome public disclosures made by the media, the government, and other litigants in the wake of the *Hendow* settlement.  These post-*Hendow,* pre-suit public disclosures, in which Relators played no role, divest the Court of subject matter jurisdiction over Relators' claims.  The Court lacks jurisdiction to hear these claims unless they are advanced by the government itself, which to date has declined to intervene in this lawsuit.  Accordingly, the lawsuit should be dismissed now pursuant to Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) ("[t]he objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").

This Court previously considered Defendants' Motion to Dismiss Relators' First Amended Complaint.  In that motion, the only issue before the Court with respect to the public disclosure bar was whether the government's knowledge of and participation *in the settlement of the prior Hendow litigation* (which was based on nearly identical incentive compensation allegations) barred Relators' claims.  In denying Defendants' motion, the Court concluded that the prior *Hendow* settlement did not serve as a bar because Relators adequately pled a claim as "original sources" by asserting that "they have knowledge that UOPX has continued to perpetrate a fraud on the government even *after the Hendow case was completed* . . . [and thereby] provided information that is independent of and materially *adds to the information publicly disclosed during the Hendow case.*"  (Mem. and Order at 11, July 2, 2012, ECF No. 42) (emphasis added); *see also* Mem. and Order at 9, March 7, 2013, ECF No. 52 ("The alleged offenses could not be based upon the prior public disclosure of the offenses in *Hendow*, as Relators base their claim *on subsequent actions by UOPX*.") (emphasis added).  In other words, the Court held that Relators could avoid the public disclosure bar if, in fact, they were original sources of allegations that incentive compensation violations continued at UOPX after the December 2009 *Hendow* settlement.

Discovery now conclusively has demonstrated that Relators were not the original sources of allegations concerning post-*Hendow* misconduct.  Publicly available materials amply demonstrate that pre-suit allegations of post-*Hendow* incentive compensation were widely advanced in the media,

1   in government hearings and reports, and in other litigation well before Relators filed this lawsuit.[3]

2   Discovery has further confirmed that the Relators cannot avail themselves of the original source

3   exception because they did not play any role in advancing these public disclosures, and had no direct

4   and independent knowledge regarding these disclosures.

5         As the Ninth Circuit has emphasized for decades, the basis for the public disclosure bar is

6   that "[a] 'whistleblower' sounds the alarm; he does not echo it."  *Wang v. FMC Corp.,* 975 F.2d

7   1412, 1419 (9th Cir. 1992).  Accordingly, a relator cannot escape the public disclosure bar unless he

8   "had a hand in the public disclosure of the allegations."  *Id.* at 1418; *see also U.S. ex rel. Zaretsky v.*

9   *Johnson Controls, Inc.,* 457 F.3d 1009, 1018 (9th Cir. 2006) ("[W]e … have interpreted the statute

10  to require that prospective relators play a role in the public disclosure at issue if they are to partake

11  of the original source exception"); *U.S. ex rel. Swan v. Covenant Care, Inc.,* 279 F. Supp. 2d 1212,

12  1219 (E.D. Cal. 2002) ("To qualify as an original source … the plaintiff must have played a role in

13  ─────────────

[3]   *See, e.g.,* Ex. 3, Allison Sherry, *Pass or Fail? For-profit colleges make the grade in reaching at-risk students, but questions arise over student loan defaults and job prospects,* The Denver Post, Jan. 17, 2010; Ex. 4, Daniel Golden, *Apollo Suffers New York Snub as SEC Probes Phoenix (Update3),* Bloomberg News, Jan. 19, 2010, http://www.bloomberg.com/apps/news?pid=21070001&sid=amvaP_MPCh14; Ex. 5, Robin Wilson, *For-Profit Colleges Change Higher Education's Landscape,* The Chronicle of Higher Education, Feb. 7, 2010, http://chronicle.com/article/For-Profit-Colleges-Change-/64012/; Ex. 6, U.S. Gov't Accountability Office, GAO-10-370R, Higher Education: Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education, Feb 23, 2010; Ex. 7, Anne Ryman, *Defaults on student loans rising,* The Arizona Republic, Mar. 7, 2010; Ex. 8, Peter S. Goodman, *In Hard Times, Lured Into Trade School and Debt,* The New York Times, Mar. 13, 2010; Ex. 9, *Frontline: College, Inc.* (PBS television broadcast May 4, 2010), http://www.pbs.org/wgbh/pages/frontline/collegeinc/etc/script.html; Ex. 10, Interview by Frontline with Daniel Golden, Editor-at-Large, Bloomberg News (May 4, 2010), http://www.pbs.org/wgbh/pages/frontline/collegeinc/interviews/golden.html; Ex. 11, Emerging Risk? An Overview of the Federal Investment in For-Profit Education: Hearing before the Comm. on Health, Education, Labor, and Pensions, 111th Cong. (June 24, 2010); Ex. 12, Emma Ashburn, *UPDATE 2-Some for-profit colleges encouraged fraud - US GAO,* Reuters, Aug. 3, 2010, http://www.reuters.com/article/2010/08/03/education-forprofit-idUSN0318105520100803; Ex. 13, Randall Forsyth, *For-Profit Stocks Marked Down on Leaked GAO Report,* Barron's, Aug. 3, 2010, http://blogs.barrons.com/stockstowatchtoday/2010/08/03/for-profit-stocks-marked-down-on-leaked-gao-report/; Ex. 31, *For Profit Education Gets 'F',* CNBC.com, August 3, 2010, http://www.cnbc.com/id/38543740; Ex. 14, Emma Ashburn, *U.S. senator lashes out at for-profit education,* Reuters, Aug. 4 , 2010, http://www.reuters.com/article/2010/08/04/education-forprofit-idUSN0421762120100804; Ex. 15, *GAO Finds For-Profit Schools Encouraged Fraud,* CNBC.com, Aug 4, 2010, http://www.cnbc.com/id/38541939; Ex. 16, For-Profit Schools: The Student Recruitment Experience: Hearing before the Comm. on Health, Education, Labor, and Pensions, 111th Cong. (Aug 4, 2010); Ex. 17, U.S. Gov't Accountability Office, GAO-10-948T, For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (Aug. 4, 2010); Ex. 26, Jennifer Epstein, *Shellacking the For-Profits,* Inside Higher-Ed, August 5, 2010, http://www.insidehighered.com/news/2010/08/05/hearing; Ex. 18, *Good Morning America: College Cashing in on Applicants?; Students Say School Misled Them* (ABC television broadcast Aug. 19, 2010) (transcript on file with Lexis Nexis).

publicly exposing the alleged fraud in the first place."); *U.S. ex rel. Casady v. Am. Int'l Grp., Inc.*, No. 10CV0431-GPC-MDD, 2013 WL 1702777, at *5 (S.D. Cal. Apr. 19, 2013) ("To qualify as an original source, a relator must … [have] had a hand in the public disclosure of allegations that are a part of [his or her] suit") (quotation omitted).  Of course, the public disclosure bar prevents only private citizens from bringing claims on behalf of the government, and the government remains free to pursue such claims on its own behalf.

Here, a broad array of media, governmental, and litigation disclosures regarding incentive compensation allegations after the *Hendow* settlement, but before the filing of Relators' complaint, make clear that Relators did nothing more than echo the same allegations that already were being advanced through many sources.  Relators were low-level employees at a single UOPX campus for a mere nine months in the post-*Hendow* period, they were aware of the widespread publicity regarding incentive compensation issues, they had no independent knowledge of the material advanced in the disclosures, and they did not materially add to the existing allegations or play any role in publicly disclosing them.  Under similar circumstances, other courts have rejected FCA claims based on incentive compensation allegations that had also been widely disseminated in the media, government investigations, and litigation.  *See* Ex. 27, Order Granting Defs.' Mot. Dismiss at 18, *U.S. ex rel. Lee v. Corinthian Colls.,* No. 07-1984 PSG (MANx) (C.D. Cal. Mar. 15, 2013) (dismissing incentive compensation action because relators "fail[ed] to offer any evidence showing that either had independent knowledge of the allegations at issue in the public disclosures"); *U.S. ex rel. Lopez v. Strayer Educ., Inc.,* 698 F. Supp. 2d 633, 643 (E.D. Va. 2010) (although public disclosures did not specifically name defendant, a for-profit college, "they certainly suffice[d] to specifically indicate how other proprietary institutions in the educational industry had purportedly violated Title IV's incentive payment rule and how that violation could act as a basis for an FCA claim."); *Schultz v. Devry Inc.*, No. 07 C 5425, 2009 WL 562286, at *1-3 (N.D. Ill. Mar. 4, 2009) (dismissing incentive compensation action where the relator, a former student recruiter, "did not have an understanding of Title IV, and had not seen a program participation agreement;" the court held that relator could not assert a false certification claim based on the HEA "without knowledge of DeVry's Title IV

1    obligations and its program participation agreement").  The factual record in this case and the well-

2    established law of this Circuit compel the same result in this case.

3                                    **BACKGROUND**

4           Defendant UOPX is a leading provider of post-secondary education offering courses in a

5    variety of subjects online and at campuses nationwide.  On December 11, 2009, UOPX paid $67.5

6    million to settle a nearly identical *qui tam* action brought by two relators, both former UOPX

7    enrollment counselors, represented by the same counsel as Hoggett and Good.[4]  Relators filed their

8    Complaint in this case nine months later, on September 15, 2010.  On July 12, 2011, after the

9    government declined to intervene and the Complaint was unsealed, Defendants moved to dismiss,

10   arguing, *inter alia*, that Relators' suit was barred by the public disclosure bar due to the

11   government's knowledge of and involvement in the *Hendow* litigation.  (Def.'s Mot. Dismiss, ECF

12   No. 12).  On July 6, 2012, the Court denied Defendants' motion, holding that Relators adequately

13   had pled that they were original sources as to allegations that incentive compensation violations

14   continued to be committed by UOPX following the *Hendow* settlement.  (Mem. and Order at 11,

15   ECF No. 42).

16          This motion is based on discovery that has been conducted since that ruling concerning

17   public disclosures made after the *Hendow* settlement, Relators' knowledge of and lack of

18   involvement in these disclosures, and the basis of Relators' knowledge regarding the allegations

19   advanced in their Complaint.  This discovery demonstrates three critical points.  ***First***, allegations

20   claiming continued violations of the incentive compensation ban were broadly disseminated post-

21   *Hendow* and the government continued to scrutinize enrollment counselor compensation at for-profit

22   universities, including at the University of Phoenix, following the *Hendow* settlement.  ***Second***,

23   neither Relator contributed to these public disclosures, and neither Relator knows anything that

24   materially adds to this publicly disclosed information.  ***Third***, neither Relator properly disclosed the

25   information in their Complaint to the government prior to the public disclosures.  As a result,

26

27   ---
     [4]   *U.S. ex rel. Hendow v. Univ. of Phoenix,* No. 2:03-cv-0457-GEB-DAD, 2009 WL 2705851 (E.D. Cal. Aug. 25, 2009).

