1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11 | UNITED STATES OF AMERICA and          No. 2:10-cv-02478-MCE-KJN
   | STATE OF CALIFORNIA, ex rel.

12 | DEREK HOGGETT and TAVIS GOOD,

13 |            Plaintiffs,                   **MEMORANDUM AND ORDER**

14 |     v.

15 | UNIVERSITY OF PHOENIX, APOLLO
   | GROUP, INC., and DOES 1 through

16 | 100, inclusive,

17

18 |            Defendants.

19

20          Relator Plaintiffs Derek Hoggett and Tavis Good ("Relators") bring a qui tam

21 action[1] against University of Phoenix and Apollo Group, Inc. under the False Claims Act,

22 31 U.S.C. §§ 3729-3733 ("FCA") and its California counterpart, Government Code

23 §§ 12650-12656 ("CFCA").  Relators are former admission counselors for Defendant

24 University of Phoenix, a for-profit post-secondary education institution, and a subsidiary

25 _____

26         [1] A qui tam action is brought by private litigants against a person or company that has allegedly
   violated the law in the performance of a contract with the Government, or in violation of a governmental
   regulation.  Qui tam suits are brought for the Government's benefit as well as for the plaintiffs.  The

27 Government may elect to intervene and proceed with the action within sixty days after it receives both the
   complaint and the material evidence and information, or it may decline to take over the action, in which

28 case the person bringing the action shall have the right to conduct the action.  A "relator" is the individual
   who relates the facts on which a qui tam action is based.  See generally 31 U.S.C. § 3730.

                                              1

1    of Defendant Apollo Group (collectively "UOPX").  Relators allege that UOPX submitted

2    false claims for federal student financial aid funding to the United States Department of

3    Education, in contravention of the requirements of the Higher Education Act, Title IV

4    ("HEA"), from at least December 12, 2009 to the present.

5         The Court previously denied UOPX' Motion to Dismiss under Federal Rule of Civil

6    Procedure 12(b)(6) on grounds that Plaintiffs' allegations, taken at face value, were

7    enough to survive a pleadings challenge.  Now that discovery has been conducted,

8    UOPX has filed the motion presently before the Court: a jurisdictional challenge under

9    Rule 12(b)(1) predicated on the contention that it is now clear that Plaintiffs cannot

10   qualify as qui tam plaintiffs in this matter, and that accordingly their action is

11   jurisdictionally barred.  For the reasons set forth below, that Motion will be granted.[2]

12

13                           **BACKGROUND[3]**

14

15        Defendant UOPX offers a broad variety of courses both online and at campuses

16   located throughout the United States.  Its overall enrollment is estimated at nearly

17   500,000 students.  The vast bulk of UOPX's tuition revenue is derived from federally

18   guaranteed loans, which are made subject to a variety of HEA preconditions, including a

19   requirement that recruiters not be paid based solely on the number of students they

20   enroll.  In 2003, a qui tam lawsuit, entitled United States ex rel. Hendow v. University of

21   Phoenix, was filed by two former UOPX enrollment counselors who argued that recruiter

22   compensation was in fact impermissibly based on enrollment count alone.[4]  On or about

23   December 11, 2009, UOPX paid $67.5 million to settle the Hendow lawsuit.  About nine

24   _____

25        [2] Because oral argument will not be of material assistance, the Court orders this matter submitted
     on the briefs.  E.D. Cal. Local Rule 230(g).

26        [3] Unless otherwise noted, all factual background information is taken from the factual allegations in
27   the Third Amended Complaint, ECF No. 74.

28        [4] United States ex rel. Hendow v. University of Phoenix, No. 2:03-cv-0457-GEB-DAD (E.D. Cal.
     2003), hereinafter "Hendow lawsuit."

                                         2

months later, on September 15, 2010, qui tam relators Hoggett and Good, who are also former UOPX enrollment counselors and worked at UOPX's Austin, Texas campus, filed the present lawsuit.  Relators allege that UOPX continues, despite the aforementioned Hendow settlement, to violate HEA's prohibition against awarding incentive payments to recruiters based solely on enrollment numbers.  Third Am. Compl., ECF No. 74 ("TAC"), ¶ 10a).[5]  By knowingly or recklessly submitting Program Participation Agreements ("PPAs") that contain false representations of compliance with HEA requirements in this regard, Relators claim that UOPX continues to run afoul of the incentive compensation ban and therefore violates FCA §§ 3729(a)(1) and (a)(2), along with CFCA sections 12561(a)(1) and 12651(a)(2).

Relators allege that UOPX continues to fraudulently represent, by way of participation agreements submitted as a prerequisite for making claims under the HEA, that it has "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . for each year at issue."  Id. at ¶ 23.  Relators contend that although UOPX disguises its compensation practices with a "matrix" that lists non-enrollment criteria for performance evaluation, in practice, enrollment numbers are the sole factor in determining promotion, salaries, and bonuses.

Relators further allege that this conduct was not deterred or altered by the settlement in and that the fraudulent activities continued with the knowledge and support of UOPX compliance officials.  See id. at ¶¶ 22-23.  Relators allege that despite the performance matrix, UOPX continues to "stack rank" counselors based on their number of enrollments and use that ranking to determine compensation.  Id. at ¶ 11.  Relators argue that these facts, and others alleged in the TAC, show that UOPX knowingly bases recruiter compensation on enrollment numbers, while trying to disguise this illicit

---

[5] In alleging that UOPX's compensation decisions are based solely on the basis of enrollment numbers, Relators recognize that such decisions based in part on enrollments were legal during the relevant period, as long as enrollment figures were not the sole factor considered in making such decisions.  See 34 C.F.R. § 668.14(b)(22)(ii)(a).

behavior with a misleading performance evaluation matrix, all in violation of the FCA and CFCA.