28

1  Relators cannot be deemed original sources and their Third Amended Complaint fails under the

2  public disclosure bar.

3  **I.   ALLEGATIONS OF CONTINUING RECRUITMENT AND COMPENSATION VIOLATIONS WERE WIDELY REPORTED BETWEEN THE *HENDOW***

4  **SETTLEMENT AND THE FILING OF THIS LAWSUIT.**

5         Broad public disclosures were made between the *Hendow* settlement on December 11, 2009

6  and the filing of this lawsuit on September 15, 2010 that contained the same claims made by

7  Relators here—that UOPX (and other for-profit colleges) allegedly continued unauthorized incentive

8  compensation practices post-*Hendow*.   These disclosures were published in media accounts,

9  Government Accountability Office ("GAO") reports, U.S. Senate hearings, and in a widely-

10 publicized securities lawsuit.

11        **A.     Disclosures In The Media**

12        Within weeks of the *Hendow* settlement, media outlets published reports on alleged

13 continuing recruitment and compensation misconduct at for-profit colleges, including UOPX.

14 Scarcely a month after the *Hendow* settlement, *The Denver Post* reported on "complaints and

15 lawsuits over recruiting practices" at for-profit colleges.  (Ex. 3, Allison Sherry, *Pass or fail? For-*

16 *profit colleges make the grade in reaching at-risk students, but questions arise over student-loan*

17 *defaults and job prospects,* The Denver Post, Jan. 17, 2010, at 1).  The *Post* reported that "[c]olleges

18 are allowed to compensate admissions representatives based, in part, on the number of students they

19 sign up" and that "[c]ritics say that makes the process less of a counseling session and more of a

20 sales job."  (*Id.* at 3).  The article quoted an official with a Washington advocacy organization as

21 saying, "[w]henever you pay someone such as a recruiter based on numbers they bring in, you're just

22 opening the door for abuse."  (*Id.*).

23        Two days later, Bloomberg News reported that "New York has blocked Phoenix's bid for a

24 Manhattan campus, questioning its academic quality, its dropout rate, *how it compensates recruiters*,

25 and even its right to call itself a university."  (Ex. 4, Daniel Golden, *Apollo Suffers New York Snub*

26 *as SEC Probes Phoenix (Update3)*, Bloomberg News, Jan. 19, 2010, at 1) (emphasis added).  The

27 Bloomberg article quoted New York's deputy commissioner for higher education as saying he would

28

1    not support UOPX's entry into New York "until I'm confident the university is playing by the rules

2    of the U.S. Education Department and complies with our requirements."  (*Id.*).

3         Three weeks later, on February 7, 2010, *The Chronicle of Higher Education* published an

4    article on the growth of for-profit colleges that questioned their recruitment practices.  (Ex. 5, Robin

5    Wilson, *For-Profit Colleges Change Higher Education's Landscape*, The Chronicle of Higher

6    Education, Feb. 7, 2010).   The article, which specifically discussed UOPX and its practices, said

7    "[e]nrollment in the country's nearly 3,000 career colleges has grown far faster than in the rest of

8    higher education," due in part to "big-bucks advertising campaigns and marketing savvy, plus ...

9    *high-pressure recruitment techniques*."  (*Id.* at 1) (emphasis added).  It referred to purported "horror

10   stories about career-college students who never graduate, or those who leave with large student-loan

11   bills and then fail to get jobs," and said for-profit students "borrow more than students in other

12   sectors of higher education, and have the largest student-loan default rates."  (*Id.* at 8).  "For-profit

13   universities," the *Chronicle* reported, "spend a lot of money to get students in the door."  (*Id.* at 7).

14        More articles appeared the following month.  On March 7, 2010, *The Arizona Republic*

15   reported on "allegations that some for-profit schools are manipulating students into costly programs

16   that don't benefit them."  (Ex. 7, Anne Ryman, *Defaults on student loans rising,* The Arizona

17   Republic, Mar. 7, 2010, at 1).  The story, which specifically referenced UOPX, said the U.S.

18   Department of Education "is looking at ... prohibit[ing] schools from paying recruiters based even

19   partly on the number of people they enroll," in light of allegations that "[i]ncentive pay can lead to

20   overly aggressive marketing."  (*Id.*).  Six days later, *The New York Times* reported allegations of

21   "aggressive, sometimes deceitful recruiting practices" by for-profit schools and said "the Obama

22   administration is toughening rules that restrict institutions that receive federal student aid from

23   paying their admissions recruiters on the basis of enrollment numbers."  (Ex. 8, Peter S. Goodman,

24   *In Hard Times, Lured Into Trade School and Debt,* The New York Times, Mar. 13, 2010, at 3, 2).

25   That story, too, specifically referenced UOPX.  (*Id.*).

26        On May 4, 2010, the PBS program "Frontline" broadcast a segment called "College Inc."

27   describing the *Hendow* litigation and its own subsequent investigation.  (Ex. 9).  The program quoted

28   a former UOPX financial counselor as saying, "*The focus is to start the student*. Whether they're

academically ready, whether they're financially ready, they need to start class." (*Id.* at 8) (emphasis added). The broadcast specifically addressed incentive compensation, with Bloomberg News reporter Daniel Golden telling Frontline, "The concern is that they are bringing in students who can't succeed or graduate *just so the recruiter can make more money. If you're paid based on how many people you enroll, you'll enroll pretty much anybody*." (*Id.* at 11) (emphasis added). Secretary of Education Arne Duncan also was interviewed and told Frontline, "where there is high-pressure tactics, where there are deceptive tactics, where there is dishonesty, we have to challenge that in a very serious way." (*Id.*). Concurrent with the program's airing, Frontline posted an interview with reporter Daniel Golden on its website. (Ex. 10). Golden described conversations with "current and former enrollment counselors, recruiters, [and] salespeople," saying "I think that many of them do feel under a large amount of pressure to *meet quotas in terms of enrollments*." (*Id.*) (emphasis added). He added that, based on his interviews, enrollment policy generally is "*[a]ll about starts* and not about retention and graduation and so on. *That's the complaint. ... That's a very common refrain*." (*Id.* at 5) (emphasis added). In a May 7, 2010 posting on the Frontline website, PBS asserted that "*[e]nrollment counselors at the University of Phoenix and other for-profit colleges are incentivized to enroll large numbers of new students every quarter*." (Ex. 19 at 2) (emphasis added).

A similar investigation to Frontline's was conducted by ABC news, specifically targeting UOPX, and was broadcast on August 19, 2010. (Ex. 20, Nightline: Nightline Investigates; Higher Learning (ABC television broadcast Aug. 19, 2010) (transcript on file with Lexis Nexis)). ABC reported that "the government has been doing its own investigation into for-profit schools like the University of Phoenix." (*Id.*)

## B.    Disclosures In Government Reports And Investigations

On February 23, 2010, only two months post-*Hendow*, the GAO, the investigative arm of Congress, published a letter to U.S. Senator Tom Harkin entitled, "Higher Education: Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education." (Ex. 6). The letter reported that the Department of Education had found incentive compensation violations at 32 for-profit schools and that "[m]any of the violations involved payments by schools to their staff in the form of bonuses or commissions for successfully enrolling students[.]" (*Id.* at 5). A follow-up

GAO report, describing an undercover investigation of 15 for-profit colleges during May and July 2010, was published on August 4, 2010.  (Ex. 17).  The report said that four schools "encouraged fraudulent practices," that representatives of all 15 schools "made some type of deceptive or otherwise questionable statement" to investigators, and that "[a]t two colleges, our undercover applicants were told that if they recruited other students, they could earn rewards." (*Id.* at 1, 7, 13).

The GAO letter and report preceded hearings by the Senate Committee on Health, Education, Labor and Pensions on June 24, 2010 and August 4, 2010.  The June 24 hearing report concluded that "[t]o boost enrollment, some for-profit schools recruit large numbers of new students each year" and that "[t]o ensure these enrollment increases, it is necessary for the schools to devote very large shares of title IV dollars and other Federal financial aid to marketing activities, not education." (Ex. 11 at 15).  Kathleen Tighe, the Inspector General of the Department of Education, told the committee that "*the Federal student aid programs have long been a focus of our audit, inspection, and investigation work as they have been considered highly susceptible to fraud and abuse.  This includes extensive work involving proprietary institutions*." (*Id.* at 34) (emphasis added).  In a prepared statement included in the hearing report, Tighe listed "Incentive Compensation" as one of several "types of fraud and abuse our work has identified involving proprietary institutions." (*Id.* at 38).  She continued, "We receive and review complaints of aggressive recruiting and violations of the HEA's ban on incentive compensation by proprietary institutions.  *We have reviewed compensation plans that are clearly providing direct financial incentives for recruiters to increase enrollment*." (*Id.*) (emphasis added).

At the August 4, 2010 hearing, Senator Tom Harkin said that "the evidence points to a problem that is systemic to the for-profit industry: *a recruitment process specifically designed to do whatever it takes to drive up enrollment numbers*, more often than not to the disadvantage of students." (Ex. 16) (emphasis added).  Senator Michael Enzi remarked that "there is clearly inappropriate behavior taking place in the recruiting practices of some schools." (*Id.* at 4).  David Hawkins, the Director of Public Policy and Research at the National Association For College Admission Counseling, testified that "in just about every case, what lies behind a lot of this is the fact that *admission officers and recruiters are compensated almost exclusively if not exclusively,*

1    *based on whether a student enrolls.*"   (*Id.* at 53) (emphasis added).   When asked to identify the

2    schools investigated by the GAO during May and July 2010, Gregory Kutz, the lead GAO

3    investigator, testified that "Case No. 1[ ] is University of Phoenix in Arizona."   (*Id.*).[5]

4    ### C.   Disclosures In Other Litigation

5    In the wake of the Senate hearings and a resulting drop in UOPX's parent's share price, on

6    August 13, 2010, investors who bought Apollo stock between December 7, 2009 and August 3, 2010

7    brought suit in *Gaer v. Apollo Group, Inc. et al.,* No. 2:10-cv-01735-JAT (D. Ariz. Aug. 13, 2010).