In bringing the present Motion, UOPX asserts that Relators' own depositions, which were taken since UOPX's initial request for dismissal, belie any assertion that their compensation was based solely on enrollment numbers.  Moreover, to the extent that Plaintiff generally claims that UOPX continues to circumvent the incentive compensation ban, UOPX asserts that because those allegations had already been publicly disclosed, and because Plaintiffs were not an original source for the allegations, this court lacks jurisdiction to entertain their qui tam claims.

**STANDARD**

Federal courts are courts of limited jurisdiction, and are presumptively without jurisdiction over civil actions.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  The burden of establishing the contrary rests upon the party asserting jurisdiction.  Id.  Because subject matter jurisdiction involves a court's power to hear a case, it can never be forfeited or waived.  United States v. Cotton, 535 U.S. 625, 630 (2002).  Accordingly, lack of subject matter jurisdiction may be raised by either party at any point during the litigation, through a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).[1]  Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006); see also Int'l Union of Operating Eng'rs v. Cnty. of Plumas, 559 F.3d 1041, 1043-44 (9th Cir. 2009).  Lack of subject matter jurisdiction may also be raised by the district court sua sponte.  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999).  Indeed, "courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party."  Id.; see Fed. R. Civ. P. 12(h)(3) (requiring the court to dismiss the action if subject matter jurisdiction is lacking).

---

[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

1    There are two types of motions to dismiss for lack of subject matter jurisdiction: a

2    facial attack and a factual attack.  Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp., 594

3    F.2d 730, 733 (9th Cir. 1979).  Thus, a party may either make an attack on the

4    allegations of jurisdiction contained in the nonmoving party's complaint, or may

5    challenge the existence of subject matter jurisdiction in fact, despite the formal

6    sufficiency of the pleadings.  Id.

7    When a party makes a facial attack on a complaint, the attack is unaccompanied

8    by supporting evidence, and it challenges jurisdiction based solely on the pleadings.

9    Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  If the motion to

10   dismiss constitutes a facial attack, the Court must consider the factual allegations of the

11   complaint to be true, and determine whether they establish subject matter jurisdiction.

12   Savage v. Glendale High Union Sch. Dist. No. 205, 343 F.3d 1036, 1039 n.1 (9th Cir.

13   2003).  In the case of a facial attack, the motion to dismiss is granted only if the

14   nonmoving party fails to allege an element necessary for subject matter jurisdiction.  Id.

15   However, in the case of a facial attack, district courts "may review evidence beyond the

16   complaint without converting the motion to dismiss into a motion for summary judgment."

17   Safe Air for Everyone, 373 F.3d at 1039.

18   In the case of a factual attack, like that levied by UOPX here, "no presumptive

19   truthfulness attaches to plaintiff's allegations."  Thornhill, 594 F.2d at 733 (internal

20   citation omitted).  The party opposing the motion has the burden of proving that subject

21   matter jurisdiction does exist, and must present any necessary evidence to satisfy this

22   burden.  St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989).  If the plaintiff's

23   allegations of jurisdictional facts are challenged by the adversary in the appropriate

24   manner, the plaintiff cannot rest on the mere assertion that factual issues may exist.

25   Trentacosta v. Frontier Pac. Aircraft Ind., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)

26   (quoting Exch. Nat'l Bank of Chi. v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir.

27   1976)).  Furthermore, the district court may review any evidence necessary, including

28   affidavits and testimony, in order to determine whether subject matter jurisdiction exists.

1   McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988); Thornhill, 594 F.2d at 733.

2   If the nonmoving party fails to meet its burden and the court determines that it lacks

3   subject matter jurisdiction, the court must dismiss the action.  Fed. R. Civ. P. 12(h)(3).

4           A court granting a motion to dismiss a complaint must then decide whether to

5   grant leave to amend.  Leave to amend should be "freely given" where there is no

6   "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

7   to the opposing party by virtue of allowance of the amendment, [or] futility of the

8   amendment . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

9   Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

10  be considered when deciding whether to grant leave to amend).  Not all of these factors

11  merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

12  carries the greatest weight."  Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

13  185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that

14  "the complaint could not be saved by any amendment."  Intri-Plex Techs. v. Crest Group,

15  Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,

16  1013 (9th Cir. 2005)); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.

17  1989) ("Leave need not be granted where the amendment of the complaint . . .

18  constitutes an exercise in futility . . . .")).