8    The suit alleged that UOPX "could no longer foreseeably maintain its growth expectations or meet

9    guidance sponsored and endorsed" by Apollo because its growth was based on "an *illegal and*

10   *fraudulent course of action designed to recruit students* and over-charge the federal government for

11   the cost of such education."   (Ex. 21 at ¶ 5) (emphasis added).   Citing the August 4, 2010 GAO

12   report and subsequent media coverage of it, the plaintiffs alleged that Apollo shares dropped nearly

13   10% on heavy trading volume, "eradicating over $684.53 million of the Company's market

14   capitalization in only four trading days."   (*Id.*).   Apollo Group, Inc. disclosed the lawsuit in a Form

15   8-K filed with the SEC on August 31, 2010.   (Ex. 23).   The lawsuit was broadly reported in financial

16   outlets, as well as *The Arizona Republic* and the *Phoenix Business Journal*.[6]

17   ---

18   [5]   In addition to the stand-alone media reports described in the preceding section, these governmental investigations and hearings received extensive press coverage, due in part to their impact on the stock of publicly-traded education

19   companies.   On August 3, 2010, *Barron's* reported that "[f]or-profit college shares are being moved to the back of the class after a Government Accountability Office report accused some of deceptive marketing and encouraging

20   fraud," while CNBC reported that "[s]hares of for-profit education companies tumbled ... after a government report prepared ahead of a Senate hearing ... detailed deceptive—and in some cases—possibly illegal actions, by recruiters

21   at 15 for-profit schools."   (Ex. 13, Ex. 31).   Reuters reported that "[t]he head of the U.S. Senate's education panel lashed out at the for-profit education sector in a congressional hearing on Wednesday after government investigators

22   uncovered deceptive practices."   (Ex. 14).   Reuters noted that "[a]mong the schools probed were Apollo Group's ... University of Phoenix in Arizona."   (*Id.*).

23   [6]   Ex. 24, Russ Wiles, *Apollo hit with fraud suit from investor,* The Arizona Republic, Aug. 31, 2010,

24   http://www.azcentral.com/business/articles/20100831apollo-hit-fraud-suit-from-investor.html;   Ex. 25, Angela Gonzales, *Apollo Group named in class action lawsuit,* Phoenix Business Journal, Aug. 31, 2010,

25   http://www.bizjournals.com/phoenix/stories/2010/08/30/daily17.html?s=print.   Although the current version of §

26   3730(e)(4)(a)(i) provides that a federal lawsuit triggers the public disclosure bar only where the government or its agent is a party, press coverage of a lawsuit will trigger the public disclosure bar even where the government was

27   not a party.   *U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.,* 933 F. Supp. 2d 825, 830 (E.D. Va. Mar. 21, 2013); *U.S. ex rel. Paulos v. Stryker Corp.,* No. 11-0041-cv-W-ODS, 2013 WL 2666346 at *5 n.7 (W.D. Mo. June 12, 2013).

28

\*      \*      \*

At deposition, Relators admitted that they were aware of many of these public disclosures *before* filing their original Complaint.  Hoggett watched the "Frontline" broadcast and even contacted PBS *afterward*.[7]  Hoggett also testified that he "read press releases put out by the University of Phoenix [to] various programs" and that he "read an awful lot of documents and an awful lot of press releases and an awful lot of information regarding the whole for-profit industry."[8]  When asked how he learned about the incentive compensation ban, he replied, "from articles written about the for-profit industry, television programs about the — it may have been television programs about the for-profit industry.  There's been an awful lot of press and concerns over the for-profit industry, so it may be one of those articles."[9]  He testified that, while he was not specifically familiar with the *Gaer* suit, "I know there was a — there was a civil action about the stock."[10]  When asked if he was aware of other lawsuits against for-profit colleges alleging incentive compensation violations, Good testified, "Yes. From what I saw in the news, yes."[11]

## II.  RELATORS HAD NO KNOWLEDGE OF UOPX'S COMPENSATION PRACTICES, EVEN AT THE AUSTIN CAMPUS WHERE THEY WORKED, OTHER THAN THEIR OWN SALARIES AND THE HEARSAY ACCOUNTS OF A HANDFUL OF OTHERS.

Hoggett and Good admitted in deposition that they did not contribute to these public disclosures.[12]  Nor could they, given their isolated, low-level, and brief employment at UOPX following the *Hendow* settlement.  Both Relators worked solely at the Austin campus of UOPX.[13]  Their combined period of employment spanned just over three years, from March 16, 2007 to

---

[7]    Ex. 1, 8/26/13 Hoggett Dep. at 269:15-270:1.

[8]    Ex. 1, 8/26/13 Hoggett Dep. at 262:6-14; 252:15-21.

[9]    Ex. 1, 8/26/13 Hoggett Dep. at 253:6-14.

[10]   Ex. 1, 8/26/13 Hoggett Dep. at 252:15-21, 256:2-3, 261:3-10, 262:6-14, 267:1-6, 269:15-270:1.

[11]   Ex. 2, 8/27/13 Good Dep. at 49:10-17.

[12]   Ex. 1, 8/26/13 Hoggett Dep. at 260:19-22, 261:7-10, 261:22-262:3, 262:19-24, 264:23-265:2; Ex. 2, 8/27/13 Good Dep. at 54:22-55:1.

[13]   Ex. 1, 8/26/13 Hoggett Dep. at 113:6-11; Ex. 2, 8/27/13 Good Dep. at 16:3-6.

August 18, 2010; collectively, covering only nine months in the post-*Hendow* period.  (TAC ¶¶ 8-9).

Hoggett was terminated in May 2010.  (TAC at ¶ 8).  Good was terminated in August 2010.  (TAC

at ¶ 9).   Also, both Relators worked exclusively in junior-level positions, where they had no

knowledge of compensation practices in general or specific compensation paid to any employees

other than themselves.[14]   Asked if he could explain compensation practices with respect to

enrollment counselors at the Austin campus, Hoggett replied:

> Well, I wasn't party to what other enrollment counselors got in their
> six-month review because they -- they didn't want you to discuss that.
> So the only knowledge I had was that people would come out and say,
> "Well, I've had my review and I got a salary increase." I've never
> heard it from the other side because they never gave me that data.  I
> only know what they did to me and they made an exception for me
> because -- you know, because they had treated me differently.[15]

In other words, even at the single campus where he worked, Hoggett was unaware of other

counselors' enrollment numbers, their success with respect to other review criteria, or the specifics

of their salary adjustments.[16]   Hoggett knows only about his own salary and, even here, he does not

view this as representative of UOPX's compensation practices because he believes "they had treated

[him] differently" than others.  Good, likewise, knew nothing about what others were paid:

> Q:    And did you know what any enrollment counselor besides yourself made in
>       terms of their actual compensation?
>
> A:    No.[17]

Other than their own salaries, all of Relators' knowledge concerning UOPX compensation

practices in the post-*Hendow* period comes from a handful of purported hearsay conversations with

other enrollment counselors.  Hoggett testified that "there were several counselors" who told him

---

[14]   Ex. 1, 8/26/13 Hoggett Dep. at 119:17-22, 154:13-19, 202:8-14, 155:3-13, 155:18-156:9, 189:16-23, 197:20-24; Ex.
2, 8/27/13 Good Dep. at 20:16-18, 21:1-2, 21:11-24, 21:3-10, 41:3-11, 55:13-56:9, 126:3-8, 135:25-136:5.

[15]   Ex. 1, 8/26/13 Hoggett Dep. at 153:6-16.

[16]   Ex. 1, 8/26/13 Hoggett Dep. at 153:6-16, 154:13-19 ("Q. Now, you said that you weren't privy to other enrollment
counselors reviews? A. No, I wasn't. Q. And you -- obviously as an enrollment counselor yourself, you weren't
involved in the review of any other enrollment counselors? A. No."); 155:18-20 ("Q. Did you know what specific
enrollment counselors you worked with were paid? A. Only if they told me what they were paid.").

[17]   Ex. 2, 8/27/13 Good Dep. at 41:3-11.

what they were paid, but he "can't remember who it was."[18]  When asked if he could provide "any names of enrollment counselors who told you what they were paid," Hoggett identified two (Mike Reid and Caren Samuels) but could not remember any others.[19]  With respect to Samuels, Hoggett was not even sure that she had told him her compensation and testified only that, "Caren Samuels might have told me.  I don't recall."[20]  With respect to Reid, Hoggett testified that Reid was terminated in approximately May 2009, meaning that anything Hoggett may have known about Reid's compensation predates the *Hendow* settlement.[21]  Relator Good testified that an enrollment counselor named Evan Robinson once told him he received a pay increase, but Robinson did not tell Good "an exact amount" and Good admitted he did not know "the details of his salary" and never saw Robinson's performance reviews.[22]  Good named several counselors who purportedly told him compensation was based on enrollments, but Good agreed that he "never saw anybody else's performance reviews" and "never saw anybody else's salary numbers."[23]

Relators even were unfamiliar with basic policy documents regarding compensation that were made broadly available to UOPX employees.  For example, Hoggett admitted that he had never seen UOPX's 2010 policy guide for enrollment counselors, which sets forth in detail UOPX's policies on performance evaluations and compensation.[24]  Hoggett also could recall few details about the "matrix" that UOPX used in 2009 and 2010 to evaluate enrollment counselor performance and make compensation changes, even though Relators refer to it repeatedly in the various iterations of their Complaint.  (*E.g.,* TAC at ¶¶ 22, 26, 27, 29, 30, 36, 37, 38, 41, Ex. 2, Ex. 4)  When shown a copy of the matrix in effect as of September 1, 2009, Hoggett said "I remember seeing something

---

[18]   Ex. 1, 8/26/13 Hoggett Dep. at 155:21-25.

[19]   Ex. 1, 8/26/13 Hoggett Dep. at 156:1-9.

[20]   Ex. 1, 8/26/13 Hoggett Dep. at 156:1-9.

[21]   Ex. 1, 8/26/13 Hoggett Dep. at 157:4-9.

[22]   Ex. 2, 8/27/13 Good Dep. at 44:11-22.

[23]   Ex. 2, 8/27/13 Good Dep. 126:3-8, 127:10-128:9.