19

20                                    **ANALYSIS**

21

22      **A.  Propriety of Jurisdictional Challenge to FCA Claim**

23          The FCA penalizes those who "knowingly present . . . a false or fraudulent claim"

24  to the government, 31 U.S.C. § 3729(a), and provides incentives to whistleblowers who

25  expose such fraud.  31 U.S.C. § 3730.  If the whistleblower files suit as a relator plaintiff,

26  and the government elects not to intervene, the relator may proceed with the action

27  unless he or she is subject to jurisdictional preclusion under § 3730(e).  That preclusion

28  may occur if there has already been a "public disclosure" of the fraudulent practices in

1    question.  The so-called "public disclosure" bar seeks to "strike a balance between

2    encouraging private persons to root out fraud and stifling parasitic lawsuits" in which

3    "opportunistic plaintiffs who have no significant information to contribute of their own"

4    seek to collect a share of the government's recovery.  <u>Graham Cnty. Soil & Water</u>

5    <u>Conservation Dist. v. U.S. ex rel. Wilson</u>, 559 U.S. 280, 295 (2010).  According to UOPX,

6    if public disclosure has occurred and Relators cannot qualify as an "original source" of

7    the false claim allegations, this Court lacks subject matter jurisdiction over the previously

8    disclosed allegations.  Relators bear the burden of establishing such jurisdiction by a

9    preponderance of the evidence.  <u>U.S. ex rel. Meyer v. Horizon Health Corp</u>., 565 F.3d

10   1195, 1199 (9th Cir. 1999).

11       Relators allege that the False Claims Act in its current form dispenses any

12   jurisdictional bar.  As amended in 2006, the statute contained unequivocal language

13   depriving the court of jurisdiction if public disclosure had occurred:

14       **No court shall have jurisdiction over an [FCA qui tam]
         action . . . based upon the public disclosure** of allegations
15       or transactions in a criminal, civil, or administrative hearing, in
         a congressional, administrative, or Government Accounting
16       Office, hearing, audit or investigation, or from news
         media, **unless the action is brought by the Attorney**
17       **General or the person bringing the action is an original**
         **source of the information.**
18

19   31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added).

20       While the 2010 amendment deleted its predecessor's specific reference to the

21   court lacking jurisdiction if a public disclosure had occurred and the relator was not an

22   original source, it nonetheless provides that the court "shall" dismiss a relator's claim in

23   that instance:

24       **The Court shall dismiss an action or claim under this
         section**, unless opposed by the Government, **if**
25       **substantially the same allegations or transaction as
         alleged in the action or claim were publicly disclosed** - -
26

27           (i) in a Federal criminal, civil, or administrative hearing
             in which the Government or its agent is a party;

28           (ii) in a congressional, Government Accountability

                                    7

Office, or other Federal report, hearing, audit, or investigation; or

(iii from the news media, **unless the action is brought by the Attorney General or the person bringing the action is an original source of the information**.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).

Without citation other than to the language of the statute as stated above, Relators claim that UOPX can no longer move to dismiss for lack of subject matter jurisdiction "because Congress has changed the law." Opp'n, 3:5-6. That contention is misplaced. First, the current statute unequivocally provides that the court "shall" dismiss an action if a public disclosure has occurred and relator fails to qualify as an original source. Second, as UOPX points out, numerous courts have interpreted the public disclosure bar as remaining jurisdictional in nature even after the 2010 amendment. See, e.g., U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc., 933 F. Supp. 2d 825, 839 (E.D. Va. 2013) ("[C]ontext makes clear that the public disclosure bar remains jurisdictional, as the public disclosure bar has long been interpreted as jurisdictional and is contained in a subsection entitled 'certain actions barred'"); U.S. ex rel. Osheroff v. HealthSpring, Inc., 938 F. Supp. 2d 724, 732 (M.D. Tenn. 2013) ("[T]he False Claims Act places jurisdictional limitations on qui tam actions, including . . . the 'public disclosure bar.'"); U.S. ex rel. Adams v. Wells Fargo Bank Nat'l Ass'n, 2013 WL 6506732 at * 4 (D. Nev. 2013) (applying post-2010 amendment public disclosure bar and stating "the rule is a jurisdictional bar").[6]

Additionally, and in any event, the 2010 FCA Amendments were not effective until July 22, 2010, or, at the earliest March 23, 2010. Compare U.S. ex rel. Cervantes v. Deere & Co., 2011 WL 5325466 at *4 n.3 (E.D. Wash. 2010) ("The public disclosure provisions were amended effective July 22, 2010") with U.S. ex rel. Gohil v. Aventis

---

[6] While the Court recognizes that some cases interpret the 2010 amendments as providing for dismissal on Rule 12(b)(6) grounds rather than based on jurisdiction itself (see, e.g., Ping Chen ex rel. U.S. v. EMSL Analytical, Inc., 2013 WL 4441509 at *8 (S.D. N.Y. 2013)), the weight of authority appears otherwise as indicated above.

1  Pharm., Inc., 387 F. App'x 143, 145 (3d Cir. 2010) (treating the FCA amendments as

2  effective March 23, 2010).  Here, Relators allege that UOPX continued to circumvent the

3  HEA requirements beginning immediately after the Hendow lawsuit was settled in

4  December of 2009, which dates Relators' claims to before the effective date of the FCA

5  amendment.

6          Ordinarily the public disclosure bar in effect at the time of alleged fraudulent billing

7  violations (which would here correlate to the allegedly false certification claims submitted

8  to HEA) is deemed to apply.  See Bloedow v. Planned Parenthood of the Great

9  Northwest, Inc., 2013 WL 6631771, at *2 (W.D. Wash. 2013).  In addition, any contention

10 that the 2010 amendments to the FCA should retroactively apply is incorrect.  The

11 Supreme Court has already noted that the 2010 amendments contain no mention of

12 retroactivity, which would be necessary in order to apply the 2010 statute to cases

13 already pending like Relator' action herein.  Graham, 559 U.S. at 283 n.1.  Additionally,

14 the 2010 amendments limit the kind of hearing that gives rise to the jurisdictional bar,

15 changing previously comprehensive language extending to any "criminal civil or