[24]   Ex. 1, 8/26/13 Hoggett Dep. at 56:2-57:17.

like this.  But whether it was this document, I don't know."[25]  He also was unfamiliar with the performance metrics included in the matrix:

> Q:     All right. So as you sit here today, you can't recall what specifically was or was not on the matrix in terms of the -- in connection with the factors that were considered as of September 2009?
>
> A:     There were a number of little tiny things that were put on there, different things.
>
> Q:     All right. There were a variety of different factors that were considered on the matrix as of September of 2009, but you can't recall specifically what each of them was?
>
> A:     Not off the top of my head, no.[26]

Relators also acknowledged that they had no role in developing compensation policies for UOPX and did not know who did.  Good admitted he was never "part of any conversation where the compensation policies for the school were devised" and when asked "who was responsible … for coming up with the compensation policies," he replied, "I just know that it was from corporate."[27]  Hoggett, likewise, admitted he had no role in "preparation," "formulation," or "distribution" of enrollment counselor compensation policies and testified, "[t]hat was all head office."[28]

Relators likewise admitted knowing nothing about any actual claims (much less false ones) made by UOPX to the federal government or to California.  When asked what information UOPX provided to the government in connection with claims for payment under the HEA, Relator Hoggett generically replied, "they had to certify that they were in compliance with certain rules and regulations," and said he learned this by reading certain "legal documents" including possibly the *Hendow* complaint.[29]  Neither Relator had any knowledge about UOPX's program participation

---

[25]     Ex. 1, 8/26/13 Hoggett Dep. at 83:2-14.

[26]     Ex. 1, 8/26/13 Hoggett Dep. at 86:2-87:6.

[27]     Ex. 2, 8/27/13 Good Dep. at 39:19-40:22.

[28]     Ex. 1, 8/26/13 Hoggett Dep. at 248:9-24.

[29]     Ex. 1, 8/26/13 Hoggett Dep. at 251:15-252:4.

agreements with the federal government or institutional participation agreements with California.[30] Hoggett testified that his knowledge of the HEA incentive compensation ban is derived "from articles written about the for-profit industry" and "television programs about the … for-profit industry."[31]  Good testified that his understanding was based solely on reviewing the complaints in this case and "what was on the news previously."[32]

In sum, Relators admitted that they know nothing about UOPX's compensation policies other than their own salaries and the hearsay accounts of a handful of other enrollment counselors at the Austin campus, and had no role whatsoever either in developing compensation policies or submitting claims for payment to the government.[33]  Moreover, in stark contrast to the substance of his own lawsuit, Hoggett testified that despite his own superior enrollment performance, he was paid less, given fewer opportunities for advancement, and made a permanent employee later than other counselors who had worse enrollment performance.[34]

## STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs the dismissal of a claim for lack of subject matter jurisdiction, and a motion under this rule may be brought at any time.  *See Boyal v. Napolitano,* No. 2:09-cv-03263, 2011 WL 864618, at *2 (E.D. Cal. Mar. 10, 2011) (England, J.) (dismissing under Rule 12(b)(1) due to lack of subject matter jurisdiction); *Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund,* No. 2:09-cv-0090, 2009 WL 2230776, at *6

---

[30]  Ex. 1, 8/26/13 Hoggett Dep. at 248:25-249:19; Ex. 2, 8/27/13 Good Dep. at 35:19-36:14.

[31]  Ex. 1, 8/26/13 Hoggett Dep. at 253:6-14.

[32]  Ex. 2, 8/27/13 Good Dep. at 24:14-25:3.

[33]  Ex. 1, 8/26/13 Hoggett Dep. at 248:9-251:14, 253:15-21, 253:24-254:17; Ex. 2, 8/27/13 Good Dep. at 35:16-38:18, 39:19-40:22.

[34]  Ex. 1, 8/26/13 Hoggett Dep. at 129:9-13, 131:3-15, 132:3-11, 133:9-24, 141:18-142:4.  Hoggett admitted at deposition that he complained to management, while a UOPX employee, that he was not being rewarded for his superior enrollment performance and if he was "not going to be rewarded for [his] superior enrollment performance, then what incentive will [he] have to continue to do a good job?"  (Ex. 1, 8/26/13 Hoggett Dep. at 134:6-10)  This testimony echoed claims Hoggett previously had made in a rejected age discrimination complaint before the Texas Workforce Commission and the Equal Employment Opportunity Commission.  (Ex. 22).  Thus, Hoggett's testimony demonstrates that he has sometimes argued that UOPX places too *much* emphasis on enrollments and at other times argued that UOPX places too *little* emphasis on enrollments, changing his position depending upon the forum.

---

(E.D. Cal. July 24, 2009) (same).  Rule 12(h)(3) expressly provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  *Id.*; *see also Arbaugh,* 546 U.S. at 506 ("[t]he objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").  If the court's subject matter jurisdiction depends on contested facts, the court may review the evidence and resolve the dispute, *Arbaugh*, 546 U.S. at 514, but the plaintiff bears the burden of establishing that subject matter jurisdiction exists by a preponderance of the evidence.  *Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir. 1995).  Accordingly, it is Relators that must establish by a preponderance either that the information contained in their Complaint was not publicly disclosed or that they qualify as original sources.

The public disclosure bar enacted in 31 U.S.C. §3730(e)(4) was designed to prevent "parasitic" lawsuits and ensures that opportunistic litigants cannot profit from a *qui tam* action "when the relevant information has already entered the public domain through certain channels." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* 559 U.S. 280, 285, 295 (2010); *see also Seal 1 v. Seal A,* 255 F.3d 1154, 1158 (9th Cir. 2001) (public disclosure bar is designed for "discouragement of opportunistic plaintiffs who have no significant information to contribute to their own.") (citation omitted); *Bates v. Mortg. Elec. Registration Sys., Inc.,* 694 F.3d 1076, 1081 (9th Cir. 2012) (California False Claims Act "erects a jurisdictional bar to *qui tam* actions that do not assist the government in ferreting out fraud because the fraudulent allegations or transactions are already in the public domain.") (citation omitted).

Section 3730(e)(4) was amended effective July 22, 2010 and Relators' allegations concern events occurring both before and after the amendment.[35]  While both versions bar suits based on publicly-disclosed allegations unless relators are "original sources," the version in effect until

---

[35]   *See, e.g., U.S. ex rel. Cervantes v. Deere & Co.,* CV-10-3034-RMP, 2011 WL 5325466 (E.D. Wash. Nov. 3, 2011) ("The public disclosure provisions were amended effective July 22, 2010."); *U.S. ex rel. Jamison v. McKesson Corp.,* 649 F.3d 322, 326 (5th Cir. 2011) ("Those provisions were amended effective July 22, 2010.").  Other courts have treated the amendments as effective March 23, 2010.  *See, e.g., U.S. ex rel. Gohil v. Aventis Pharm., Inc.,* 387 F. App'x 143, 145 (3d Cir. 2010).  Whether the effective date is March 23, 2010 or July 22, 2010, Relators' allegations span both the pre-amendment and post-amendment periods.

July 22, 2010 defined "original source" to mean "an individual who has direct and independent knowledge of the information on which the allegations are based *and* has voluntarily provided the information to the government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2010) (emphasis added).  The current version, post-July 22, 2010, allows a relator to qualify as an original source if *either* "(i) *prior to a public disclosure* … [relator] voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, *or* (ii) … [relator has] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and … voluntarily provided the information to the Government before filing an action under this section."   31 U.S.C. § 3730(e)(4)(B) (2013) (emphasis added).

Courts considering the issue have held that the version of the statute in effect at the time of the alleged violation controls and that the amendments are not retroactive.  (*See* Ex. 27, Order Granting Defs.' Mot. Dismiss at 18, *Lee,* No. 07-1984 PSG (MANx) (C.D. Cal. Mar. 15, 2013); *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.,* 709 F. Supp. 2d 1084 (D.N.M. 2010)).   As a practical matter, however, the version of the statute applied is immaterial in this case because, under either version, there are two fundamental hurdles the Relators cannot overcome.  First*,* under either version, Ninth Circuit law requires that relators play a role in the public disclosures to qualify as original sources; here it is undisputed that Relators did not.  *See Wang,* 975 F.2d at 1418; *U.S. ex rel. Lujan v. Hughes Aircraft Co*., 162 F.3d 1027, 1033 (9th Cir. 1998) (internal quotation marks omitted).  ("To bring a qui tam suit, one must have had a hand in the public disclosure of allegations that are a part of one's suit.").   Second, Relators cannot qualify as original sources under either version of the statute relying on claims that are substantially the same as those already available in the public domain; here, Relators' claims are indistinguishable from those that were already public and their claims are not based on their own direct and independent knowledge.  *See U.S. ex rel. Meyer v. Horizon Health Corp.,* 565 F.3d 1195, 1202 (9th Cir. 2009) (affirming dismissal where relator lacked "direct and independent knowledge of the alleged fraud"); *Whipple v. Chattanooga-Hamilton Hosp. Auth.,* No. 3-11-0206, 2013 WL 4510801, at *8 (M.D. Tenn. Aug. 26, 2013) (dismissing action under either pre-amendment or post-amendment original source test where relator

had "no first-hand knowledge" of alleged false claims).  Relators' claims, therefore, are barred under

Section 3730(e)(4) and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

<u>**ARGUMENT**</u>

I.   **THE POST-*HENDOW* MISCONDUCT ALLEGED IN RELATORS' COMPLAINT WAS THE SUBJECT OF WIDESPREAD PUBLIC DISCLOSURES BETWEEN DECEMBER 12, 2009 AND SEPTEMBER 15, 2010.**

As a starting point, the public disclosure bar requires dismissal where "substantially the same

allegations or transactions" were publicly disclosed in media accounts, government reports and

hearings, or prior litigation.  31 U.S.C. § 3730(e)(4)(A).[36]  "For a qui tam suit to be 'based upon' a

prior public disclosure … the publicly disclosed facts need not be identical with, but only

substantially similar to, the relator's allegations."  *Meyer,* 565 F.3d at 1199.  Nor does the public

disclosure have to specifically discuss a particular defendant entity, where wrongdoing is alleged

industry-wide.  *Lopez*, 698 F. Supp. 2d 633, 643 (E.D. Va. 2010) (although public disclosures did

not specifically name defendant, a for-profit college, "they certainly suffice[d] to specifically

indicate how other proprietary institutions in the educational industry had purportedly violated Title

IV's incentive payment rule and how that violation could act as a basis for an FCA claim."); *see also*

*U.S. v. Alcan Elec. & Eng'g, Inc.,* 197 F.3d 1014, 1018-19 (9th Cir. 1999) (public disclosure of

alleged fraud by electrical contractors working on federally funded projects in Alaska barred

subsequent claim against twenty-two specific contractors).  Establishing a public disclosure is not

hard and many courts treat this part of the inquiry as "a quick trigger to get to the more exacting

original source inquiry."  *Hagood v. Sonoma Cty. Water Agency,* 81 F.3d 1465, 1476 n. 18 (9th Cir.