16 administrative hearing" to a more restricted version which limited qualifying hearings to

17 those in a federal forum and required the government or its agent to be a party to such

18 hearing.   Because this made the statutory bar less stringent by limiting its application to

19 federal hearings and would therefore result in more plaintiffs being able to sue, the 2010

20 amendment creates a substantive change in the law.  As such, the amendment is

21 presumed not to apply retroactively to conduct occurring before its passage.  See

22 Hughes Aircraft Co. v. U.S. ex rel. Schumer, 520 U.S. 939, 946-47 (1997).

23         Having determined that Plaintiff's claim is indeed subject to a jurisdictional

24 challenge if the prerequisites for maintaining a qui tam lawsuit have not been satisfied,

25 the Court next looks to whether there has been a public disclosure, and if so whether

26 Relators can qualify as an "original source" and therefore prosecute a claim despite the

27 fact that a prior disclosure has occurred.

28 ///

## B. Public Disclosure

Turning first to the initial question of disclosure itself, in order to determine whether the requisite dissemination has occurred, the Court must make "two distinct but related determinations." A-1 Ambulance Serv., Inc v. California, 202 F.3d 1238,1243 (9th Cir. 2000).  First, it must "decide whether the public disclosure originated in one of the sources enumerated in the statute." Id.  If so, then the Court must then decide "whether the disclosure consisted of the allegations or transactions giving rise to the relator's claims. . ." Id.

Under the 2006 version of the FCA, the requisite public disclosure can occur in the broad context of  dissemination through the "news media", through any "criminal, civil, or administrative hearing" as well as through any "congressional, administrative, or Government Accounting Office report, hearing, audit or investigation."[7]   Although this initial determination with respect to public disclosure can therefore be satisfied through a wide variety of ways, the second prong in assessing whether a disclosure has occurred requires a more difficult determination as to whether the disclosure encompasses the relator's claims.  That determination, however, does not have to be precise.  In order to constitute public disclosure, "the publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations," U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195, 1199, (9th Cir. 2009), and need not be accompanied by "an explicit allegation of fraud."  Hagood v. Sonoma Cnty. Water Agency, 81 F.3d 1465, 1473 (9th Cir. 1996).  All that is required for a public disclosure is that the "material elements" of the underlying "transaction" be disclosed in the public forum.  A-1 Ambulance Serv., 202 F.3d at 1243.  In order to be preclusive, disclosure need not necessarily be comprehensive, but must only contain "enough information to enable the government to pursue an investigation."  U.S. v. Alcan Elec. & Eng'g. Inc., 197 F.3d 1014, 1019 (9th Cir. 1999).

---

[7] As indicated above, the 2010 amendments are identical except that a qualifying hearing is limited to those in a federal forum in which the government or its agent is a party.

1        UOPX claims that broad public disclosures were made between the time of the

2   Hendow settlement in December of 2009 and the time this lawsuit was filed in

3   September of 2010 that revolve around the contention that UOPX, and other for-profit

4   colleges, continue, post-Hendow, to engage in unauthorized incentive compensation for

5   its recruiters.  On January 19, 2010, less than a month after the Hendow settlement,

6   Bloomberg News reported that New York had blocked UOPX's bid for a Manhattan

7   campus, questioning, among other concerns, how UOPX compensates recruiters.

8   Bloomberg News, January 19, 2010, Ex. 4 to the Decl. of Scott Cameron.  The PBS

9   program Frontline aired a segment on May 4, 2010, reporting continuing abuse in

10  incentive compensation among for-profit colleges, with Bloomberg News reporter Daniel

11  Golden telling Frontline that "the concern is that they are bringing in students who can't

12  succeed or graduate just so the recruiter can make more money.  If you're paid based on

13  how many people you enroll, you'll enroll pretty much anybody."  Frontline, May 4, 2010,

14  Id. at Ex. 9, p. 11.  The University of Phoenix was discussed at length in the segment

15  and referred to as the "granddaddy" of for-profit schools.  Id. at p. 6.  In a May 7, 2010

16  posting on the website for its program Frontline, PBS responded to UOPX's claim that its

17  enrollment advisors are compensated only in part based on enrollment numbers, with

18  the retort that "enrollment counselors at the University of Phoenix and other for-profit

19  colleges are incentivized to enroll large numbers of students every quarter."  Id. at

20  Ex. 19.  Then, on August 4, 2010, Reuters reported that "[t]he head of the U.S. Senate's

21  panel lashed out at the for profit education sector in a congressional hearing on

22  Wednesday after government investigators uncovered deceptive practices. . . . Among

23  the schools probed [was the] Apollo Group's University of Phoenix in Arizona."  Reuters,

24  August 4, 2010, Id. at Ex. 14.

25        In addition to the post-Hendow media disclosures discussed above, UOPX also

26  points to disclosures in government reports and investigations.  On February 23, 2010,

27  some two months after the Hendow settlement, Congress' investigative arm, the

28  Government Accountability Office ("GAO") published a letter reporting that the

1   Department of Education had found incentive compensation violations at 32 for-profit

2   schools and that "[m]any of the violations involved payments by schools to their staff in

3   the form of bonuses or commissions for successfully enrolling students. . . ."  GAO letter

4   to Congress, February 23, 2010, Id. at Ex. 6, p. 5.  At an August 4, 2010 hearing  before

5   the Senate Committee on Health Education, Labor and Pensions that followed the GAO