1996) (quotation omitted); *see also Malhotra v. Steinberg,* C09-1618JLR, 2013 WL 441740, at *5

(W.D. Wash. Feb. 5, 2013) ("This first step in the two-step inquiry is typically not hard to meet").

Here, although the underlying facts are vigorously contested by UOPX, there can be no

dispute that there were abundant post-*Hendow* public allegations about purported continuing

---

[36]   The California False Claims Act has a public disclosure bar "almost identical" to that in the federal False Claims Act, and "California courts interpreting the CFCA generally rely on FCA cases."  *Johnson Controls,* 457 F.3d at 1020-22.  Therefore, both the federal claims and the California claims in this case are barred by the prior public disclosures for which Relators were not original sources.

incentive compensation violations, both in the for-profit education industry generally and at UOPX in particular.  **First,** public disclosures were widely disseminated in the media.  This included reports asserting violations of the incentive compensation ban within the for-profit education industry, as well as reports in which government officials questioned UOPX's specific compliance with Department of Education regulations.  (*See* Ex. 3 at 3 (Jan. 17, 2010 Denver Post) ("[w]henever you pay someone such as a recruiter based on numbers they bring in, you're just opening the door for abuse"); Ex. 4 at 1 (Jan. 19, 2010 Bloomberg News) ("New York has blocked Phoenix's bid for a Manhattan campus, questioning … how it compensates recruiters"); Ex. 5 at 7 (Feb. 7, 2010 Chronicle of Higher Education) (discussing "high-pressure recruitment techniques"); Ex. 7 at 1 (Mar. 7, 2010 Arizona Republic) ("Incentive pay can lead to overly aggressive marketing"); Ex. 8 at 2 (Mar. 13, 2010 New York Times) ("the Obama administration is toughening rules that restrict institutions that receive federal student aid from paying their admissions recruiters on the basis of enrollment numbers"); Ex. 9 at 11 (May 4, 2010 PBS) ("they are bringing in students who can't succeed or graduate just so the recruiter can make more money"); Ex. 20 at 6 (Aug. 19, 2010 ABC News) ("the government has been doing its own investigation into for-profit schools like the University of Phoenix.")).  Any of these reports by itself is sufficient to trigger the public disclosure bar.  *See, e.g., U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.,* 161 F.3d 533, 535 (9th Cir. 1998) (public disclosure bar triggered by report on ABC news program "20/20"); *U.S. ex rel. Devlin v. State of California,* 84 F.3d 358, 360 (9th Cir. 1996) (public disclosure bar triggered by article in local newspaper); *Cervantes,* 2011 WL 5325466, at *5 (public disclosure bar triggered by "press releases, financial disclosures … and other information retrieved from the Internet").

 **Second**, public disclosures were made in government reports.  These included two GAO reports.  (*See* Ex. 6 at 2 (Feb. 23, 2010 GAO report) ("[m]any of the violations involved payments by schools to their staff in the form of bonuses or commissions for successfully enrolling students."); Ex. 17 at 13 (Aug. 4, 2010 GAO report) ("our undercover applicants were told that if they recruited other students, they could earn rewards")).  Public disclosures were also made during two U.S. Senate hearings.  (Ex. 11 at 38 (June 24, 2010 Hr'g Tr.) ("We receive and review complaints of aggressive recruiting and violations of the HEA's ban on incentive compensation by proprietary

institutions."); Ex. 16 at 2 (Aug. 4, 2010 Hr'g Tr. ("the evidence points to a problem that is systemic to the for-profit industry: a recruitment process specifically designed to do whatever it takes to drive up enrollment numbers, more often than not to the disadvantage of students.")).

Both GAO reports and congressional hearings specifically are identified in the False Claims Act as types of public disclosure barring a *qui tam* suit. 31 U.S.C. § 3730(e)(4)(A)(ii). Indeed, these particular reports and hearings were more specific than required for the public disclosure bar to apply, since even a generalized report about industry-wide practices will bar a *qui tam* action where it "set[s] the government squarely on the trail of the alleged fraud." *U.S. ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 571 (10th Cir. 1995) (public disclosure bar triggered by GAO report that laboratory operators improperly "taxed" funds for unapproved research projects, even though report did not identify claim alleged by relator); *see also U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cty.,* 494 F. App'x 285, 294 (4th Cir. 2012) (dismissing *qui tam* lawsuit based on "robust public discussion" of Medicaid payment mechanism challenged by relator where "[t]he discussion was manifested in GAO reports, congressional reports and hearings, and in various forms of news media.").

**Third,** public disclosures were made in litigation, including the *Gaer* shareholder suit alleging "an illegal and fraudulent course of action designed to … over-charge the federal government." (Ex. 21 at ¶ 5). Any prior litigation qualified as a public disclosure in the pre-July 2010 version of 31 U.S.C. § 3730(e)(4)(B); in the post-July 2010 version, the government must be a party for the litigation to qualify, but even third-party litigation will trigger the public disclosure bar where it is reported in the news media, as *Gaer* was. *Beauchamp,* 933 F. Supp. 2d at 830; *see also Paulos*, 2013 WL 2666346, at *5 n. 7.

Not surprisingly, much of Relators' Third Amended Complaint mimics almost verbatim these preexisting public disclosures:

| Public Disclosure | Relators' Complaint |
|---|---|
| "'It was about reaching your numbers,' [a for-profit enrollment counselor] said of the high-pressure sales pitches she delivered on the phone. 'They would move you down a pay level if you didn't make your numbers.'" Ex. 3, Allison Sherry, *Pass or fail? For-profit colleges make the grade in reaching at-risk students, but questions arise over student-loan defaults and job prospects*, Denver Post, January 17, 2010, at 3. | "Counselors often resort to pressuring and bullying students into starting in order to try to make their numbers to earn a salary raise." (TAC ¶27) |
| "Some schools have paid recruiters according to the number of people they sign up. That has led to claims that students are being admitted who are more likely to drop out, never get degrees and default on their loans." Ex. 7, Anne Ryman, *Defaults on student loans rising*, Arizona Republic, March 7, 2010, at 3. | "[Because of incentive pay] high-pressure sales methods are employed to recruit students into programs regardless of their fitness, aptitude or motivation, and students are misled with falsified information and promises about programs. These students who are deceived into enrolling find little or no benefit upon graduating from the programs. As a result, such students are unable to re-pay student loans." (TAC ¶ 24). |
| "[Recruiters] do feel under a large amount of pressure to meet quotas in terms of enrollments." Ex. 10, Interview by PBS Frontline with Daniel Golden, May 4, 2010, at 5. | "UOPX … uses incredible pressure on its recruiters who are not successfully meeting enrollment budgets (quotas) or targets."  (TAC ¶26). |
| "[R]ecruiters are compensated almost exclusively, if not exclusively, based on whether a student enrolls."  Ex. 16, Senate Comm. Hearing, August 4, 2010, at 53. | "[Recruiters] compensation was at all times, based exclusively on the number of students enrolled[.]"  (TAC ¶29). |
| "[T]he aggressive marketing of anybody walking in the door should not be a surprise here to anybody." Ex. 16, Senate Comm. Hearing, August 4, 2010, at 12. | Alleges campus director said, "our goal has always been just to get them in the door[.]" (TAC ¶30). |
| "[Senator] Harkin said he thought inducements to recruit aggressively were coming from company executives."  Ex. 26, Jennifer Epstein, *Shellacking the For-Profits*, Inside Higher-Ed, Aug. 5, 2010, at 2. | "UOPX Corporate Enrollment management urges enrollment counselors to enroll students regardless of whether they have the academic qualifications to attend university[.]"  (TAC ¶31). |

In sum, all of these sources alerted the government to possible post-*Hendow* violations of the incentive compensation ban at least as early as the January 17, 2010 *Denver Post* article.  Indeed, through the GAO reports and Senate hearings, the government itself already was actively

1  investigating UOPX's post-*Hendow* incentive compensation practices before this lawsuit ever was

2  filed.  This case—brought scarcely a month after the second GAO report was released on August 4,

3  2010—is at best an echo of the widely-disseminated public disclosures that already had been made.

4  This is not what the FCA was meant to encourage or reward.

5  **II.   RELATORS ARE NOT ORIGINAL SOURCES.**

6  Given the extensive public disclosure of allegations identical to those made by Relators, it is

7  Hoggett's and Good's burden to establish, by a preponderance of the evidence, that they qualify as

8  "original sources" under the public disclosure bar.  *Meyer,* 565 F.3d at 1199 ("Relators, as the qui

9  tam plaintiffs, bear the burden of establishing subject-matter jurisdiction by a preponderance of the

10  evidence.").  Regardless of whether the pre- or post-July 2010 version of Section 3730(e)(4)(B) is

11  applied, Relators cannot satisfy the common, long-standing requirement in the Ninth Circuit that

12  they "had a hand" or played a role in the disclosures.  *See, e.g., Wang,* 975 F.2d at 1418.  Relators

13  also fail to meet the remaining elements of either version of the statute, because they offer no

14  material, independent knowledge of the alleged facts; because the public disclosures predated any

15  information provided by Relators to the government; and because the solitary email sent by Relator

16  Hoggett to the government was inadequate under the statute.

17  **A.   Relators Did Not Have A Hand In the Public Disclosures.**

18  As a threshold matter, Hoggett and Good fail to meet the requirement that *qui tam* relators

19  show they "had a hand in the public disclosure of the allegations."  *Wang,* 975 F.2d at 1418; *see also*

20  *Johnson Controls, Inc.,* 457 F.3d at 1018 ("[W]e … have interpreted the statute to require that

21  prospective relators play a role in the public disclosure at issue if they are to partake of the original

22  source exception"); *Swan,* 279 F. Supp. 2d at 1219 ("To qualify as an original source … the plaintiff

23  must have played a role in publicly exposing the alleged fraud in the first place."); *Casady*, 2013 WL

24  1702777, at *5 ("To qualify as an original source, a relator must … [have] had a hand in the public

25  disclosure of allegations that are a part of [his or her] suit") (quotation omitted).  The basis for this

26  rule is that "[a] 'whistleblower' sounds the alarm; he does not echo it."  *Wang,* 975 F.2d at 1419; *see*

27  *also U.S. v. Northrop Corp.,* 59 F.3d 953, 964 (9th Cir. 1995) ("engrafting a requirement that a *qui*