6   report, Senator Tom Harkin observed that "the evidence points to a problem that is

7   systemic to the for-profit industry:  a recruitment process specifically designed to do

8   whatever it takes to drive up enrollment numbers. . . ."  See S.H.R. 111-1160, August 4,

9   2010, Id. at Ex. 16, p. 1.  David Hawkins, the Director of Public Policy and Research at

10  the National Association for College Admission Counseling, testified at the August 4,

11  2010 hearing that "in just about every case, what lies behind a lot of this is the fact that

12  admission officers and recruiters are compensated almost exclusively if not

13  exclusively,[?] based on whether a student enrolls."  Id. at 53.  Gregory Kutz, GAO's

14  Managing Director for its Forensic Audits and Special Investigations Unit, further testified

15  that UOPX was one of the 15 schools investigated in GAO's 2010 investigation,[8] and

16  that all the schools provided some "deceptive and questionable information" with "high-

17  pressure sales and marketing practices" also identified.  Id. at 11-12.[9]

18      The above-described information both from the news media and from the

19  congressional record both fall squarely within the purview of qualifying disclosures under

20  31 U.S.C. § 3730(e)(4)(A), both under the pre- and post-2010 versions of the statute.  In

21  both instances disclosures can come from either the media or from "a congressional,

22  Government Accountability Office, or other Federal report, hearing, audit, or

23  investigation."  With respect to whether the disclosure consisted of the allegations or

24  transactions giving rise to Relators' claims (the second requirement that must be

25  satisfied before a "public disclosure" is deemed to have occurred), the disclosure is close

26  _____

27      [8] According to Defendants, GAO's investigation was conducted during May and July of 2010, well after the Hendow settlement was concluded.  UOPX Mot., ECF No. 80-1, 10:1-2.

28      [9] This particular portion of the Hearing Record was not attached to the Cameron Declaration.

1   enough in this Court's estimation to the substantive claims made herein with respect to

2   unlawful incentive compensation.  As indicated above, the disclosure need not be

3   identical to satisfy that prerequisite; they need only contain "enough information to

4   enable the government to pursue an investigation."  <u>Alcan Elec.</u>, 197 F.3d at 1019.  The

5   disclosures made prior to Relators' lawsuit only have to be sufficient "to set government

6   investigators on the trail of [the alleged] fraud" such as to put the government in a

7   position to pursue the allegations on its own.  <u>U.S. ex rel. Rabushka v. Crane Co</u>.,

8   40 F.3d 1509, 1514 (8th Cir. 1994).  The Court concludes that the pre-lawsuit

9   disclosures suffice in that regard.  Although some of the disclosures applied to the for-

10  profit college industry in general as opposed to only UOPX in particular, that does not

11  negate the requisite disclosure.  Case law has found that a public disclosure does not

12  even have to target a particular defendant, where wrongdoing is alleged on an industry-

13  wide basis.  <u>See, e.g.</u>, <u>U.S. ex rel. Lopez v. Strayer Educ., Inc.</u>, 698 F. Supp. 2d 633,

14  643 (E.D. Va. 2010 (although public disclosures did not specifically name defendant, a

15  for-profit college, "they certainly suffice[d] to specifically indicate how other proprietary

16  institutions in the educational industry had purportedly violate Title IV's incentive

17  payment rule and how that violation could act as a basis for an FCA claim").

18  Establishing a public disclosure is therefore not difficult and many courts treat this part of

19  jurisdictional determination as "a quick trigger to get to the more exacting original source

20  inquiry."  <u>Hagood v. Sonoma Cty. Water Agency</u>, 81 F.3d at 1476 n.18; <u>see also</u>

21  <u>Malhotra v. Steinberg</u>, 2013 WL 441740, at *5 (W.D. Wash. 2013) ("This first step in the

22  two-step inquiry is typically not hard to meet").

23          Since the Court finds that a public disclosure did occur before Relators' lawsuit

24  was filed, Relators can maintain the present suit only if they qualify as an "original

25  source" for the information so disclosed.

26      **C.  Original Source**

27          Prior to 2010, the False Claims Act defined the term "original source to mean "an

28  individual who has direct and independent knowledge of the information on which the

1  [false claim] allegations are based and has voluntarily provided the information to the

2  government before filing an action under this section which is based on the information."

3  28 U.S.C. § 3730(e)(4)(B) (2010) (emphasis added).  The current version of the statute

4  expands the definition of an original source by allowing disclosure to meet the statutory

5  requirements in two ways.  The statute now allows a relator to qualify as an original

6  source if either "(i) prior to a public disclosure  . . . [relator] voluntarily disclosed to the

7  Government the information on which allegations or transactions in a claim are based, or

8  (ii) . . . [relator has] knowledge that is independent of and materially adds to the publicly

9  disclosed allegations or transaction, and . . . voluntarily provided the information to the

10  Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B) (2013)

11  (emphasis added).  Consequently, while the statute previously required a relator to

12  supply their direct and independent knowledge to the government before filing a qui tam

13  lawsuit, the version presently in force also permits a relator to qualify as an original

14  source if it provides information to the government prior to the public disclosure at issue.

15          While the parties disagree on what version of the statute controls in this matter

16  since disclosures are alleged to have occurred both before and after the 2010

17  amendment, the plain language of both versions, as well as Ninth Circuit precedent,

18  shows that under either version, relators must have "played some part" in the public

19  disclosure of the allegations at issue to qualify as original sources, either by providing

20  their independent knowledge to the government before the disclosure itself or before the

21  commencement of a lawsuit based on such independent knowledge.  See 31 U.S.C.