28  *tam* plaintiff ... have played some part in his allegation's original public disclosure … discourages

persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time.") (quotation omitted).   Therefore, "[i]f … someone *republishes* an allegation that already has been publicly disclosed, he cannot bring a *qui tam* suit, even if he had 'direct and independent knowledge' of the fraud."   *Wang,* 975 F.2d at 1419 (emphasis in original).   Thus, under well-established Ninth Circuit precedent, an "original source" is a relator who provides information to the person or entity that makes the "public disclosure" preceding his *qui tam* lawsuit.   It is not enough that the relator could have been the source of the public disclosure—he must *actually* have been the source of the disclosure.[37]

At deposition, Relators admitted that they did not "have a hand" in the public disclosures described in Section I above.   Hoggett specifically testified that he provided no information to *The Chronicle of Higher Education,* "Frontline," ABC News, the GAO, or the Senate Committee on Health, Education, Labor, and Pensions.[38]   Indeed, when asked if he knew "what the Government Accountability Office is," Hoggett responded, "Vaguely."[39]   Good testified that he never provided any information about "compensation practices at the University of Phoenix" to *anyone* other than his lawyers.[40]   When asked if he was familiar with the GAO, Good said he was "not familiar with it" and that he never communicated with the GAO about UOPX compensation practices.[41]   Relators likewise had no role in the *Gaer* securities litigation.[42]

In sum, by their own admission, Relators had no "hand" in the reports, investigations, or prior lawsuits that put the government on notice of possible post-*Hendow* incentive compensation

---

[37]   As the Supreme Court has recognized, the Ninth Circuit standard is stricter than the "original source" standard used by some circuits.   *See Schindler Elevator Corp. v. U.S. ex rel. Kirk,* 131 S. Ct. 1885, 1895 n.8 (2011) ("Some Courts of Appeals have narrowly construed the exception to limit 'original sources' to those who were the cause of the public disclosure, while others have been more generous.").

[38]   Ex. 1, 8/26/13 Hoggett Dep. at 260:19-22, 261:7-10, 261:22-262:3, 262:19-24, 264:23-265:2.

[39]   Ex. 1, 8/26/13 Hoggett Dep. at 262:19-24.

[40]   Ex. 2, 8/27/13 Good Dep. at 54:22-55:1.

[41]   Ex. 2, 8/27/13 Good Dep. at 53:18-21, 53:25-54:4.

[42]   Ex. 1, 8/26/13 Hoggett Dep. at 255:3-256:19; Ex. 2, 8/27/13 Good Dep. at 50:18-52:1.

---

violations.  Moreover, Relators do not assert in any pleading or declaration that they did.  *See Meyer,* 565 F.3d at 1202-03 ("neither the [complaint] nor relators' declarations filed in opposition to appellees' motion to dismiss the [complaint] include any assertion that relators had a hand in the … public disclosure of the allegations").  Therefore, as a matter of law, Hoggett and Good cannot be original sources under well-established Ninth Circuit precedent regardless of whether they satisfy the other statutory elements.  As set forth below, Relators fail to satisfy these remaining statutory elements as well.

### B.    Relators Do Not Have Knowledge Independent Of The Publicly Disclosed Allegations That Materially Adds To Them.

In addition to being the actual source of the public disclosure, which Relators were not, the pre-July 2010 version of Section 3730(e)(4) required Relators to have "direct and independent knowledge of the information on which the allegations are based."  31 U.S.C. § 3730(e)(4)(B) (2010) (emphasis added).  The post-July 2010 version is similar, requiring "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," unless relators provided the information their claim is based on to the government "prior to a public disclosure."  31 U.S.C. § 3730(e)(4)(B) (2013) (emphasis added).[43]

Here, Relators played no role in the wave of post-*Hendow* public disclosures regarding continued incentive compensation issues for the simple and dispositive reason that they had no direct and independent knowledge that materially would have added to those disclosures.  To demonstrate direct and independent knowledge, a relator must "show that he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his own labor unmediated by anything else."  *Alcan Elec. & Eng'g,* 197 F.3d at 1020 (quotation omitted).  Where the relator "never participated in the negotiating, drafting, or implementation" of the allegedly fraudulent program and "does not allege that he played any role in submitting false claims to the government," he lacks direct and independent knowledge.  *Id.* at 1021; *see also Devlin,* 84 F.3d at 361 & n. 4 (relators were not original sources because they "did not see the fraud with their own eyes or obtain their

---

[43]    That no information was provided by Relators to the government prior to the public disclosures is discussed in Part II (C), *infra*.

knowledge of it through their own labor unmediated by anything else, but derived it secondhand."); *U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.,* No. 3:07CV290-HEH, 2011 WL 129842, at *3 (E.D. Va. Jan. 12, 2011) (dismissing based on public disclosure bar where relators "worked as mere telemarketers with no access to information concerning the alleged illegal practices" and did not "have access to information regarding claims for government reimbursement submitted by" defendant) *aff'd,* 469 F. App'x 244 (4th Cir. 2012).  Relators cannot be original sources based on statements allegedly made to them by others regarding the role of enrollments in compensation at UOPX, even if those statements were true.  *See U.S. ex rel. Smith v. Yale Univ.,* 415 F. Supp. 2d 58, 77 (D. Conn. 2006) ("As a matter of law, Relator cannot claim to be an original source of information derived from third parties."); *U.S. ex rel. Hays v. Hoffman,* 325 F.3d 982, 991 (8th Cir. 2003) (information that relator obtained from co-worker was "neither direct nor independent"); *U.S. ex rel. Feldstein v. Organon, Inc.,* No. 07–CV–2690 (DMC), 2009 WL 961267, at *9 (D.N.J. Apr. 7, 2009) (relator could not be original source based on information in email received from colleague, because "[t]he colleague giving the e-mail to Relator constitutes intervening agency").

Even "independent" knowledge of a fraud does not "materially add to the publicly disclosed allegations" unless it is "qualitatively different" from information already discovered and "not merely the product and outgrowth of publicly disclosed information."  *U.S. ex rel. Lockey v. City of Dallas, Tex.*, No. 3:11-CV-354-O, 2013 WL 268371, at *16 (N.D. Tex. Jan. 23, 2013) (quoting *U.S. ex rel. Fried v. West Indep. Sch. Dist.* 527 F.3d 439, 443 (5th Cir. 2008)); *see also Whipple*, 2013 WL 4510801, at *8 (relator's "background information or unique experience allowing him to understand the significance of publicly disclosed allegations" did not "materially add to" publicly disclosed allegations); *Beauchamp*, 933 F. Supp. 2d at 843 (complaints that "add only illustrative examples of the specific behavior" already disclosed do not materially add to publicly disclosed information).

Here, Relators cannot demonstrate independent, material knowledge for two distinct reasons: (i) they admit having no information or understanding whatsoever about the participation agreements submitted by UOPX to the Department of Education and the State of California, through which Defendants' false claims purportedly were made; and (ii) they admit having no knowledge of post-

*Hendow* incentive compensation practices, even at the Austin campus, outside their own personal experiences and, therefore, cannot add materially to the publicly-disseminated information already available.

## 1. Relators Lack Knowledge Of HEA Certification Requirements.

Relators admitted at deposition that they know nothing about events at corporate headquarters, policies made by corporate executives, events at campuses other than Austin or certifications made by UOPX to the government—let alone independent knowledge that materially adds to the public disclosures described above.[44]  When asked if he ever saw a program participation agreement—the document whose alleged falsity is the basis of his claim—Hoggett replied, "You'd have to remind me.  You have to remind me what that agreement is."[45]  When asked if he knew what information UOPX provided to the government "in connection with claims for payment," Hoggett replied, "[o]nly to the respect of the general knowledge that they had to certify that they were in compliance with certain rules and regulations."[46]  Good, likewise, has little knowledge of the basis for his "false certification" claim, as evidenced by the following exchange at his deposition:

Q:     Have you ever heard of the Higher Education Act?

A:     Vaguely.

Q:     Do you know what it requires?

A:     Not off the top.

…

Q:     All right. But can you tell me any of the criteria that need to be satisfied for an institution to receive Title IV funds?

A:     No.[47]

---

[44]   Ex. 1, 8/26/13 Hoggett Dep. at 113:6-11, 248:9-24; Ex. 2, 8/27/13 Good Dep. at 16:3-6, 39:19-40:22.

[45]   Ex. 1, 8/26/13 Hoggett Dep. at 248:25-249:4.

[46]   Ex. 1, 8/26/13 Hoggett Dep. at 251:15-20.

[47]   Ex. 2, 8/27/13 Good Dep. at 21:25-22:4, 23:22-25.

Such paucity of knowledge has resulted in the dismissal of other *qui tam* actions against for-profit colleges.  For example, in *U.S. ex rel. Lee v. Corinthian Colls.*, No. 07-1984 PSG (MANx) (C.D. Cal. Mar. 15, 2013) (Ex. 27), the court dismissed an incentive compensation *qui tam* action brought by two former employees of the defendant, one of whom served as a campus director of admissions—a much more senior position than Hoggett or Good ever held at UOPX.  *Id.* at 16.  The relator "admitted in her deposition that she did not know what a PPA [Program Participation Agreement] was," and that "she had never communicated with the government on behalf of Corinthian and was not aware of communications by anyone else."  *Id.*  Moreover, "she was not aware of any legal or regulatory requirements relating to recruiter compensation, and was unable to describe the HEA."  *Id.*  Based on this testimony, the court determined that relators "fail[ed] to offer any evidence showing that either had independent knowledge of the allegations at issue in the public disclosures" and, therefore, were not original sources of the publicly disclosed allegations in their complaint.  (*Id.* at 18).

So too in *U.S. ex rel. Lopez v. Strayer Education, Inc.*, 698 F. Supp. 2d 633 (E.D. Va. 2010), the court dismissed an action alleging incentive compensation violations after finding that relator "knows no facts derived from her own experiences which might serve as a basis for alleging" a false certification claim.  *Id.* at 637.  Relator's deposition testimony showed she had "no personal knowledge of what false statements [defendant] purportedly made, nor whether [defendant] made them with the requisite scienter," and she was "unable to plausibly identify any specific 'false' claim made by [defendant]."  *Id.*  The court also noted that "a key facet of [relator's] FCA claim is necessarily based on the representations made by [defendant] to the government in its PPAs," but that "[relator] specifically stated that she did not know what a program participation agreement was."  *Id.* at 638; *see also Schultz v. Devry Inc.*, CIV.A. 07 C 5425, 2009 WL 562286, at *1-3 (N.D. Ill. Mar. 4, 2009) (dismissing incentive compensation action where the relator, a former student recruiter, "did not have an understanding of Title IV, and had not seen a program participation agreement;" the court held that relator could not assert a false certification claim based on the HEA "without knowledge of DeVry's Title IV obligations and its program participation agreement").