22  § 3730(e)(4)(B) (2013); U.S. ex rel Lujan v. Hughes Aircraft Co., 162 F.3d 1027, 1033

23  (9th Cir. 1998) (to bring a qui tam suit, one must have had a hand in the public

24  disclosure of allegations that are a part of one's suit); Wang v. FMC Corp., 975 F.2d

25  1412, 1418 (9th Cir. 1992).  As Wang states, if someone merely "republishes an

26  allegation that has already been publicly disclosed, he cannot bring a qui tam suit."

27  Wang, 975 F.2d at 1419.

28  ///

We first look to just what Relators allege in this matter.  The gravamen of their lawsuit is that UOPX enrollment counselors continue to be paid "solely" based on the number of students enrolled, in contravention of the HEA's incentive compensation ban, even after the 2009 settlement of similar charges made in the <u>Hendow</u> action.  Pls.' TAC, ECF No. 74, at ¶¶ 1-4, 22.  In order to hide that practice, according to Relators, UOPX "creates fake or imaginary qualitative criteria" by way of a Performance Matrix despite the fact that the "sole criterion" for compensation continues to be the number of students enrolled.  <u>Id.</u> at ¶ 26.  Under the FCA, as enumerated above, Relators cannot maintain a qui tam action unless they had independent knowledge of such practices and had a role in conveying that independent knowledge to the government either before public disclosures were made or before Relators filed their lawsuit.

There is no evidence that Relators "had a hand" or "played some part" in the public disclosures already described in this Memorandum and Order.  Relator Hoggett could not recall any specific information he provided to the news media after 2009, when the <u>Hendow</u> lawsuit settled, other than possibly some contact with Frontline after its program aired.  Hoggett Dep., Ex. A to the Cameron Decl., pp. 267-69.  Nor did Hoggett provide any information to the GAO or to the Senate Committee on Health, Education, Labor and Pensions.  <u>Id.</u> at 262-265.  There is no indication whatsoever that any information Hoggett provided figured in any of these public disclosures, let alone "caused" said disclosures as required by the Ninth Circuit for purposes of qualifying as an original source.  <u>See</u> <u>Schindler Elevator Corp. v. U.S. ex rel. Kirk</u>, 131 S. Ct. 1885, 1895 n.8 (2011) (recognizing stricter Ninth Circuit standard in this regard).  Relator Good, for his part, conceded he never provided any information about "compensation practices at the University of Phoenix" to <u>anyone</u> other than his lawyers.  Good Dep., Ex. 2 to the Cameron, Decl., 54:22-55:1.

Since there is no evidence that Relators played any role in the public disclosures made about UOPX's allegedly continuing unlawful compensation practices post-<u>Hendow</u>, Relators cannot qualify as original sources on that basis alone.  Relators'

1    status as original sources under the False Claims Act is also precluded by the fact that

2    they have failed to establish independent knowledge of the allegations on which their

3    Complaint purports to be based.  As indicated above, the pre-2010 version of the Act

4    required Relators to have "direct and independent knowledge of the information on

5    which the allegations are based."  31 U.S.C. § 3730(e)(4)(B) (2010).  The current version

6    of the statute is similar, requiring "knowledge that is independent of and materially adds

7    to the publicly disclosed allegations or transactions," unless relators provided their

8    information to the government "prior to a public disclosure", which the Court has

9    determined above they have not.  See 31 U.S.C. § 3730(e)(4)(B) (2013).

10        The test for establishing independent knowledge is an exacting one. To

11   demonstrate such knowledge, a relator must "show that he had firsthand knowledge of

12   the alleged fraud, and that he obtained this knowledge through his own labor

13   unmediated by anything else." Alcan Elec & Eng'g, 197 F.3d at 1020.  If the relator

14   "never participated in the negotiation, drafting or implementation" of the allegedly

15   fraudulent program (here UOPX's certification that its incentive compensation did not

16   violate the HEA's prohibition), he lacks such knowledge. Id. at 1021; see also U.S. ex

17   rel. Devlin v. State of California, 84 F.3d 358, 361 & n.4 (9th Cir. 1996) (relators were not

18   original sources because they did not see the fraud with their own eyes or obtain their

19   knowledge of it through their own labor, but derived it secondhand).  Additionally,

20   relators cannot be original sources on the basis of statement purportedly made to them

21   by others regarding incentive compensation at UOPX.  See U.S. ex rel. Smith v. Yale

22   Univ., 415 F. Supp. 2d 58, 77 (D. Conn. 2006) ("As a matter of law, Relator[s] cannot

23   claim to be an original source of information derived from third parties.").  Finally, even

24   "independent" knowledge of allegedly fraudulent activity does not "materially add" to

25   publicly disclosed allegations unless it is "qualitatively different" from information already

26   discovered and not "merely the product and outgrowth of publicly disclosed information."

27   U.S. ex rel. Lockey v. City of Dallas, 2013 WL 268371, at *16 (N.D. Tex. 2013 (quoting

28   U.S. ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 443 (5th Cir. 2008)).

1        Applying these criteria to the instant matter, the Court first looks to whether

2   Relators' own experience as enrollment counselors for UOPX  can constitute

3   independent knowledge pointing to fraud on the part of UOPX in certifying that its

4   incentive compensation met HEA standards.  Examination of the evidence makes it

5   impossible to make that finding.  Relators' own deposition testimony confirms that

6   enrollment was not the only benchmark used to determine that compensation.  Relator

7   Hoggett, for his part admitted that his salary was determined by a performance matrix

8   that evaluated "a number of . . . different things,' such as "retention of students,

9   "referrals" of prospective students, "judgment," "working relationships," and "professional

10  development."  See Hoggett Dep., Ex. 1 to Cameron Decl., 84:14-85:18; 86:21-87:1.