## 2.    Relators Lack Knowledge Of UOPX's Compensation Practices.

Apart from their dearth of knowledge concerning the laws and agreements at the heart of this false certification claim, Hoggett's and Good's understanding of enrollment counselor compensation practices at the Austin campus where they worked is extremely narrow—since they had no role in supervising others or determining their compensation—and is limited to their own personal experiences and the hearsay accounts of a handful of others.  Hoggett testified that he never saw any other enrollment counselor's performance reviews except possibly Mike Reid — another disaffected former employee with whom Hoggett occasionally strategized regarding conflicts with UOPX management.[48]  But Reid left UOPX in 2009, months before the *Hendow* settlement.[49]  Hoggett admitted that he never attended other counselors' reviews and that there was no reason "why [he] would even be invited."[50]  Hoggett knew what other counselors were paid "only if they told [him] what they were paid" and he cannot remember anyone besides Reid disclosing this information to him.[51]  Good, likewise, knew nothing about other counselors' reviews or compensation.[52]

Similar testimony was the basis for dismissal in *Lopez,* where the relator claimed some knowledge of compensation earned by two other enrollment counselors, but relied primarily on her own experiences to support her incentive compensation allegations.  698 F. Supp. 2d at 640; *see also Lee,* CV 07-1984 PSG (MANx) (C.D. Cal. March 15, 2013) (dismissing under public disclosure bar where relator "ha[d] no personal knowledge of the alleged incentive compensation" and "was unable to show that she, or anyone else at the school, was compensated solely based on the number of students recruited.").

Thus, all that Relators have to add to the extensive public record on alleged incentive compensation violations by for-profit colleges are complaints about their own compensation and a

---

[48]    Ex. 1, 8/26/13 Hoggett Dep. at 155:3-13, 202:8-14.

[49]    Ex. 1, 8/26/13 Hoggett Dep. at 157:4-9.

[50]    Ex. 1, 8/26/13 Hoggett Dep. at 197:20-24.

[51]    Ex. 1, 8/26/13 Hoggett Dep. at 155:18-156:9.

[52]    Ex. 2, 8/27/13 Good Dep. at 21:1-24, 41:3-11.

handful of hearsay anecdotes about purported events at the Austin campus.  But this adds nothing material to the widely-disseminated, near-identical allegations of post-*Hendow* incentive compensation violations that led up to this lawsuit.  *See, e.g.,* Ex. 4 at 1 (Jan. 19, 2010 Bloomberg News) ("New York has blocked Phoenix's bid for a Manhattan campus, questioning … how it compensates recruiters"); Ex. 10 at 5 (May 4, 2010 Frontline interview) ("many [enrollment counselors] do feel under a large amount of pressure to meet quotas in terms of enrollments"); Ex. 11 at 38 (June 24, 2010 Hr'g Tr.) ("We receive and review complaints of aggressive recruiting and violations of the HEA's ban on incentive compensation by proprietary institutions"); Ex. 16 at 53 (Aug. 4, 2010 Senate Hr'g Tr.) ("in just about every case, what lies behind a lot of this is the fact that admission officers and recruiters are compensated almost exclusively, if not exclusively, based on whether a student enrolls.").  Having failed to add any independent, material information to the public allegations already available, Relators cannot qualify as original sources.

**C.     Relators Did Not Disclose To The Government The Information On Which Their Claims Are Based Prior To A Public Disclosure.**

Under either version of Section 3730(e)(4), Relators are required to have "had a hand" in the public disclosure to qualify as original sources, *see Wang,* 975 F.2d at 1418; as described in Part II(A), *supra,* here they did not.  If that threshold requirement were satisfied, which it is not, Relators could qualify as original sources under either version of the statute if they could prove by a preponderance of the evidence that they had contributed material, independent knowledge to that which was already publicly available; here again, as set forth in Part II(B), *supra,* they did not.  With respect to the *current* version of Section 3730(e)(4) *only*, and if the Court were to determine that Relators satisfied the threshold requirement that they had a hand in the public disclosures, Relators could also qualify as original sources if "*prior to a public disclosure* … [Relators] voluntarily disclosed to the Government the information on which [the] allegations or transactions in [their] claim are based."  31 U.S.C. § 3730(e)(4)(B) (2013) (emphasis added).

Here, however, neither Good nor Hoggett disclosed *any* information to the government regarding UOPX's alleged post-*Hendow* conduct prior to the first wave of post-*Hendow* public disclosures.  Good made no disclosures at all, and the meager disclosure Hoggett eventually made on

April 20, 2010—more than three months after the first public disclosure described above — was inadequate and inaccurate.

For his part, Relator Good admitted at deposition that he *never* disclosed anything to the government regarding UOPX's compensation practices:

Q.   Have you ever had any communication with anyone from the government about the compensation practices at the University of Phoenix at any point in time?

A.   No.

Q.   Did you ever have any communication with anyone from the Department of Education about the compensation practices at the University of Phoenix?

A.   No, not that I'm aware.

…

Q.   Okay. And you've had no written or oral communication with any person associated with either [the] federal government or state government at any point in time about the University of Phoenix compensation practices to the best of your recollection?

A.   Not that I'm aware of.

Q.   Other than your lawyers in this case, have you at any point in time provided information to any other person about the compensation practices at the University of Phoenix?

A.   No. Not that I'm aware of.[53]

Relator Hoggett, meanwhile, identified a single, isolated communication between himself and the federal government in the post-*Hendow* period: an e-mail sent to a Department of Education employee on April 20, 2010.[54]  (Ex. 28).  But that e-mail does not satisfy the post-July 2010 original source test—that "prior to a public disclosure … [relator] voluntarily disclose[] to the Government the information on which allegations or transactions in a claim are based," 31 U.S.C. § 3730(e)(4)(B)─for at least three reasons.

---

[53]   Ex. 2, 8/27/13 Good Dep. at 54:5-55:1.

[54]   Ex. 1, 8/26/13 Hoggett Dep. at 186:3-9; TAC ¶ 10.

**First,** the April 20, 2010 email was *not* made prior to a number of the public disclosures discussed in Section I, *supra*, including the January 17, 2010 Denver Post article (Ex. 3), the January 19, 2010 Bloomberg News article (Ex. 4), the February 7, 2010 article in The Chronicle of Higher Education (Ex. 5), the February 23, 2010 GAO report (Ex. 6), the March 7, 2010 Arizona Republic article (Ex. 7), and the March 13, 2013 New York Times article (Ex. 8).  Thus, Hoggett's April 20, 2010 e-mail cannot satisfy the original source test for the simple and dispositive reason that Hoggett's information was not provided to the government "prior to a public disclosure."  31 U.S.C. § 3730(e)(4)(B).

**Second,** the April 20, 2010 e-mail discloses only a small fraction of the allegations Hoggett later included in his original and amended Complaints.  The statute, however, requires that an original source disclose "the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B).  To meet this requirement, and thereby qualify as an original source, a relator must include "substantially all material evidence and information" possessed by the relator. *Lockey,* 2013 WL 268371, at *15 (dismissing complaint); *see also In re Natural Gas Royalties,* 562 F.3d 1032, 1044 (10th Cir. 2009) ("if a relator does not deem information important enough to voluntarily disclose it to the government before filing suit, he should not be allowed to later rely upon it to establish his status as an original source.").

Hoggett's April 20, 2010 e-mail is only three pages long, in contrast to the 25-page Third-Amended Complaint.  Although the e-mail alleges in generalities that "[t]he misconduct reported in 2008 and 2009 continues," it makes virtually no specific factual allegations and is limited to the following:

    (i)    "The 'meets expectations' standards set forth for the other matrix elements are near impossible to beat, meaning that counselors must meet or beat enrollment numbers to receive salary increases";

    (ii)    "The team performance whiteboards at the Austin campus still prominently display the number of student enrollments and applications made by each counselor";

    (iii)    "The weekly enrollment department and monthly campus meetings announce and praise the counselors who top the enrollment numbers.  If it looks like a duck, walks like a duck . . .";

(iv)   "While salary decreases for not meeting enrollment targets were officially ended in late 2009, counselors are told they must come up with a written 'action plan' to 'improve' their performance before they are allowed to return to work";

(v)   "The University recently reintroduced psychological sales coaching to train counselors to help manipulate students into enrolling."

(vi)   "towards the end of 2009," the Austin campus director purportedly told Hoggett "our goal has always been to just get them in the door" and "we are not going to change what has worked for us."

(Ex. 28 at RELATORS0000016). As described below, Hoggett recanted or contradicted even these meager allegations in his deposition testimony. In any event, Hoggett's sole disclosure to the government failed to include substantially all material on which his claims are based, and he therefore cannot qualify as an original source. *Lockey*, 2013 WL 268371, at *15.

**Third**, a relator cannot qualify as an original source by making allegations that either are shown to be false or that go beyond his personal knowledge.[55] Even with respect to the few specific allegations in the April 20 e-mail, Hoggett retreated from each at deposition, either expressly contradicting the allegation or admitting that he lacked knowledge necessary to substantiate it.