11  Similarly, Relator Good conceded during his deposition that "retention," "judgment,"

12  "ability to communicate," "working relationship[s] with other persons at the campus,"

13  "efforts you took to develop yourself as a professional," and "customer service that you

14  provided to students" were all considered in his performance evaluations and salary

15  determinations.  Good Dep., Ex 2 to the Cameron Decl., 20:10-15, 102-5-103:5.

16  Consequently, Relators' claims that their own salaries violated the incentive

17  compensation ban by being exclusively on enrollment numbers appears misplaced, and

18  while the Court had to assume the truth of those allegations for purposes of UOPX's

19  prior Rule 12(b)(6) challenge, in now reviewing the evidence in the context of a Rule

20  12(b)(1) motion premised on lack of jurisdiction, those claims are insufficient.  Therefore,

21  in assessing the viability of Relators' qui tam claims, we next turn to their general

22  allegations that UOPX falsely represented that its compliance with the incentive

23  compensation ban.

24       Relators' claim in this regard fails because there is no evidence they had firsthand

25  knowledge of UOPX's compensation practices sufficient to qualify them as original

26  source for any continuing fraud attendant to those practices.  As UOPX points out,

27  relators were non-managerial employees at a single UOPX campus and collectively

28  worked for UOPX only some nine months after the Hendow lawsuit was settled in 2009.

17

1    There is no evidence they participated in the development or implementation of the

2    allegedly fraudulent certification practices, and, as the Ninth Circuit's <u>Alcan</u> decision

3    demonstrates, absent such participation the requisite independent knowledge is lacking.

4    <u>Alcan Elec. & Eng'g</u>, 197 F.3d at 1021.  Moreover, as discussed above, allegations

5    concerning violations of the incentive compensation ban continued to be disclosed post-

6    <u>Hendow</u> and as the GAO report and August 4, 2010 hearing before the Senate

7    Committee on Health, Education, Labor and Pensions attests, the government continued

8    to scrutinize compensation practices at for-profit universities, including UOPX, after that

9    case resolved in December of 2009.

10        Even more significantly, there is no evidence that Relators played any role, or had

11    any real understanding of, UOPX's allegedly fraudulent activities during this period.

12    They had no access to other enrollment counselors' salary information or review data,

13    never submitted PPAs, and had no direct participation in activities or tasks related to the

14    underlying improprieties alleged in this lawsuit.  <u>See</u> Hoggett Dep., 155:3-156:9,

15    197:20-24, 248:9-252:21; Good Dep., 21:1-22:4, 23:22-25, 39:19-40:22, 41:3-11.

16    Relators admitted at deposition that they knew nothing about events at UOPX corporate

17    headquarters, about policies made with respect to PPAs, or about certifications made by

18    UOPX to the government.   <u>See</u> Hoggett Dep., 113:6-11; 248:9-250:23; Good Dep.,

19    16:3-6, 39:19-40:22.  Hoggett's lack of familiarity with the fundamentals of the very

20    program participation agreement his suit charges UOPX with violating underscores the

21    fact that Hoggett simply did not have access to decision making concerning the practices

22    his qui tam lawsuit seeks to implicate as fraudulent.  <u>See</u> Hoggett Dep., 248:25-249:4;

23    251:15-20.  Relator Good's dearth of knowledge was even more apparent.  He

24    conceded at deposition that he did not even know what the HEA required, let alone the

25    criteria that had to be satisfied for an educational institution to receive federal funding.

26    Good Dep. 21:25-22:4, 23:22-25.

27        The Central District's recent decision in <u>U.S. ex rel. Lee v. Corinthian Colleges</u>,

28    No. 07-1986 (MANx) C.D. Cal. Mar. 15, 2013 (Ex. 27 to the Cameron Decl.) is

1    instructive.  In that case, the court dismissed an incentive compensation qui tam action

2    brought, like this case, by two former employees of a for-profit college.  Significantly, one

3    of those employees, Nyoka Lee, was a campus director of admission, a job presumably

4    superior to Relators' enrollment counselor positions.  Id. at 16.  Ms. Lee, admitted at her

5    deposition that she did not know what a Program Participation Agreement was (as set

6    forth above, the PPA certifies that the educational institution seeking federal loan

7    financing complies with HEA requirements), had "never communicated with the

8    government on behalf of Corinthian and was not aware of communications by anyone

9    else." Id. at 16.  The other relator, Talala Mshuja, "similarly [had] no direct knowledge of

10   information regarding the allegations at issue in [the] litigation." Id. at 18.  The Lee court

11   consequently found that neither relator had independent knowledge of the allegations at

12   issue and thus could not qualify as original sources of those allegations.  Id.

13        The reasoning employed by Lee applies with equal force here.  The relatively low-

14   level positions occupied by Relators Hoggett and Good, along with their admitted lack of

15   knowledge about corporate decisions, including the very practices that are at the heart of

16   this lawsuit, make it abundantly clear that they lacked access to the determinations on

17   which UOPX's alleged violations rest.  As we have already established, Relators' own

18   personal experiences are inadequate to provide any direct and independent knowledge

19   about the compensation practices at issue.  Any additional knowledge they obtained

20   from others did not materially add to the disclosures that had already been made.