### 1.    Other Matrix Elements.

Hoggett alleges in his April 20, 2010 e-mail that enrollment counselors could not meet or beat the other matrix elements and therefore a counselor needed to "meet or beat" enrollment numbers to get a raise. (Ex. 28 at RELATORS0000016). Hoggett's deposition testimony reveals that this was speculation and that he had no factual basis for this statement. First, he has no

---

[55]   *See, e.g.*, Ex. 27, Order Granting Defs.' Mot. Dismiss at 16-17, *U.S. ex rel. Lee v. Corinthian Colls.*, No. 07-1984 PSG (MANx) (C.D. Cal. Mar. 15, 2013) (dismissing under public disclosure bar where affidavit submitted by relator "directly contradict[ed]" her deposition testimony as to factors considered in evaluating performance of enrollment counselors at for-profit college, such that affidavit was a "sham" the court "cannot rely upon"); *Jones v. Collegiate Funding Servs., Inc.*, 2011 WL 129842 at *12 (dismissing under public disclosure bar where "the Relators' lack of convincing evidence of 'direct and independent knowledge' … weigh[ed] against their credibility"); *Lopez v. Strayer Education, Inc.*, 698 F. Supp. 2d at 640 n.6 (dismissing under public disclosure bar where relator's disclosure of material evidence "brought no credible allegation of fraud to the government's attention"); *see also U.S. ex rel. Hafter D.O v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1163 (10th Cir. 1999) (relator was not original source where he possessed only "background knowledge" and "opinions about [defendant]'s management techniques.").

knowledge about the matrix scores or performance evaluations of other enrollment counselors.[56]

Second, his own experience was to the contrary.  In 2008, Hoggett received a performance review on

which he was rated "requires improvement" with respect to enrollment numbers.[57]  Yet despite his

unsatisfactory enrollment numbers, Hogget received an overall performance rating of "meets

expectations" and was given a raise.[58]  Hoggett admitted that he was evaluated on multiple criteria in

addition to enrollments, including "retention" of students, "referrals" of prospective students,

"judgment," "working relationships," and "professional development."[59]  Good too admitted he was

evaluated on "retention," "judgment," "ability to communicate," "working relationship[s] with other

persons at the campus," "efforts you took to develop yourself as a professional," and "customer

service that you provided to students."[60]  Good testified that reviews accounted for all of these:

> Q:     And the way the reviews worked is that points would be assigned for each of
> those different categories and then an overall point total would be added up
> based on the individual points earned for each individual category?
>
> A:     Correct. I believe so, yes.[61]

Relators also conceded that UOPX changed its compensation procedures in the fall of 2009,

just before the *Hendow* settlement.  For example, both admitted that UOPX no longer reduced

---

[56]   Ex. 1, 8/26/13 Hoggett Dep. at 197:20-24 (never attended another counselor's review), 155:3-13 (Q. [] What I mean to say is did you see performance reviews for any other enrollment counselor other than yourself? A. I may have seen Mike Reid's. I can't remember. Q. You don't recall one way or the other? A. No. No, I can't remember. Q. Did you see any other enrollment counselors' performance reviews with the possible exception of Mike Reid? A. I don't think so.)

[57]   Ex. 1, 8/26/13 Hoggett Dep. at 144:22-145:1.

[58]   Ex. 1, 8/26/13 Hoggett Dep. at 145:2-15.

[59]   Ex. 1, 8/26/13 Hoggett Dep. at 84:14-85:18, 86:21-87:1.

[60]   Ex. 2, 8/27/13 Good Dep. at 20:10-15, 102:5-103:5.

[61]   Ex. 2, 8/27/13 Good Dep. at 121:20-25. Similar testimony has contributed to relators in other incentive compensation *qui tam* cases being denied original source status.  *See Lopez,* 698 F. Supp. 2d at 640 (relator evaluated on "knowledge of the job," "performs well under pressure," "punctuality," and "establishes priorities"); Ex. 27, *Lee,* CV 07-1984 PSG (MANx) (C.D. Cal. March 15, 2013) (relator evaluated on "promptness and accuracy of communications with prospective students, accurate classification of student inquiries, compliance with applicable regulations, ensuring pre-start paperwork was completed, and the accuracy of the employer's recordkeeping.").

salaries of enrollment counselors in response to poor performance by the fall of 2009.[62]  Relators also conceded that UOPX changed the performance matrix in the fall of 2009, for example, to place greater emphasis on retention of students.[63]

### 2.    Numbers On Whiteboards.

Hoggett alleged in his e-mail to DOE that team performance whiteboards at the Austin campus displayed the number of enrollments and applications made by each counselor.  (Ex. 28 at RELATORS0000016).  Yet he admitted at deposition that whiteboards at the Austin campus also listed numerous other performance metrics in addition to new student enrollments:

> Q.    … At the morning huddles from -- during the period from December, 2009 to the end of your employment in May, 20[10], you recall being written on the white boards statistics such as enrollments, talk time, applications and referrals, right?
>
> A.    Correct.
>
> Q.    And there may have been other statistics that were also written on the white boards during those morning huddles, but you don't recall one way or the other as you sit here now?
>
> A.    There were several columns. Several columns were blank and there might have been some other things, but I can't remember right now.[64]

Good, similarly, testified that whiteboards used at meetings displayed "dials," "customer service time," "talk time," and "referrals."[65]  Thus, by Relators' own testimony, both evaluations and whiteboards at the Austin campus included performance metrics in addition to enrollments.

### 3.    Praise For Enrollments At Meetings.

Hoggett alleged in his email that counselors who "top the enrollment numbers" were praised at meetings.  (Ex. 28 at RELATORS0000016).  But he testified at deposition that counselors also were praised for performance in other areas, including "customer service time," "referral numbers,"

---

[62]   Ex. 1, 8/26/13 Hoggett Dep. at 78:6-13; Ex. 2, 8/27/13 Good Dep. at 117:8-11.

[63]   Ex. 1, 8/26/13 Hoggett Dep. at 80:22-81:4; Ex. 2, 8/27/13 Good Dep. at 117:12-15.

[64]   Ex. 1, 8/26/13 Hoggett Dep. at 33:2-14.

[65]   Ex. 2, 8/27/13 Good Dep. at 78:22-79:13.

"numbers of applications," "number of dials," and "retention" of students.[66]  Good, likewise, agreed that "counselors were congratulated on a variety of metrics … such as customer service time, dials, talk time, referrals," and "retention."[67]

### 4.    Action Plans To Improve Performance.

Hoggett alleged in his e-mail that counselors who failed to meet enrollment targets were required to develop written action plans to improve their performance.   (Ex. 28 at RELATORS0000016).  That counselors were required to develop written action plans does not show they were compensated solely on enrollments.  In any event, Hoggett had no basis for knowing if any other counselors were required to develop an "action plan" to improve their performance.  He was never present when any other counselor was told to develop an action plan and, while he was told to develop action plans himself "a couple of times," he could not recall the details and did not assert that it was due to low enrollments.[68]  He testified that one action plan was requested after a written warning.[69]  Hoggett received multiple written warnings while at UOPX—including one related to offensive comments he made to a pregnant co-worker—but never for low enrollment numbers.  (Ex. 29).

### 5.    Manipulative Sales Methods.

Hoggett alleged in his email to DOE that psychological sales methods were used to manipulate students into enrolling.  (Ex. 28 at RELATORS0000016).  Even if true, this does not show that UOPX paid enrollment counselors based solely on enrollments.  In any event, Hoggett acknowledged at deposition that he approved of the sales techniques being used by UOPX in the post-*Hendow* period.  Hoggett testified that he had been the first to recommend these methods— which he described as a "relationship building style"—and that management willingly switched to this method because "[t]hey recognized that pressuring students into starting was not a very effective

---

[66]    Ex. 1, 8/26/13 Hoggett Dep. at 18:10-19:7, 21:7-21, 24:11-14.

[67]    Ex. 2, 8/27/13 Good Dep. at 75:10-14, 75:24-76:4.

[68]    Ex. 1, 8/26/13 Hoggett Dep. at 223:21-224:1; 225:10-20.

[69]    Ex. 1, 8/26/13 Hoggett Dep. at 75:1-3, 225:10-20.

way and that building relationships with students was a more effective way of getting a student to enroll at university."[70]  Hoggett testified that "regional management" made this change as of October 2009 and that counselors were "coached" to use this sales method until at least Hoggett's departure in May 2010.[71]  Good, for his part, testified that management told him to be "[h]onest about anything that you were dealing with a prospective student about" and recruit only "quality students" who could succeed at UOPX.[72]

### 6.   "Get Them In The Door."

Hoggett alleged in his email that Austin campus director Michael Cullup once told him that UOPX's objective was to get students "in the door" and that UOPX would not change "what has worked for us."  (Ex. 28 at RELATORS0000016).  But Hoggett admitted that the former statement was made on August 14, 2009—four months *before* the *Hendow* settlement[73]—and that the latter was made in a different conversation, in a completely different context.[74]  Indeed, a recording of that conversation secretly made by Hoggett shows that the remark about "getting them in the door" was made in the context of a discussion about *changes* to the enrollment process.  According to the recording secretly made by Hoggett without Cullup's knowledge, Cullup said "the model … based on getting people in the door" was a "remnant of twenty years ago" and that "the whole goal now is to make sure that we're doing the right thing."  (Ex. 30 at 23).

\*        \*        \*

In sum, because it postdates many of the relevant public disclosures, because it does not contain substantially all the information on which his claims are based, and because Hoggett's testimony contradicts it, the April 20, 2010 e-mail cannot qualify Hoggett as an original source under Section 3730(e)(4)(B).

---

[70]   Ex. 1, 8/26/13 Hoggett Dept. at 115:6-116:25.

[71]   Ex. 1, 8/26/13 Hoggett Dep. at 116:1-25.

[72]   Ex. 2, 8/27/13 Good Dep. at 99:3-100:8.

[73]   Ex. 1, 8/26/13 Hoggett Dep. at 214:24-216:24.

[74]   Ex. 1, 8/26/13 Hoggett Dep. at 216:17-217:5.

1

## CONCLUSION

2          This is a parasitic lawsuit brought by two unhappy former employees who are seeking to

3 capitalize on widely-publicized concern about the growth of for-profit colleges like UOPX and the

4 means such colleges allegedly used to recruit students and compensate recruiters.  Relator Hoggett

5 candidly testified that he "would love to make millions" through this litigation,[75] but the False

6 Claims Act reserves such payouts for true whistleblowers—those who "sound the alarm, not merely

7 echo it"; those who have independent knowledge of a fraud and who alert the government to that

8 fraud before anyone else.  Here, the government was alerted to alleged post-*Hendow* incentive

9 compensation violations at UOPX through numerous press reports, a securities lawsuit, and

10 investigations conducted by the government itself.  Discovery conclusively demonstrates that

11 Relators had no role in any of these prior disclosures regarding potential post-*Hendow* misconduct

12 and that they also fail to meet the statutory requirements for being original sources.  For all the

13 foregoing reasons, and because Relators have failed to establish a basis for federal subject matter

14 jurisdiction, Defendants respectfully request that this lawsuit be dismissed with prejudice.

15

16 Dated: November 4, 2013          By:     _/s/ Matthew G. Jacobs_____

17                                                        DLA PIPER LLP (US)
18                                                        Matthew G. Jacobs
                                                           W. Scott Cameron
19
                                                           KIRKLAND & ELLIS LLP
20                                                        Jonathan C. Bunge (*pro hac vice*)
                                                           Leonid Feller (*pro hac vice*)
21
22                                                        *Attorneys for Defendants,*
                                                           *UNIVERSITY OF PHOENIX and APOLLO GROUP, INC.*
23

24

25

26

27 ———————————————
   [75]   Ex. 1, 8/26/13 Hoggett Dep. at 275:16-21.
28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of the attached **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF FEDERAL SUBJECT MATTER JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(1)** via the CM/ECF system on November 4, 2013.

*/s/  Matthew G. Jacobs* _____
Matthew G. Jacobs