21        Relators' knowledge of compensation practices, at best, secondhand.  Both

22   Hoggett and Good admitted they had no role in developing compensation policies for

23   UOPX and did not know who did.  Relator Good conceded he was never "part of any

24   conversation where the compensation policies for the school were devised" and when

25   asked "who was responsible . . . for coming up with the compensation policies,' he

26   replied, "I just know it was from corporate." Good Dep., 39:19-40:22.  Hoggett, for his

27   part, similarly admitted he had no role in the "preparation," "formulation," or "distribution"

28   of enrollment counselor compensation policies and testified "[t]hat was all head office."

1  Hoggett Dep. 248:9-24.  Any such secondhand knowledge is plainly insufficient for

2  purposes of qui tam standing.  Relators cannot be original sources if they did not "see

3  the fraud with their or own hands or obtain their knowledge of it through their own labor

4  unmediated by anything else."  <u>Devlin</u>, 84 F.3d 361 & n.4.  Moreover, to the extent

5  Relators claim they were told by their supervisors that compensation continued to be

6  based on enrollment figures, any such assertions gleaned from third parties does not

7  make Relators an original source of the information.  <u>See</u> <u>U.S. ex rel. Smith v. Yale</u>

8  <u>Univ.</u>, 415 F. Supp. 2d at 77. As the Ninth Circuit has explicitly recognized, a

9  whistleblower for false claim purposes "sounds the alarm; he does not merely echo it."

10  <u>Wang</u>, 975 F.2d at 1419.

11        To the extent Relator Hoggett claims he reported UOPX's alleged incentive ban

12  violations to Dale Hilliard at the Department of Education by way of a "Further

13  Complaint" dated April 20, 2010 (Cameron Decl., Ex 28), that report indicates that

14  Hoggett had made previous complaints in July of 2008 and February of 2009, well

15  before the Hendow lawsuit settled.  While the Further Complaint does allege that

16  enrollment misconduct is continuing, most of the allegations are generic and those that

17  are specific were not corroborated by Relator's deposition testimony.  Several examples

18  are illustrative.

19        With respect to claims that the Performance Matrix was a ruse to hide the fact that

20  recruiter compensation continued to be based on enrollment numbers alone, as already

21  indicated Hoggett's own testimony belies that allegation.   With regard to other

22  enrollment counselors, Hoggett admitted he had no knowledge about their matrix scores

23  or performance evaluations and never attended their reviews.  Hoggett Dep. 197:20-24;

24  154:13-155:13.  Additionally, with respect to Hoggett's claim that performance

25  whiteboards on the Austin campus displayed the number of enrollments and applications

26  made by each counselor, Hoggett admitted at deposition that other statistics like

27  referrals and other performance metrics like "talk time" were also made on the boards.

28  <u>Id</u>. at 33:2-14.  Hoggett's contention that UOPX praise counselors who "top the

1  enrollment numbers" at periodic meetings is countered by his concession at deposition

2  that counselors were also praised for performance in other areas, including "customer

3  service time, "referral numbers," "number of dials," and student retention. Id. at

4  78:22-79:13. Finally, with respect to Hoggett's claim that Austin campus director Michael

5  Cullup told him that UOPX's objective was to get students "in the door," and that the

6  university would not change "what has worked for us," Hoggett admitted at deposition

7  that the former statement was made on August 14, 2009, well before settlement of the

8  Hendow lawsuit, and that the latter remark was made in a completely different

9  conversation. Id. at 216:17-217:5. Moreover, the Further Complaint itself identified the

10  statements as having been made "towards the end of 2009" at a point also presumably

11  before Hendow resolved on December 11, 2009. In sum, then, the Court finds that the

12  generalized allegations made by Hoggett in his April 20, 2010 Further Complaint either

13  predate the Hendow settlement or do not materially add to the public disclosures already

14  made. Any specific allegations are not corroborated by Relators' sworn deposition

15  testimony. The April 2010 Complaint is not sufficient to confer original source status

16  permitting Relators to maintain this lawsuit.

17

18                                   **CONCLUSION**

19

20       On December 11, 2009, as set forth above, UOPX paid $67.5 million to settle

21  allegations that it paid recruitment counselors based solely on the number of students

22  the counselors enrolled. Defendants herein have established that public disclosures

23  continued to be made, even after December of 2009, that UOPX in fact still engaged in

24  recruiter compensation practices running afoul of HEA requirements.   Given those post-

25  2009 public disclosures, Relators here cannot maintain their qui tam lawsuit unless they

26  qualify as "original sources" for allegations that unlawful compensation practices

27  continued. For all the reasons set forth above, the Court further finds that neither

28  Relator has established, by the requisite preponderance of the evidence, that they were

original sources as defined by the False Claims Act.  Consequently, Relators are jurisdictionally barred from maintaining this action, and Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 80) is GRANTED.[10]  Because the Court does not believe that further amendment will change the fact that this Court lacks jurisdiction, no further leave to amend will be permitted. The Clerk of Court is directed to close the file.

IT IS SO ORDERED.

Dated:  July 23, 2014

_____
MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[10] Given this Court's dismissal of the case in its entirety, Relators' Motion to Continue (ECF No. 88) is DENIED as moot.